# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

STATE OF UTAH,
STATE OF TEXAS,
STATE OF ALABAMA,
STATE OF ARKANSAS,
STATE OF IDAHO,
STATE OF INDIANA,
STATE OF IOWA
STATE OF KANSAS,
STATE OF LOUISIANA,
STATE OF MISSOURI,
STATE OF MONTANA,
STATE OF NEBRASKA,
STATE OF SOUTH CAROLINA,
STATE OF TENNESSEE,
STATE OF WEST VIRGINIA, and
NATIONAL ASSOCIATION OF HOME BUILDERS
OF THE UNITED STATES,

    *Plaintiffs*,

v.

ADRIANNE TODMAN, in her official capacity as
Acting Secretary of Housing and Urban
Development; U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT; THOMAS VILSACK,
in his official capacity as Secretary of
Agriculture; U.S. DEPARTMENT OF
AGRICULTURE,

    *Defendants*.

No. _____

## **COMPLAINT**

Plaintiffs Utah, Texas, Alabama, Arkansas, Idaho, Indiana, Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, South Carolina, Tennessee, and West Virginia (collectively, "Plaintiff States"), and Plaintiff National Association of Home Builders of the United States bring this civil action for declaratory and injunctive relief related to Section 109 of the Cranston-Gonzalez Act, together with Defendants' decision to adopt updated energy efficiency standards purportedly pursuant to that provision. *See* Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing, 89 Fed. Reg. 33,112 (Apr. 26, 2024) ("2024 Final Determination"). Plaintiffs allege as follows:

## INTRODUCTION

1.      On a single night in January 2023, roughly 653,100 people in the United States were homeless, the then-highest number of people reported as homeless on a single night since reporting began in 2007.[1] That already-high number increased in 2024, with more than 770,000 people reported as homeless on a single night, *i.e.*, an 18% increase since 2023.[2]

2.      To state the obvious: homelessness is tied to the cost of housing. For every $1,000 increase in the median price of a new home, an additional 106,031 American households are priced-out of being able to buy that home.[3] So it's shocking that bureaucrats at the Department of Housing and Urban Development ("HUD") and the Department of Agriculture ("USDA") thought it acceptable to impose energy-efficiency requirements they concede will cost low-income homebuyers an extra $8,845, and that homebuilders estimate will actually add up to $31,000 to the price of a new home.[4]

3.      HUD and USDA's vehicle for excluding thousands of families from the American Dream? A well-meaning provision that sought to lower housing costs for low- and-moderate income Americans by requiring new homes financed by HUD and USDA to meet basic energy efficiency standards. That statute is now being stretched to the breaking point to support a green agenda that

---

[1]     https://www.hud.gov/press/press_releases_media_advisories/hud_no_23_278
[2]     https://www.hud.gov/press/press_releases_media_advisories/HUD_No_24_327
[3]     https://www.nahb.org/news-and-economics/housing-economics/housings-economic-impact/households-priced-out-by-higher-house-prices-and-interest-rates
[4]      https://www.nahb.org/news-and-economics/press-releases/2024/07/costly-energy-codes-and-rent-caps-will-harm-housing-affordability-nahb-tells-congress

Congress never enacted, with the upshot of reducing the affordability and availability of low-income housing. Not surprisingly, HUD and USDA's action is contrary to the statute's plain language and Congress's underlying intent. And the mechanism by which Defendants are proceeding makes clear the statute is unconstitutional.

4.      It's a "cardinal constitutional principle … that federal power can be wielded only by the federal government." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F. 4th 869, 872 (5th Cir. 2022). Yet Congress purported to delegate to two private entities—the International Code Council ("ICC") and the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE")—the authority to update statutory energy efficiency standards if administrative agencies declined to do so. But seeking to expand that rank unconstitutionality even further, HUD and USDA misconstrue the delegation to provide those private entities with an ongoing authority to revise the energy efficiency standards, which HUD and USDA declare they must accept *in toto* so long as the revised standards meet certain criteria.

5.      Even if that was okay, HUD and USDA's analysis of the 2021 IECC shows the statutory criteria aren't met. The delegation is conditioned on the Secretary of HUD and the Secretary of Agriculture making "a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing … subject to mortgages insured under the National Housing Act." 42 U.S.C. § 12709(d)(1). The statute doesn't set a threshold: on its face, it requires the absence of negative effect. But the agencies concede that adopting the 2021 IECC "would reduce the production of homes for FHA-insured borrowers by 1.5 percent, which represents a 0.2 percent reduction of all homes available to FHA-insured homebuyers." Rather than accept the negative effect their own calculations show, the agencies put forth a spray of hedged and contingent speculation that benefits "will <u>diminish</u>, and <u>maybe even reverse</u>, the contraction of new construction from higher minimum energy standards" and "[a]ny adverse impacts on availability would be diminished where there is a perceptible demand for energy-efficient homes." Such speculation doesn't overcome the express showing of negative effect. HUD and USDA's affordability analysis is equally faulty. The agencies claim affordability only by

excluding real-world overhead and profit and further excluding real-world home designs. The Final Determination accordingly fails under the Administrative Procedure Act.

## PARTIES

6.     Plaintiff State of Utah is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests.  The Attorney General of Utah is authorized to bring legal actions on behalf of the State and its citizens. Utah Const. art. 7, § 16; Utah Code § 67-5-1.

7.     Plaintiff State of Texas is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Texas is authorized to bring legal actions on behalf of the State and its citizens.

8.     Plaintiff State of Alabama is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests.  The Attorney General of Alabama is authorized to bring legal actions on behalf of the State and its citizens. *See* Ala. Code § 36-15-1(2).

9.     Plaintiff State of Arkansas is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests.  The Attorney General of Arkansas is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts." Ark. Code Ann. § 25-16-703.

10.     Plaintiff State of Idaho is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Idaho is authorized to bring legal actions on behalf of the State and its citizens. Idaho Code § 67-1401(1), (11).

11.     Plaintiff State of Indiana is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Indiana is authorized to "represent the state in any matter involving the rights or interests of the state." Ind. Code § 4-6-1-6.

12.     Plaintiff State of Iowa is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Iowa is

authorized to bring legal actions on behalf of the State and its citizens. *See* Iowa Code § 13.2.

13.    Plaintiff State of Kansas is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Kansas is authorized to bring legal actions on behalf of the State and its citizens.

14.    Plaintiff State of Louisiana is a sovereign State of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Louisiana is authorized to sue on the State's behalf. La. Const. art. IV, § 8.

15.    Plaintiff State of Missouri is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Missouri is authorized to "institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." Mo Rev. Stat. § 27.060; *see also State ex rel. Hawley v. Pilot Travel Centers, LLC*, 558 S.W.3d 22, 30–31 (Mo. 2018).

16.    Plaintiff State of Montana is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Montana is authorized to bring legal actions on behalf of the State and its citizens.

17.    Plaintiff State of Nebraska is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General of Nebraska is authorized to bring legal actions on behalf of the State and its citizens. Neb. Rev. Stat. § 84-203.

18.    Plaintiff South Carolina is a sovereign State of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. The Attorney General of South Carolina is authorized to bring legal actions on behalf of the State and its citizens. *See State ex rel. Condon v. Hodges*, 349 S.C. 232, 239-40, 562 S.E.2d 623, 627 (2002) (the South Carolina Attorney General "may institute, conduct and maintain all such suits and *proceedings as he deems* necessary for *the*

*enforcement of the laws of the State*, the *preservation of order*, and the *protection of public rights*." (emphasis in original)).

19.     Plaintiff State of Tennessee is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General and Reporter of Tennessee is authorized by statute to try and direct "all civil litigated matters … in which the state … may be interested." Tenn. Code Ann. § 8-6-109(b)(I).

20.     Plaintiff State of West Virginia is a sovereign state of the United States of America, and it sues to vindicate its sovereign, quasi-sovereign, and pecuniary interests. The Attorney General "is the State's chief legal officer," *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 107 (W. Va. 2002), and his express statutory duties include "appear[ing] as counsel for the state in all causes pending . . . in any federal court[] in which the state is interested," W. Va. Code § 5-3-2.

21.     Plaintiff National Association of Home Builders of the United States ("NAHB") is a non-profit trade organization incorporated under the laws of Nevada. Founded in 1942, NAHB represents more than 140,000 members. About one-third are home builders and remodelers, with the rest working in closely related specialties such as sales and marketing, housing finance, and manufacturing and supplying building materials. Through its advocacy function on behalf of the nation's homebuilders, NAHB represents its members in legal, regulatory, and legislative matters affecting building codes and federal housing programs. It is germane to NAHB's organizational purpose to ensure the availability of affordable housing and government programs designed to ensure every American family is adequately housed.

22.     On that point, NAHB has adopted the following resolution:

Resolved that the National Association of Home Builders (NAHB) urges lawmakers, regulators, and other policymakers to support or adopt cost-effective energy codes, standards, and legislation that contain provisions where the initial cost and annual savings to home buyers meet the following criteria:

    1. Consider the needs of home buyers and renters with modest incomes and limited resources for down payment;
    2. Are based on the final cost to the home buyer rather than the change in costs to construction trades or the builder;

3. Are estimated using methods and data that are recent and verifiable via published sources;
4. Are estimated to show positive life-cycle metrics; and
5. Are based on incremental evaluation of individual measures[.]

23.     Plaintiff NAHB has numerous members who would have standing to pursue this suit in their own right. For example, customers of NAHB member Tilson Homes used $8,000,000 - $10,000,000 in FHA financing last year to purchase new homes from Tilson. Tilson has concluded that requiring compliance with the Final Determination will raise the cost of covered homes, reduce the number of affordable homes built by Tilson, and reduce Tilson's profits. Compliance with the Final Determination will also materially impair the ability of many low- and moderate-income home-buyers—including customers of Tilson—to acquire new homes.

24.     Defendant Adrianne Todman is the Acting Secretary of the Department of Housing and Urban Development. She is sued in her official capacity. The Secretary of HUD is statutorily tasked with making the determination underlying this suit. *See* 42 U.S.C. § 12709.

25.     Defendant U.S. Department of Housing and Urban Development is an agency of the federal government headquartered at 451 7th Street S.W., Washington, DC 20410. HUD operates programs that are subject to the energy efficiency standards underlying this suit. *See* 42 U.S.C. § 12709.

26.     Defendant Thomas Vilsack is the Secretary of Agriculture. He is sued in his official capacity. The Secretary of Agriculture is statutorily tasked with making the determination underlying this suit. *See* 42 U.S.C. § 12709.

27.     Defendant U.S. Department of Agriculture is an agency of the federal government headquartered at 1400 Independence Avenue S.W., Washington, DC 20250. USDA operates programs that are subject to the energy efficiency standards underlying this suit. *See* 42 U.S.C. § 12709.

## JURISDICTION AND VENUE

28.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.

29.     An actual controversy exists between the parties under 28 U.S.C. § 2201(a).

30.     This Court has authority to grant Plaintiff States' requested relief and other appropriate relief pursuant to 5 U.S.C. §§ 705-06 (the Administrative Procedure Act), 28 U.S.C. §§ 2201-02 (the

Declaratory Judgment Act), and its inherent equitable powers.

31.    Plaintiffs' claims "seek[] relief other than money damages," so the government has waived sovereign immunity.  5 U.S.C. § 702; *see Webster v. Doe*, 486 U.S. 592, 601-05 (1988).

32.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1).  Defendants are United States agencies and officers sued in their official capacities. Plaintiff State of Texas is a resident of every judicial district in its sovereign territory, including this judicial district and division. Further, last year, NAHB member Tilson Homes built at least one FHA-financed home in this judicial district and division, and Tilson Homes expects to build FHA-financed homes in the future in this judicial district and division.

## GENERAL ALLEGATIONS

### Statutory Background

33.    In the midst of the Great Depression, Congress passed the National Housing Act of 1934, Pub. L. 73-479, 48 Stat. 1246 (codified as amended at 12 U.S.C. § 1701 *et seq*) to stimulate the release of private credit for home repair and construction. This law also created the Federal Housing Administration ("FHA"), the main federal agency handling mortgage insurance. FHA's assumption of risk, through its insurance programs, made possible the amortization of mortgage loans with regular monthly payments and a secondary market for home mortgages, thus freeing up funds for home loans.

34.    In 1937, the Federal National Mortgage Association (Fannie Mae) was chartered by the FHA as a subsidiary of the Reconstruction Finance Corporation. Contemporaneously, the United States Housing Act of 1937 authorized loans to local public housing agencies for lower-rent public housing construction expenses.

35.    The impact of the National Housing Act and its amendments significantly altered the housing market. Home mortgage terms became more standardized, and the familiar 30-year fixed-interest mortgage evolved as a result of the National Housing Act and its associated programs. America was transformed from a nation of renters to a nation of homeowners.

36.     An expert at the Federal Reserve Bank of St. Louis elaborated:

Prior to the creation of the FHA, many banks were highly restricted in the amount of mortgage loans they were allowed to make. Mortgage loans were historically considered risky by those who had crafted federal banking law. Regulators such as the Federal Reserve feared that banks could be unable to pay depositors on demand if their funds were locked up in mortgages, especially since the secondary market for mortgages was limited historically. The advent of FHA insurance in the 1930s led to new federal bank regulations that encouraged banks to hold FHA-insured loans. FHA-insured loans were viewed as relatively safe given the federal insurance and because the uniform nature of FHA-insured loans supported a secondary market that made the loans relatively easy to sell if needed.

37.     Although the impact of the National Housing Act and its associated programs substantially increased home ownership, affordable housing continued to be lacking. So in the late 1980s, Congress started reviewing the policy failures that had resulted in the loss of "some 4.5 million affordable rental units … while the number of very low income families was rising." S. Rep. 101-316, at 8, *reprinted in* 1990 U.S.C.C.A.N. 5763, 5770. Indeed, a Senate Report explained "housing that very-low income families [could] afford [was] being lost at the rate 1.5 million units a decade." *Id.*

38.     The Senate Report recognized, on the one hand, that "federal housing policy must be carried out in an environment of intense budgetary pressure." 1990 U.S.C.C.A.N. at 5775. On the other hand, "national institutions, such as FHA, Fannie Mae, Freddie Mac, and Ginnie Mae, provide homebuyers with the benefits of a strong, efficient national mortgage market;" had "power;" and "continued to carry out important public purposes despite profound market change and political hostility…." *Id.* Congress sought to capture that power by designing the law "so that it could build on … housing activities that are already underway" and "use federal funds to leverage state, local, and private resources." *Id.* at 5772. That bill was ultimately enacted as the Cranston-Gonzalez Affordable Housing Act, Pub. L. 101-625, 104 Stat. 4079 (1990) ("Cranston-Gonzalez Act").

39.     As enacted, the Cranston-Gonzalez Act "affirm[ed] the national goal that every American family be able to afford a decent home in a suitable environment." 42 U.S.C. § 12701.

40.     The Cranston-Gonzalez Act further declared that "the objective of national housing

policy shall be to reaffirm the long-established national commitment to decent, safe, and sanitary housing for every American by strengthening a nationwide partnership of public and private institutions able: "(1) to ensure that every resident of the United States has access to decent shelter or assistance in avoiding homelessness; (2) to increase the Nation's supply of decent housing that is affordable to low-income and moderate-income families and accessible to job opportunities; … (5) to expand opportunities for homeownership; [and] (6) to provide every American community with a reliable, readily available supply of mortgage finance at the lowest possible interest rates." 42 U.S.C. § 12702.

41.    Energy expenditures were viewed as part of the housing problem for low-income families:

> [T]he Alliance to Save Energy reported that energy costs are the largest housing expense after rent or mortgage payments. Research found that energy represents about 20 percent of the typical monthly housing expense, and more than one-third of the housing budget of low-income families. **** Much of this could be avoided with cost-effective investments. The Committee intends that HUD encourage energy efficiency in new construction of public and assisted housing.

1990 U.S.C.C.A.N. at 5810-11. The Cranston-Gonzalez Act accordingly required the Secretary of HUD to promulgate energy efficiency standards for housing subject to mortgages under the National Housing Act:

> The Secretary of Housing and Urban Development shall, not later than one year after the date of enactment of this Act, promulgate energy efficiency standards for new construction of public and assisted housing and single-family and multifamily residential housing (other than manufactured homes) subject to mortgages under the National Housing Act. Such standards shall meet or exceed the provisions of the most recent edition of the Model Energy Code of the Council of American Building Officials and shall be cost-effective with respect to construction and operating costs. In developing such standards the Secretary shall consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies and building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated by the Secretary.

Pub. L. 101-625 § 109, 104 Stat. 4079, 4093 (1990).

42.    In 1992, Congress amended Section 109 to expand the energy efficiency requirement

to include new construction of single-family housing subject to mortgages under Title V of the Housing Act of 1949, to extend the deadline for those requirements to be adopted, and to set backstop energy efficiency requirements in case the Executive failed to adopt requirements:

(a) ESTABLISHMENT.
(1) IN GENERAL.—The Secretary of Housing and Urban Development and the Secretary of Agriculture shall, not later than 1 year after the date of the enactment of the Energy Policy Act of 1992, jointly establish, by rule, energy efficiency standards for—
(A) new construction of public and assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act; and
(B) new construction of single family housing (other than manufactured homes) subject to mortgages insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949.
(2) CONTENTS.—Such standards shall meet or exceed the requirements of the Council of American Building Officials Model Energy Code, 1992 (hereafter in this section referred to as 'CABO Model Energy Code, 1992'), or, in the case of multifamily high rises, the requirements of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers Standard 90.1-1989 (hereafter in this section referred to as 'ASHRAE Standard 90.1-1989), and shall be cost-effective with respect to construction and operating costs on a life-cycle cost basis. In developing such standards, the Secretaries shall consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies, building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated by the Secretaries.
(b) MODEL ENERGY CODE.—If the Secretaries have not, within 1 year after the date of the enactment of the Energy Policy Act of 1992, established energy efficiency standards under subsection (a), all new construction of housing specified in such subsection shall meet the requirements of CABO Model Energy Code, 1992, or, in the case of multifamily high rises, the requirements of ASHRAE Standard 90.1-1989.
(c) REVISIONS OF MODEL ENERGY CODE.—If the requirements of CABO Model Energy Code, 1992, or, in the case of multifamily high rises, ASHRAE Standard 90.1-1989, are revised at any time, the Secretaries shall, not later than 1 year after such revision, amend the standards established under subsection (a) to meet or exceed the requirements of such revised code or standard unless the Secretaries determine that compliance with such revised code or standard would not result in a significant increase in energy efficiency or would not be technologically feasible or economically justified.

Energy Policy Act of 1992, Pub. L. 102-486 § 109, 106 Stat. 2776, 2786-87 (1992).

43.    Congress subsequently reset the deadline to establish energy efficiency standards to September 30, 2006. Energy Policy Act of 2005, Pub. L. 109-58 § 153, 119 Stat. 294, 649-50.

44.    The most recent amendment to Section 109 was in the Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492, 1648 ("EISA"), which, as relevant here, replaced "CABO Model Energy Code, 1992" with "2006 International Energy Conservation Code," replaced "1989" with "2004" in the ASHRAE standard, and added new subsection (d).

45.    So Cranston-Gonzalez Act Section 109 now reads:

**(a) Establishment.**
**(1)** In general. The Secretary of Housing and Urban Development and the Secretary of Agriculture shall, not later than September 30, 2006, jointly establish, by rule, energy efficiency standards for—
**(A)** new construction of public and assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act;
**(B)** new construction of single family housing (other than manufactured homes) subject to mortgages insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 [42 USCS §§ 1471 et seq.]; and
**(C)** rehabilitation and new construction of public and assisted housing funded by HOPE VI revitalization grants under section 24 of the United States Housing Act of 1937 (42 U.S.C. 1437v).
**(2)** Contents. Such standards shall meet or exceed the requirements of the 2006 International Energy Conservation Code (hereafter in this section referred to as "the 2006 IECC"), or, in the case of multifamily high rises, the requirements of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers Standard 90.1-1989 (hereafter in this section referred to as "ASHRAE Standard 90.1-2004"), and shall be cost-effective with respect to construction and operating costs on a life-cycle cost basis. In developing such standards, the Secretaries shall consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies, building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated by the Secretaries.
**(b) International Energy Conservation Code.** If the Secretaries have not, by September 30, 2006, established energy efficiency standards under subsection (a), all new construction and rehabilitation of housing specified in such subsection shall meet the requirements of the 2006 IECC, or, in the case of multifamily high rises, the requirements of ASHRAE Standard 90.1-2004.
**(c) Revisions of the International Energy Conservation Code.** If the requirements of the 2006 IECC, or, in the case of multifamily high rises, ASHRAE Standard 90.1-2004, are revised at any time, the Secretaries shall, not later than 1 year after such revision, amend the standards established under subsection (a) to meet or exceed the requirements of such revised code or standard unless the Secretaries determine that compliance with such revised code or standard would not result in a significant increase in energy efficiency or would not be technologically feasible or economically justified.
**(d) Failure to amend the standards.** If the Secretary of Housing and Urban

Development and the Secretary of Agriculture have not, within 1 year after the requirements of the 2006 IECC or the ASHRAE Standard 90.1-2004 are revised, amended the standards or made a determination under subsection (c), all new construction and rehabilitation of housing specified in subsection (a) shall meet the requirements of the revised code or standard if—

**(1)** the Secretary of Housing and Urban Development or the Secretary of Agriculture make a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act (12 U.S.C. 1701 et seq.) or insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 (42 U.S.C. 1471 et seq.), respectively; and

**(2)** the Secretary of Energy has made a determination under section 304 of the Energy Conservation and Production Act (42 U.S.C. 6833) that the revised code or standard would improve energy efficiency.

42 U.S.C. § 12709.

REGULATORY BACKGROUND

46.    HUD and USDA did not develop independent energy efficiency building standards by September 30, 2006. Accordingly, HUD and USDA took the position that the 2006 IECC and ASHRAE 90.1–2004 applied to covered HUD and USDA programs pursuant to the 2007 amendments to Section 109 of the Cranston-Gonzalez Act. Multiple new versions of the IECC and ASHRAE 90.1 were thereafter published.

47.    On April 15, 2014, HUD and USDA published a preliminary determination that the 2009 IECC and (with the exception of the State of Hawaii) ASHRAE 90.1-2007 [would] not negatively affect the affordability and availability of housing covered by" Cranston-Gonzalez Act Section 109. Preliminary Affordability Determination-Energy Efficiency Standards, 79 Fed. Reg. 21,259.

48.    HUD and USDA were transparent in their non-statutory motivation, stating they "have two primary motivations for the promulgation of this Notice: (1) To reduce the total cost of operating and thereby increasing the affordability of housing by promoting the adoption of cost-effective energy technologies, and (2) to reduce the social costs (negative externalities) imposed by residential energy consumption," *i.e.*, a factor not set forth in the Cranston-Gonzalez Act. 79 Fed. Reg. at 21,262.

49.    HUD and USDA pointed to "a wide body of literature on a range of market failures

that have resulted in an 'energy efficiency gap' between the actual level of investment in energy effi-

ciency and the higher level of investment that would [purportedly] be cost-beneficial from the con-

sumer's … point of view." 79 Fed. Reg. at 21,262. The agencies conceded "the public places a low

priority on energy issues and energy efficiency opportunities," and further conceded "[t]he existence

of unobserved costs (either upfront or periodic) is a potential explanation for low levels of investment

in energy-saving technology." *Id.*

50.     Turning to the determinations required by Cranston-Gonzalez Act Section 109, the

2014 Preliminary Determination explained that "[i]n determining the impact that the 2009 IECC will

have on HUD- and USDA-assisted or insured new homes, the agencies have relied on a cost-benefit

analysis of the 2009 IECC completed by the Pacific Northwest National Laboratory (PNNL) for

DOE. This study provides an assessment of both the initial costs and the long-term estimated savings

and cost-benefits associated with complying with the 2009 IECC. It offers evidence that the 2009

IECC may not negatively impact the affordability of housing covered by the Act." 79 Fed. Reg. at

21,265.

51.     The agencies correctly noted the importance of modelling housing of the type cov-

ered by Cranston-Gonzalez Act Section 109. They emphasized that "DOE provided HUD and USDA

with the underlying disaggregated data for single family housing only, to more accurately reflect the

housing type receiving FHA single family insurance or USDA loan guarantees." 79 Fed. Reg. at 21,266.

52.     The agencies acknowledged "studies that discuss limitations associated with cost-sav-

ings models such as these developed by PNNL for DOE," including "unaccounted physical costs,

risks, or opportunity costs," "engineering estimates of energy savings [that] can overstate true field

returns, sometimes by a large amount," and "engineering simulation models [that] have still not been

fully calibrated to approximate actual returns." 79 Fed. Reg. at 21,266. But those criticisms were ig-

nored: "HUD and USDA nevertheless believe[d] that the PNNL-DOE model used to estimate the

savings shown … represents the current state-of-the-art for such modelling, is the product of signif-

icant public comment and input, and is now the standard for all of DOE's energy code simulations

and models." *Id.*

53.     On May 6, 2015, HUD and USDA published a final determination that adoption of the 2009 IECC for single family homes and ASHRAE 90.1-2007 for multifamily buildings would not negatively affect the affordability and availability of housing specified in Cranston-Gonzalez Act Section 109. Final Affordability Determination-Energy Efficiency Standards, 80 Fed. Reg. 25,901.

THE 2024 FINAL DETERMINATION

54.     The bureaucracy marched on, and on May 18, 2023, HUD and USDA published a preliminary determination, purportedly "as required under section 481(d)(1) of EISA, that the 2021 IECC and ASRAE 90.1-2019 will not negatively affect the affordability and availability of housing covered by" Section 109 of the Cranston-Gonzalez Act. Adoption of Energy Efficiency Standards for New Construction of HUD-and USDA-Financed Housing: Preliminary Determination and Solicitation of Comment, 88 Fed. Reg. 31,773 (May 18, 2023).

55.     Once again, numerous commenters raised concerns with the data and modelling used by HUD and USDA, as well as the consequences of an incorrect analysis. The State of Montana, for example, noted that requiring the new standards "could limit or obliterate the supply of HUD or USDA-approved housing" or cause that housing to shift to areas "farther away from urban centers (where land prices are lower)" and thereby cause adverse environmental impacts from sprawl.

56.     On April 26, 2024, HUD and USDA published a final determination "the 2021 IECC and ASHRAE 90.1– 2019 will not negatively affect the affordability and availability of housing covered by" Section 109 of the Cranston-Gonzalez Act. Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing, 89 Fed. Reg. 33,112 (Apr. 26, 2024) ("2024 Final Determination").

57.     HUD and USDA recognized there is a "current affordable housing shortage across the United States," which HUD and USDA attributed to "high mortgage interest rates, increased construction costs driven in part by … supply chain shortages, and an inadequate supply of new housing sufficient to meet demand due to a range of regulatory barriers … that may limit the production of affordable housing." 89 Fed. Reg. at 33,120.

58.     HUD and USDA did substantially alter their analysis to reflect, among other things, a

37% increase in construction costs and higher mortgage rates more in line with real-world economic conditions. HUD and USDA also revised the down payment contribution for home purchases to 3.5% "to better reflect the typical HUD and USDA borrower." 89 Fed. Reg. at 33,120, 121. That's because "[t]he down payment requirement for FHA borrowers is a minimum of 3.5 percent, distinct from a typical 20 percent down payment requirement for conventional mortgage financing … or the 12 percent down payment rate used by DOE-PNNL and utilized by HUD and USDA in the preliminary determination." *Id.* at 33,121. Finally, HUD and USDA stated that "[c]ost and savings factors have been applied to the affordability analysis to better reflect the typical home [*sic*] FHA or USDA-sized home." *Id.* According to HUD and USDA, "[t]hese factors revise the analysis to better reflect the smaller home size of a typical FHA or USDA property (2,000 square feet (sf)) compared to a conventionally financed house modelled by PNNL (2,376 sf)." *Id.*

59.    HUD and USDA did not, however, revise their model to include real-world costs, real-world profit and overhead amounts, or typical real-world house designs. The agencies conceded that doing so "would lead to cost estimates approximately 2.2 times larger than the PNNL analysis" relied on in the Final Determination. 89 Fed. Reg. at 33,134.

60.    The 2024 Final Determination is a final agency action. Indeed, according to HUD and USDA, "Section 109(d) of Cranston-Gonzalez automatically applies to all covered programs upon completion of the specified affordability determinations by HUD and USDA, and the energy efficiency determinations by the U.S. Department of Energy...." 79 Fed. Reg. at 21,260. "[O]nce a final affordability determination has been made by HUD and USDA under section 109(d), additional notice and comment rulemaking will not be required for the covered programs; the new codes, if found not to negatively affect the availability or affordability of covered housing, will automatically apply." *Id.*

61.    "[F]or FHA Single Family mortgage insurance programs, [the 2021 IECC] requirements will be applicable to new construction where building permit applications are submitted on or after November 28, 2025. For new construction occurring in persistent poverty rural areas, as defined by USDA's Economic Research Service, the requirements will be applicable no later than May 28,

2026." [5]

IMPACT OF THE CHALLENGED DETERMINATION ON PLAINTIFFS

62.     FHA has acknowledged that "[t]he scarcity of affordable homes for sale, especially at lower price points, poses a steep barrier to homeownership for FHA's traditional borrowers." [6]

63.     Although many states have adopted some version of the IECC (either directly or embedded in the IRC), there is great variation regarding which versions of which codes are adopted at any given point in time. 88 Fed. Reg. at 31,778. Further, states and local areas sometimes make adjustments to the codes, removing and in some cases adding requirements for some building elements. *Id.*

64.     HUD and USDA estimated that imposition of the 2021 IECC may impact approximately 151,300 units of HUD- and USDA-financed or insured housing in states and territories that have not adopted the 2021 IECC. 88 Fed. Reg. at 31,782-83. The impact is not evenly distributed, however, with Texas alone accounting for 41,230 units, *i.e.*, 24 percent of impacted units.

65.     In 2020, just one of the programs covered by Section 109—FHA-insured loans—financed 18.3% of newly-built homes nationwide, and 24.5% of newly-built homes in the fast-growing South. 88 Fed. Reg. at 31,800-01. Accordingly, imposing the 2021 IECC will have a substantial impact on the housing market, especially the market for housing that is affordable to low-income and moderate-income families.

66.     FHA mortgages disproportionately benefit first-time homebuyers, and FHA is "the primary source of low down payment financing for underserved borrowers." In CY2023, for example, 32 percent of FHA-insured mortgages were made to borrowers with incomes less than 80 percent of the Area Median Income. [7]

67.     Plaintiffs are adversely impacted by the 2024 Final Determination.

68.     The products of NAHB's members—many of whom build affordable housing that is financed through programs covered by the 2024 Final Determination—are the objects of the

---

[5] FHA Annual Report to Congress (FY2024) at 28.
[6] FHA Annual Report to Congress (FY2024) at 26.
[7] FHA Annual Report to Congress (FY2024).

increased standards. Indeed, "HUD expects that builder profits would diminish" as a result of the Final Determination. 89 Fed. Reg. at 33,134 n.53.

69.     Plaintiff States are adversely affected by the 2024 Final Determination, too. According to the Final Determination, no Plaintiff State has adopted the 2021 IECC, such that it will have units affected by the Final Determination. *See* 89 Fed. Reg. at 33,147, 33,149-150.

70.     The HOME Investments Partnership Program ("HOME") and Housing Trust Fund ("HTF") are federal programs by which Plaintiff States receive funding for affordable housing. Indeed, HTF is a grant program exclusively for states and territories. *See* 89 Fed. Reg. 58,391. New construction projects funded through the HOME, HTF, and certain other federal programs are subject to the energy efficiency standards in the Final Determination. 89 Fed. Reg. at 33,113. State affordable housing programs funded by HOME, HTF, or other federal programs subject to the Final Determination will be able to construct fewer units of housing and/or those units will be more expensive, thereby undermining the purpose of those programs. HUD and USDA concede that housing units in Plaintiff States will be affected by the Final Determination. 89 Fed. Reg. at 33,149-150.

71.     By way of example, in Utah, the Olene Walker Housing Loan Fund supports quality affordable housing options that meet the needs of Utah's individuals and families. Funding is comprised of state appropriations, as well as federal funds received through HOME and HTF. HUD and USDA estimate that every year, 2,826 units of housing in Utah—including 7 HOME-funded units—will be affected by the Final Determination. 89 Fed. Reg. at 33,150. The Final Determination will increase the cost of Utah units of housing funded via the HOME or HTF, decrease the quality of Utah units of housing funded via the HOME or HTF, and/or decrease the number of units fundable via HOME or HTF.

72.     Similarly, Texas was allocated $8,605,522 from the HTF in 2024. HUD and USDA estimate that every year, 32,070 units of housing in Texas—including 243 HOME-funded units and 57 HTF-funded units—will be affected by the Final Determination. 89 Fed. Reg. at 33,150. The Final Determination will increase the cost of Texas units of housing funded via the HOME or HTF, decrease the quality of Texas units of housing funded via the HOME or HTF, and/or decrease the

number of units fundable via HOME or HTF.

73.    Some states have chosen to prohibit excessive energy efficiency standards. For example, Tennessee adopted the 2018 ICC as the maximum standard allowable; to the extent localities or cities want to impose more stringent standards, they must obtain approval from the Tennessee General Assembly. 2023 HB 0799. In view of HUD and USDA's role in the housing market, the Final Determination effectively undercuts those prohibitions, and the Final Determination pressures states like Tennessee to change their laws.

### CLAIMS FOR RELIEF
### Count One
### Violation of the Private Non-Delegation Doctrine
### Administrative Procedure Act

74.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

75.    The Administrative Procedure Act requires this Court to "set aside" final agency action that is, *inter alia*, "contrary to constitutional right, power, privilege, or immunity" "or taken "without observance of procedure required by law." 5 U.S.C. § 706(2).

76.    "[I]t it is an elementary proposition of constitutional law that conditions attached to Spending Clause legislation are valid only if they are not in violation of an independent constitutional provision." *Abbott v. Biden*, 70 F. 4th 817, 845 (5th Cir. 2023).

77.    It is an independent and "cardinal constitutional principle … that federal power can be wielded only by the federal government." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F. 4th 869, 872 (5th Cir. 2022). "Private entities may do so only if they are subordinate to an agency." *Id.* (compiling Supreme Court authorities).

78.    Known as the "private non-delegation doctrine," the textual authority for that cardinal constitutional principal lies in the Constitution's Vesting Clauses. *Id.* at 880 & n.19; *see also* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); art. II, § 2 ("The executive

Power shall be vested in a President of the United States of America."); art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish."); *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 67 (2015) (Thomas, J., concurring) ("[T]he Constitution identifies three types of governmental power and, in the Vesting Clauses, commits them to three branches of Government. . . . These grants are exclusive.")

79.    Where a statute requires an agency to adopt a private entity's proposed rule so long as the proposed rule meets specified criteria, the statute is unconstitutional pursuant to the private non-delegation doctrine. *Nat'l Horsemen's*, 53 F. 4th at 887.

80.    The International Code Council and the American Society of Heating, Refrigerating, and Air-Conditioning Engineers are private entities, and they have pecuniary interests in promulgating revised building codes regardless of actual need. But, as amended, Section 109 of the Cranston-Gonzalez Act requires HUD and USDA to adopt standards set by the ICC or the ASHRAE if HUD and USDA determine "the revised codes do not negatively affect the availability or affordability of new construction of" covered housing.

81.    Indeed, in response to a comment that relying on overall cost effectiveness "masks the extremely low-cost effectiveness of some of the individual measures by averaging the results with the measures that are more cost-effective," HUD and USDA stated:

> The statutory requirement (Section 109(d) of the Cranston Gonzalez Act of 1990) for this notice requires HUD and USDA to make a determination on the latest ASHRAE 90.1 or IECC code editions as published. It does not allow for selecting only the most cost-effective measures in the code. * * * * Therefore, HUD and USDA do not have the ability to pick and choose between specific amendments to the code.

89 Fed. Reg. at 33,130.

82.    Put succinctly, the ICC and ASHRAE do not function subordinately to an agency with authority and surveillance over them.

83.    Accordingly, Section 109 of the Cranston-Gonzalez Act is unconstitutional because it violates the private non-delegation doctrine.

84.    Any demand (a) that covered housing comply with any standard other than those specified by Congress, *i.e.*, the 2006 IECC or the ASHRAE Standard 90.1-2004, (b) on the basis of Section 109 of the Cranston-Gonzalez Act, must be set aside.

## Count Two
### Administrative Procedure Act
### Second Final Determination

85.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

86.    The Administrative Procedure Act requires this Court to "set aside" final agency action that is, *inter alia*, "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2).

87.    When Congress amended Section 109 of the Cranston-Gonzalez Act in 1992 to add backstop energy efficiency provisions, Congress stated:

> If the requirements of CABO Model Energy Code, 1992, or, in the case of multifamily high rises, ASHRAE Standard 90.1-1989, are revised at any time, the Secretaries shall, not later than 1 year after such revision, amend the standards established under subsection (a) to meet or exceed the requirements of such revised code or standard unless the Secretaries determine that compliance with such revised code or standard would not result in a significant increase in energy efficiency or would not be technologically feasible or economically justified.

Energy Policy Act of 1992, Pub. L. 102-486, 106 Stat. at 2787.

88.    In contrast, other portions of the Energy Policy Act of 1992 contemplate revisions to both statutorily-specified codes and "any successor" to those codes:

> Whenever CABO Model Energy Code, 1992, (or any successor of such code) is revised, the Secretary shall, not later than 12 months after such revision, determine whether such revision would improve energy efficiency in residential buildings. The Secretary shall publish notice of such determination in the Federal Register.

and

> Whenever the provisions of ASHRAE Standard 90.1 1989 (or any successor standard) regarding energy efficiency in commercial buildings are revised, the Secretary shall, not

> later than 12 months after the date of such revision, determine whether such revision
> will improve energy efficiency in commercial buildings. The Secretary shall publish a
> notice of such determination in the Federal Register.

106 Stat. at 2783, 2784 (codified as amended at 42 U.S.C. § 6833).

89.    The canons of statutory construction require giving meaning to the omission of "or any successor standard" from the Energy Policy Act of 1992. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) ("Congress's choice to depart from the model of a closely related statute is a choice neither [courts] nor the agency may disregard."); *Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

90.    Tellingly, when Congress amended the backstop provision in Section 109 of the Cranston-Gonzalez Act in 2007, it updated the backstop to reflect the 2006 IECC and a specific revised version of ASHRAE Standard 90.1, and it did not include any language regarding a "successor code":

> If the Secretary of Housing and Urban Development and the Secretary of Agriculture
> have not, within 1 year after the requirements of the 2006 IECC or the ASHRAE
> Standard 90.1-2004 are revised, amended the standards or made a determination under
> subsection (c), all new construction and rehabilitation of housing specified in subsec-
> tion (a) shall meet the requirements of the revised code or standard …."

121 Stat. at 1648.

91.    Congress then struck "'CABO Model Energy Code, 1992' each place it appear[ed]" and inserted "the 2006 IECC." With respect to ASHRAE Standard 90.1, Congress similarly struck "'1989' each place it appeare[ed] and insert[ed] '2004.'" 121 Stat. at 1649.

92.    "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

93.    Construing Section 109 of the Cranston-Gonzalez Act to permit HUD and USDA to repeatedly amend to the energy efficiency standards based on revisions to the IECC or ASHRAE Standard 90.1 would render much the 2007 amendments without real effect.

94.    The best reading of Section 109 is that it permitted a single update to the backstop standards.

95.    The IECC was revised in 2003, 2006, 2009, 2012, 2015, 2018, 2021, and 2024. Accordingly, there have been six revisions to the IECC since the 2006 IECC. *See* 88 Fed. Reg. at 31,779.

96.    According to the ICC, "Each new edition shall incorporate the results of the code development activity since the previous edition." International Code Council, CP#28-05 – Code Development (revised July 12, 2024). Therefore, the 2009 IECC was the revision to the 2006 IECC.

97.    ASHRAE Standard 90.1 was revised in 2007, 2010, 2013, 2016, 2019, and 2022. Accordingly, there have been six revisions to ASHRAE Standard 90.1-2004.

98.    According to the ASHRAE, ASHRAE Standard 90.1-2007 superseded ASHRAE Standard 90.1-2004 and included 31 addenda to the 2004 standard. ASHRAE Standard 90.1-2007, Energy Standard for Buildings Except Low-Rise Residential Buildings (2007). In contrast, "[t]he 2019 edition of Standard 90.1 incorporates over 100 addenda to the 2016 edition." ASHRAE Standard 90.1-2019, Energy Standard for Buildings Except Low-Rise Residential Buildings (2019). Therefore, ASHRAE Standard 90.1-2007 was the revision to ASHRAE Standard 90.1-2004.

99.    The 2015 Final Determination was the single permissible update to energy efficiency standards based on the backstop, and the 2024 Final Determination is not in accordance with law, in excess of statutory authority, and without effect.

**Count Three**
**Administrative Procedure Act**
**Modeling and Affordability**

100.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

101.    The Administrative Procedure Act requires this Court to "set aside" final agency action

that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" "or taken "without observance of procedure required by law." 5 U.S.C. § 706(2).

102.     HUD and USDA failed to grapple with the divergence between cost-savings models and reality, generally. HUD and USDA failed to grapple with the divergence between the model on which they relied and reality, specifically.

103.     In the 2014 Preliminary Determination, HUD and USDA acknowledged "studies that discuss limitations associated with cost-savings models such as those developed by PNNL," noted a study that "found that nearly half of the investments that engineering assessments showed in energy audits … would have short payback periods were not adopted due to unaccounted physical costs, risks, or opportunity costs," and that "engineering estimates of energy savings can overstate true field returns, sometimes by a large amount, and that some engineering simulation models have still not been fully calibrated to approximate actual returns." 79 Fed. Reg. at 21,266. HUD and USDA nevertheless proceeded with the "PNNL-DOE model used to estimate the savings shown" because it supposedly "represent[ed] the current state-of-the-art for such modeling, is the product of significant public comment and input, and is now the standard for all of DOE's energy code simulations and models." *Id.*

104.     Although the 2023 Preliminary Determination relied on a similar methodology adopted in 2015, it simply regurgitated those same statements and conclusions verbatim, including that the then-8-year-old PNNL-DOE model "represents the current state-of-the-art for such modeling," 88 Fed. Reg. at 31,784-85, apparently without considering whether that statement remained true. *Cf. Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered, however, is not a substitute for considering it."). The 2024 Final Determination then rejected recently updated models—including an analysis by NAHB-affiliated Home Innovation Research Labs ("HIRL") showing significantly higher cost to comply with the 2021 IECC—because "[t]he analysis produced by PNNL was developed with a methodology that underwent a rigorous public comment and peer review process, has been used for cost- benefit analysis of the revised editions of the IECC and ASHRAE since the 2006 IECC," whereas the HIRL report and another response report "are independent, third-party studies that include additional data and analysis but are

24

not peer reviewed nor do they follow a federally approved methodology." 89 Fed. Reg. at 33,134.

105.    That was both a reversal in position and reflective of a schizophrenic approach to data and analyses supplied by HIRL. For example, in the 2015 Final Determination, the agencies favorably cited HIRL's analysis that calculated payback periods similar to DOE's, 80 Fed. Reg. at 25,906. The agencies then noted that PNNL's methodology incorporates data from HIRL. *Id.* Similarly, in the 2024 Final Determination, the agencies found it "important to note" that HIRL's energy savings analysis "show[s] consensus with the PNNL energy savings estimates used by HUD and USDA in their determination," and again noted that PNNL's methodology incorporates data from HIRL. *Id.* The inference is that the agencies were cherry-picking to justify a predetermined outcome. *Cf. Chamber of Commerce v. U.S.D.O.L.*, 885 F. 3d 360, 382 (5th Cir. 2018) ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action.").

106.    HUD and USDA did, however, acknowledge that the economic factors used in their "peer reviewed" and "federally approved methodology" were outdated. Put succinctly: Even HUD and USDA couldn't blind themselves to the judicially-noticeable mortgage rates and CPI inflation published in the *Wall Street Journal.* So they "revised their analysis to include updated economic factors that better reflect current market conditions," as well as the lower down payment and smaller home sizes typical of FHA borrowers. 89 Fed. Reg. at 33,133, 33,136-37. But HUD and USDA did not adjust their models to accurately reflect real-world cost information or real-world home construction.

107.    With respect to real-world cost to homebuyer consumers, the HIRL report referenced in NAHB's comment and discussed in the 2024 Final Determination explained how it incorporated overhead and profit:

> [C]osts are reported as both total to the builder and total to consumer. The total cost to builder includes overhead and profit (designated in the tables as "w/O&P") applied to individual component costs (materials and labor) to represent the cost charged by the sub-contractor. The total cost to consumer is based on applying a builder's gross profit margin of 19.0% to the builder's total cost.

The HIRL report noted that the 19.0% reflected "[i]ndustry average gross profit margin for 2017, as reported in NAHB's Builder's Cost of Doing Business Study, 2019 Edition."

108.    The PNNL methodology, in contrast, is based on costs to the builder instead of costs to homebuyer consumer. The 15% overhead and profit assumed by PNNL, 89 Fed. Reg. at 33,135, is intended to account only for the overhead and profit of the sub-contractor and ignores the portion of the costs associated with the profit margin by the general contractor (i.e., builder) that get passed on to the consumer. PNNL's analysis fails to account for the business arrangement commonly used in real-world home construction. *Cf. Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (an agency "retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule"). Moreover, the PNNL overhead and profit is less than the 19.0% industry average for builders

109.    With respect to real-world home design, the HIRL report referenced in NAHB's comment and discussed in the 2024 Final Determination uses a Standard Reference House by Home Innovation "was originally developed using Home Innovation's 2009 Annual Builder Practices Survey (ABPS) for a representative single-family detached home," but "[t]he geometry [was] updated based on Home Innovation's 2019 ABPS." "The parameters represent the average values from the ABPS for building areas and features not dictated by the IECC."

110.    The underlying Methodology Paper explains that "[m]ost houses are irregular in shape (i.e., not rectangles). Consequently, houses have a higher ratio of wall to floor area as compared to a simple rectangle. The Standard Reference House shape incorporates average wall areas and floor areas along with assigning equal wall exposure in all cardinal directions into its design."[8]

111.    HUD and USDA misleadingly claim that "[t]he set of prototypes PNNL uses in its analysis are designed to represent the majority of the new residential building construction stock in the United States." 89 Fed. Reg. at 33,134. But that statement is true only as to certain attributes, not

---

[8]https://www.homeinnovation.com/-/media/Files/Reports/Percent_Energy_Savings_Final_Calculation_Methodology.PDF

geometry. The prototypes PNNL uses for single family houses are all based on a simple two-story box.

112.    Geometry is important to HUD and USDA's analysis. The agencies explain:

> The design of the home plays a role by determining the quantity of insulation. The model single family homes of PNNL are similar in terms of living space (floor area). The Home Innovation model is less dense, however, and has more of its floor area in the first floor than the second floor. A low-density design leads to larger areas exposed to the exterior and in need of insulation. For example, although the floor area of the Home Innovation home is only 5 percent greater, the ceiling area requiring insulation is 56 percent greater.

89 Fed. Reg. at 33,134.

113.    HUD and USDA correctly recognize "[t]he representativeness of the Home Innovation and PNNL data are not equivalent." But the agencies failed to recognize that the geometry of the PNNL model home isn't representative at all. *See, e.g., Motor Vehicle Manufacturer's Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has … entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency…."); *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("[A]n agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary")

114.    The impact of the agencies' failure to grapple with their models' divergence from the real-world is substantial. "The profit assumption combined with the design of the home would lead to cost estimates approximately 2.2 times larger than the PNNL analysis," 89 Fed. Reg. 33,134, which is a significant impact to affordability.

115.    The 2024 Final Determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and/or taken without observance of procedure required by law.

**Count Four**
**Administrative Procedure Act**
**Availability**

116.    Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

117.    The Administrative Procedure Act requires this Court to "set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" "or taken "without observance of procedure required by law."  5 U.S.C. § 706(2).

118.    Section 109 of the Cranston-Gonzalez Act conditions application of revised codes on the Secretary of HUD and the Secretary of Agriculture "mak[ing] a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act (12 U.S.C. 1701 et seq.) or insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 (42 U.S.C. 1471 et seq.), respectively."

119.    In their Regulatory Impact Analysis, HUD and USDA used an estimate of the price elasticity of demand applicable "for low-income households" and "estimate[d] … that the quantity in an affected submarket will decline by 1.5 percent of the pre notice market activity" as a result of applying the 2021 IECC. RIA at 80. In the 2024 Final Determination, the agencies try to minimize that calculation as their "most cautious estimate," 89 Fed. Reg. at 33,177, but it's the only estimate in the RIA. The agencies then concede adopting the 2021 IECC "would reduce the production of homes for FHA-insured borrowers by 1.5 percent, which represents a 0.2 percent reduction of all homes available to FHA-insured homebuyers." *Id.* In short, the agencies concede the availability of new construction of covered housing will be negatively affected by application of the 2021 IECC.

120.    The RIA then states that "[i]ncluding the benefits imparted by the Notice will <u>diminish</u>, and <u>maybe even reverse</u>, the contraction of new construction from higher minimum energy

standards." RIA at 80 (emphasis added). The possibility of reversal is speculative on its face. Similarly, in the 2024 Final Determination, HUD and USDA claim that "[a]ny adverse impacts on availability would be diminished where there is a perceptible demand for energy-efficient homes," 89 Fed. Reg. at 33,177, but offer no evidence that contingent condition would be satisfied in the relevant market, *i.e.*, low-income and "especially price sensitive" first-time buyers.

121.    Their models having shown a negative impact to availability, HUD and USDA cannot simply speculate that negative impact away. *See, e.g.*, *Louisiana v. U.S.D.O.E.*, 90 F. 4th 461, 473, 475 (5th Cir. 2024) ("[T]he 2022 DOE recognized the facts that undermined its Repeal Rule, cited other facts to suggest the Repeal Rule would conserve water and energy, and then implicitly credited the latter without explaining why. That is the touchstone of arbitrary and capricious agency action."). *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("[S]peculation is an inadequate replacement for the agency's duty to undertake an examination of the relevant data and reasoned analysis."). HUD and USDA's doing so rendered the 2024 Final Determination arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and/or taken without observance of procedure required by law.

## RELIEF REQUESTED

Plaintiffs pray for the following relief from the Court:

a.    A declaration that Section 109 of the Cranston-Gonzalez Act is unconstitutional to the extent it delegates to the International Code Council or ASHRAE the authority to set energy efficiency standards for covered housing;

b.    A declaration that the 2024 Final Determination is arbitrary, capricious, an abuse of discretion, and contrary to law.

c.    That the Court set aside the 2024 Final Determination.

d.    An order enjoining Defendants from applying energy efficiency standards to covered housing where such standards are not consistent with the constitutional provisions of Section 109 of

the Cranston-Gonzalez Act;

       e.   An order awarding Plaintiffs attorneys' fees and costs to the extent provided by law; and

       f.   Any further relief as the Court may deem just and proper.

Dated: January 2, 2025

Respectfully submitted:

SEAN D. REYES
  ATTORNEY GENERAL OF UTAH

/s/ Stanford E. Purser
STANFORD E. PURSER (UTSB 13440)
  Solicitor General
OFFICE OF THE UTAH
  ATTORNEY GENERAL
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111
Tel. (801) 366-0100
spurser@agutah.gov

Counsel for State of Utah


ST. JOHN LLC

/s/ Joseph Scott St. John
JOSEPH SCOTT ST. JOHN (LASB 36682)
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
Tel. (410) 212-3475
scott@stjohnlaw.com

Counsel for National Association of Home Builders
of the United States


STEVE MARSHALL
  ATTORNEY GENERAL OF ALABAMA

/s/ Edmund G. LaCour Jr.
EDMUND G. LACOUR JR. (ALSB-9182-U81L)*
  Solicitor General
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GEN.
501 Washington Ave.
Montgomery, AL 36130
Tel. (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Counsel for State of Alabama

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Legal Strategy

RYAN D. WALTERS
Chief, Special Litigation Division

/s/ Ryan G. Kercher
RYAN G. KERCHER (TXSB 24060998)
Deputy Division Chief
  Special Litigation Division
ZACHARY BERG (TXSB 24107706)
Special Counsel
OFFICE OF THE ATTORNEY GENERAL
  OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Tel. (512) 463-2100
Ryan.Kercher@oag.texas.gov
Zachary.Berg@oag.texas.gov

Counsel for State of Texas

31

TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

*Dylan L. Jacobs*
DYLAN L. JACOBS (ARSB 2016167)
  *Deputy Solicitor General*
OFFICE OF ATTORNEY GENERAL TIM GRIFFIN
323 Center Street, Suite 200
Little Rock, AR 72201
Tel. (501) 682-2007
Dylan.jacobs@arkansasag.gov

*Counsel for State of Arkansas*


THEODORE E. ROKITA
  ATTORNEY GENERAL OF INDIANA

*/s/ James A. Barta*
JAMES A. BARTA (INSB 31589-49)*
  *Solicitor General*
INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Tel. (317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*


KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

*/s/ Abhishek S. Kambli*
ABHISHEK S. KAMBLI (KSSB 29788)
  *Deputy Attorney General*
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel. (785) 296-7109
abhishek.kambli@ag.ks.gov

*Counsel for State of Kansas*


RAUL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Sean "Jack" Corkery*
SEAN "JACK" CORKERY (IDSB 12350)*
  *Assistant Solicitor General*
OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W Jefferson St #210
Boise, ID 83720
Tel. (208) 332-3548
jack.corkery@ag.idaho.gov

*Counsel for State of Idaho*


BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

*/s/ Eric H. Wessan*
ERIC H. WESSAN
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel. (515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*


LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

*/s/ Kelsey L. Smith*
KELSEY L. SMITH (TXSB 24117070)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel. (225) 428-7432
SmithKel@ag.louisiana.gov

*Counsel for State of Louisiana*

**ANDREW BAILEY**
  **ATTORNEY GENERAL OF MISSOURI**

*/s/ Dominic X. Barceleau*
DOMINIC X. BARCELEAU (MOSB 76510)*
  *Assistant Attorney General*
OFFICE OF THE MISSOURI
  ATTORNEY GENERAL
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel: (314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


**MICHAEL T. HILGERS**
  **ATTORNEY GENERAL OF NEBRASKA**

*/s/ Grant D. Strobl*
GRANT D. STROBL (NESB 27985)*
  *Assistant Solicitor General*
OFFICE OF THE NEBRASKA ATTORNEY GEN.
2115 State Capitol
Lincoln, NE 68509
Tel. (402) 471-2683
grant.strobl@nebraska.gov

*Counsel for State of Nebraska*


**JONATHAN SKRMETTI**
  **ATTORNEY GENERAL AND REPORTER**
  **OF TENNESSEE**

*/s/ Whitney D. Hermandorfer*
WHITNEY D. HERMANDORFER (TNSB 041054)
  *Director of Strategic Litigation*
STATE OF TENNESSEE
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
Tel. (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*


*\* pro hac vice or motion for admission to follow*

**AUSTIN KNUDSEN**
  **ATTORNEY GENERAL OF MONTANA**

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR. (MTSB 68806768)*
  *Deputy Solicitor General*
MONTANA DEPT. OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
peter.torstensen@mt.gov

*Counsel for State of Montana*


**ALAN WILSON**
  **ATTORNEY GENERAL OF SOUTH CAROLINA**

*/s/ Thomas Hydrick*
THOMAS HYDRICK (SCSB 103198)*
  *Assistant Deputy Solicitor General*
OFFICE OF THE SOUTH CAROLINA
  ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*


**PATRICK MORRISEY**
  **ATTORNEY GENERAL OF WEST VIRGINIA**

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS (WVSB 14148)*
  *Solicitor General*
State Capitol Complex,
Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
Tel. 304-558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*