UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| STATE OF UTAH, ET AL,<br><br>   *Plaintiffs*,<br><br>v.<br><br>SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development, ET AL,<br><br>   *Defendants*. | No. 25-cv-1 |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES...........................................................................................iv

INTRODUCTION AND MOTION ...............................................................................1

BACKGROUND.............................................................................................................2

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................9

STATEMENT OF ISSUES TO BE DECIDED ........................................................10

LEGAL STANDARDS.................................................................................................10

STANDING...................................................................................................................11

ARGUMENT................................................................................................................12

I.      Section 109's delegation of spending conditions to private entities is
        unconstitutional. .........................................................................................12

        A. USDA and HUD construe Section 109 as incorporating ever-changing
           efficiency standards set by private code bodies, and the agencies concede
           they cannot alter those standards. .........................................................12

        B. Section 109 violates the private non-delegation doctrine. .......................14

        C. Section 109 violates the requirement that statutory spending conditions be
           unambiguous. ..........................................................................................16

II.     The Final Determination Is Contrary to Law............................................16

        A. Section 109 only permitted a single update to the 2006 IECC and ASHRAE
           Standard 90.1-2004.................................................................................17

        B. HUD and USDA concede the 2021 IECC does not comply with the statutory
           bar against negative affects to availability of covered housing. ...................20

III.    The analysis in the Final Determination is unreasoned, arbitrary, and capricious....................22

        A. HUD and USDA have long-acknowledged discrepancies between energy
           savings models and actual returns. ..........................................................22

        B. The agencies rejected newer models and ignored real world data indicating that
           compliance with the 2021 IECC costs substantially more than HUD and
           USDA estimated ....................................................................................23

C. HUD and USDA ignored serious defects in their analysis. .................................................... 25

CONCLUSION ................................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630 (D.C. Cir. 2017) ...................................25

*Abbott v. Biden*, 70 F. 4th 817 (5th Cir. 2023) .........................................................15

*Amin v. Mayorkas*, 24 F. 4th 383 (5th Cir. 2022) ....................................................11

*Brown v. Gardner*, 513 U.S. 115 (1994) ...................................................................18

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)....................................22

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).......................................................14

*Chamber of Commerce v. U.S.D.O.L.*, 885 F. 3d 360 (5th Cir. 2018)........................24

*Cochise Consultancy, Inc. v. United States ex rel Hunt*, 587 U.S. 262 (2019) ............17

*Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914 (D.C. Cir. 1998).................. 22, 27

*Gen. Land Office of Tex. v. U.S.D.O.I.*, 947 F.3d 309 (5th Cir. 2020)........................14

*Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ......................22

*Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246 (D.C. Cir. 1994) .................21

*Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)..........................12

*Louisiana v. U.S.D.O.E.*, 90 F. 4th 461 (5th Cir. 2024) .....................................passim

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 10, 22

*Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 741 F. Supp. 3d 568 (N.D. Tex. 2024) ....................................11

*Nat'l Horsemen's Beneveloent & Protective Ass'n v. Black*, 107 F. 4th 415 (5th Cir. 2024) ("*Horsemen's II*") .........................................................15

*National Horsemen's Benevolent and Protective Association v. Black*, 53 F.4th 869 (5th Cir. 2022) ("*Horsemen's I*").......................................................14

*New Orleans v. SEC*, 969 F.2d 1163 (D.C. Cir. 1992)...............................................25

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ...............................16

*Restaurant Law Ctr. v. U.S. Dep't of Labor*, 120 F. 4th 163 (5th Cir. 2024) ........................ 11, 17

*S. Tex. Mortg. Corp. v. HUD*, 163 F. App'x 321 (5th Cir. 2006) ...............................20

*SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ..................................................................19

*South Dakota v. Dole*, 483 U.S. 203 (1987) ........................................................................16

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) ....................................... 14, 15

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F. 3d 350 (5th Cir. 2021).............................16

*Tex. Med. Ass'n v. U.S. H.H.S.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) .....................................12

*Texas v. United States*, 787 F.3d 733  (5th Cir. 2015) .........................................................11

*Texas v. Yellen*, 105 F.4th 755 (5th Cir. 2024).....................................................................16

*United States v. Lauderdale Cnty.*, 914 F.3d 960 (5th Cir. 2019) ......................................17

*UnitedHealthcare Bens. of Tex., Inc. v. CMS*, 2024 U.S. Dist. LEXIS 213013 (E.D. Tex. Nov. 22, 2024) ...................................................................................................................11

**Statutes**

42 U.S.C. § 12702 ..................................................................................................................2

42 U.S.C. § 12709 ........................................................................................................5, 13, 20

42 U.S.C. § 6833........................................................................................................................18

42 U.S.C. § 6834........................................................................................................................18

5 U.S.C. § 706 ...........................................................................................................................10

Cranston-Gonzalez Affordable Housing Act, Pub. L. 101-625, 104 Stat. 4079 (1990) .................. 2, 17

Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492.........................4, 19

Energy Policy Act of 1992, Pub. L. 102-486, 106 Stat. 2776 .............................................. 3, 17

Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 .................................................. 3, 18

**Other Authorities**

S. Print 103-91 ........................................................................................................................21

S. Rep. 101-316,.........................................................................................................................2

**Regulations**

*Adoption of Energy Efficiency Standards for New Construction of HUD-and USDA-Financed Housing: Preliminary Determination and Solicitation of Comment,* 88 Fed. Reg. 31,773 (May 18, 2023) ................................................................................................................................*passim*

*Building Energy Standards Program: Determination Regarding Energy Efficiency Improvements*,
67 Fed. Reg. 46,464 (July 15, 2002) ............................................................................ 9, 18

*Final Affordability Determination— Energy Efficiency Standards*,
80 Fed. Reg. 25,901 (May 6, 2015)…..……………………………………………..*passim*

*Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD-
and USDA-Financed Housing*, 89 Fed. Reg. 33,112 (Apr. 26, 2024).........................*passim*

*Housing Trust Fund: Fiscal Year 2024 Allocation Notice*,
89 Fed. Reg. 58,391 (July 18, 2024)…...……………………….……………………………9

*Preliminary Affordability Determination-Energy Efficiency Standards*,
79 Fed. Reg. 21,259 (Apr. 15, 2014) ........................................................................*passim*

## INTRODUCTION AND MOTION

Seeking to make low-income housing more affordable, Congress required the Department of Housing and Urban Development ("HUD") to issue energy efficiency standards for new homes that it insures or finances. That apparently was too much for HUD to accomplish; the agency simply didn't do it. So Congress amended the law to extend the deadline, added a self-executing backstop of specific energy efficiency standards developed by private bodies, and subjected Department of Agriculture ("USDA") financed housing to the same requirement. Congress then mandated the backstop standards be updated if the private bodies revised them. The way that process works raises grave doubt as to the statute's constitutionality under the private non-delegation doctrine. The Court doesn't need to reach the constitutional question, however, because a careful reading of the statute makes clear that only a single update was authorized, and the agencies accomplished that in 2015.

HUD and USDA nevertheless purported to update the backstop standards again in 2024. In doing so, the agencies conceded the new standards would negatively affect the availability or affordability of new construction of assisted housing in violation of a statutory bar. The agencies then speculated that adverse impact away, while ignoring real-world data showing the actual negative impact is worse than their estimates.

Faced with unlawful agency action that will drive up the cost of low-income housing by thousands of dollars, Utah, Texas, Alabama, Arkansas, Idaho, Indiana, Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, South Carolina, Tennessee, and West Virginia (collectively, "Plaintiff States"), and the National Association of Home Builders of the United States ("NAHB") filed suit. Plaintiffs now move pursuant to Fed. R. Civ. P. 56 for summary judgment that Defendants' deterimination to adopt updated energy efficiency standards, *Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing*, 89 Fed. Reg. 33,112 (Apr. 26, 2024) ("2024 Final Determination") (Exh. 65), violates the Administrative Procedure Act.

## BACKGROUND

### STATUTORY HISTORY

In the late 1980s, Congress started reviewing policy failures that had resulted in the loss of "some 4.5 million of affordable rental units … while the number of very low-income families was rising." S. Rep. 101-316, at 8, reprinted in 1990 U.S.C.C.A.N. 5763, 5770. Congress responded to those failures with the Cranston-Gonzalez Affordable Housing Act, Pub. L. 101-625, 104 Stat. 4079 (1990) ("Cranston-Gonzalez Act").

The Cranston-Gonzalez Act "reaffirm[ed] the long-established national commitment to decent, safe, and sanitary housing for every American." 42 U.S.C. § 12702. It sought to do so by, among other things, "increas[ing] the Nation's supply of decent housing that is affordable to low-income and moderate-income families" and "provid[ing] every American community with a reliable, readily available supply of mortgage finance at the lowest possible interest rates." *Id.*

Energy expenditures were viewed as part of the housing problem for low-income families. *See* 1990 U.S.C.C.A.N. at 5810-11. So in Section 109 of the Cranston-Gonzalez Act, Congress required the Secretary of HUD to promulgate energy efficiency standards for housing subject to mortgages under the National Housing Act:

> The Secretary of Housing and Urban Development shall, not later than one year after the date of enactment of this Act, promulgate energy efficiency standards for new construction of public and assisted housing and single-family and multifamily residential housing (other than manufactured homes) subject to mortgages under the National Housing Act. Such standards shall meet or exceed the provisions of the most recent edition of the Model Energy Code of the Council of American Building Officials and shall be cost-effective with respect to construction and operating costs. In developing such standards the Secretary shall consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies and building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated by the Secretary.

104 Stat. at 4093 (as amended, "Section 109") (Exh. 1).

2

In 1992, Congress amended Section 109 to expand the energy efficiency requirement, to extend the deadline for those requirements to be adopted, and to set self-executing backstop energy efficiency standards if the Executive failed act:

> (a) ESTABLISHMENT.
> (1) IN GENERAL.—The Secretary of Housing and Urban Development and the Secretary of Agriculture shall, not later than 1 year after the date of the enactment of the Energy Policy Act of 1992, jointly establish, by rule, energy efficiency standards for—
> (A) new construction of public and assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act; and
> (B) new construction of single family housing (other than manufactured homes) subject to mortgages insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949.
> (2) CONTENTS.—Such standards shall meet or exceed the requirements of the Council of American Building Officials Model Energy Code, 1992 (hereafter in this section referred to as 'CABO Model Energy Code, 1992'), or, in the case of multifamily high rises, the requirements of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers Standard 90.1-1989 (hereafter in this section referred to as ASHRAE Standard 90.1-1989), and shall be cost-effective with respect to construction and operating costs on a life-cycle cost basis. In developing such standards, the Secretaries shall consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies, building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated by the Secretaries.
> (b) MODEL ENERGY CODE.—If the Secretaries have not, within 1 year after the date of the enactment of the Energy Policy Act of 1992, established energy efficiency standards under subsection (a), all new construction of housing specified in such sub section shall meet the requirements of CABO Model Energy Code, 1992, or, in the case of multifamily high rises, the requirements of ASHRAE Standard 90.1-1989.
> (c) REVISIONS OF MODEL ENERGY CODE.—If the requirements of CABO Model Energy Code, 1992, or, in the case of multifamily high rises, ASHRAE Standard 90.1-1989, are revised at any time, the Secretaries shall, not later than 1 year after such revision, amend the standards established under subsection (a) to meet or exceed the requirements of such revised code or standard unless the Secretaries determine that compliance with such revised code or standard would not result in a significant in crease in energy efficiency or would not be technologically feasible or economically justified.

Energy Policy Act of 1992, Pub. L. 102-486 § 109, 106 Stat. 2776, 2786-87 (1992) (Exh. 2).

Congress subsequently reset the deadline to establish energy efficiency standards to September 30, 2006. Energy Policy Act of 2005, Pub. L. 109-58 § 153, 119 Stat. 294, 649-50 (Exh. 5). The most

3

recent amendment to Section 109 was in the Energy Independence and Security Act of 2007, Pub. L.

110-140, 121 Stat. 1492, 1648 ("EISA") (Exh. 6), which, as relevant here, replaced "CABO Model

Energy Code, 1992" with "2006 International Energy Conservation Code," replaced "1989" with

"2004" in the ASHRAE standard, and added new subsection (d). Section 109 now reads:

> (a) Establishment.
> (1) In general. The Secretary of Housing and Urban Development and the Secretary
> of Agriculture shall, not later than September 30, 2006, jointly establish, by rule, en-
> ergy efficiency standards for—
> (A) new construction of public and assisted housing and single family and multifamily
> residential housing (other than manufactured homes) subject to mortgages insured
> under the National Housing Act;
> (B) new construction of single family housing (other than manufactured homes) sub-
> ject to mortgages insured, guaranteed, or made by the Secretary of Agriculture under
> title V of the Housing Act of 1949 [42 USCS §§ 1471 et seq.]; and
> (C) rehabilitation and new construction of public and assisted housing funded by
> HOPE VI revitalization grants under section 24 of the United States Housing Act of
> 1937 (42 U.S.C. 1437v).
> (2) Contents. Such standards shall meet or exceed the requirements of the 2006 Inter
> national Energy Conservation Code (hereafter in this section referred to as "the 2006
> IECC"), or, in the case of multifamily high rises, the requirements of the American
> Society of Heating, Refrigerating, and Air-Conditioning Engineers Standard 90.1-1989
> (hereafter in this section referred to as "ASHRAE Standard 90.1-2004"), and shall be
> cost-effective with respect to construction and operating costs on a life-cycle cost ba-
> sis. In developing such standards, the Secretaries shall consult with an advisory task
> force composed of homebuilders, national, State, and local housing agencies (includ-
> ing public housing agencies), energy agencies, building code organizations and agen-
> cies, energy efficiency organizations, utility organizations, low-income housing organ-
> izations, and other parties designated by the Secretaries.
> (b) International Energy Conservation Code. If the Secretaries have not, by September
> 30, 2006, established energy efficiency standards under subsection (a), all new con-
> struction and rehabilitation of housing specified in such subsection shall meet the re-
> quirements of the 2006 IECC, or, in the case of multifamily high rises, the require-
> ments of ASHRAE Standard 90.1-2004.
> (c) Revisions of the International Energy Conservation Code. If the requirements of
> the 2006 IECC, or, in the case of multifamily high rises, ASHRAE Standard 90.1-2004,
> are revised at any time, the Secretaries shall, not later than 1 year after such revision,
> amend the standards established under subsection (a) to meet or exceed the require-
> ments of such revised code or standard unless the Secretaries determine that compli-
> ance with such revised code or standard would not result in a significant in crease in
> energy efficiency or would not be technologically feasible or economically justified.
> (d) Failure to amend the standards. If the Secretary of Housing and Urban Develop-
> ment and the Secretary of Agriculture have not, within 1 year after the requirements
> of the 2006 IECC or the ASHRAE Standard 90.1-2004 are revised, amended the
> standards or made a determination under subsection (c), all new construction and

rehabilitation of housing specified in subsection (a) shall meet the requirements of the revised code or standard if—

(1) the Secretary of Housing and Urban Development or the Secretary of Agriculture make a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act (12 U.S.C. 1701 et seq.) or insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 (42 U.S.C. 1471 et seq.), respectively; and

(2) the Secretary of Energy has made a determination under section 304 of the Energy Conservation and Production Act (42 U.S.C. 6833) that the revised code or standard would improve energy efficiency.

42 U.S.C. § 12709 (emphasis added).

THE 2015 FINAL DETERMINATION

HUD and USDA did not develop independent energy efficiency building standards by September 30, 2006. Accordingly, HUD and USDA took the position that the 2006 IECC and ASHRAE 90.1–2004 applied to covered housing pursuant to the 2007 amendments to Section 109. New editions of the IECC were published in 2009 and 2012, and new editions of ASHRAE 90.1 were thereafter published in 2007, 2010, and 2013.

All but ignoring the more recent editions, in 2014, HUD and USDA published a preliminary determination that the 2009 IECC and ASHRAE 90.1-2007 (the revisions to the 2006 IECC and ASHRAE 90.1-2004) would not negatively affect the affordability and availability of covered housing. *Preliminary Affordability Determination-Energy Efficiency Standards*, 79 Fed. Reg. 21,259 (Apr. 15, 2014) (Exh. 50). The agencies were transparent in their non-statutory motivation, stating they "have two primary motivations for the promulgation of this Notice: (1) To reduce the total cost of operating and thereby increasing the affordability of housing by promoting the adoption of cost effective energy technologies, and (2) to reduce the social costs (negative externalities) imposed by residential energy consumption," i.e., a factor not set forth in the Cranston-Gonzalez Act. *Id.* at 21,262.

Attempting to explain why the public would build housing without cost-effective energy features, the agencies pointed to "a wide body of literature on a range of market failures that have resulted

in an 'energy efficiency gap' between the actual level of investment in energy efficiency and the higher level of investment that would [purportedly] be cost-beneficial from the consumer's … point of view." 79 Fed. Reg. at 21,262. But the agencies conceded "the public places a low priority on energy issues and energy efficiency opportunities," and further conceded "[t]he existence of unobserved costs (either upfront or periodic) is a potential explanation for low levels of investment in energy-saving technology." *Id.*

Turning to the determinations required by Section 109, HUD and USDA explained that "[i]n determining the impact that the 2009 IECC will have on HUD- and USDA-assisted or insured new homes, the agencies have relied on a cost-benefit analysis of the 2009 IECC completed by the Pacific Northwest National Laboratory (PNNL) for DOE." 79 Fed. Reg. at 21,265. The agencies noted the importance of modelling housing of the type covered by Section 109. They emphasized that "DOE provided HUD and USDA with the underlying disaggregated data for single family housing only, to more accurately reflect the housing type receiving FHA single family insurance or USDA loan guarantees." *Id.* at 21,266.

The agencies then acknowledged "studies that discuss limitations associated with cost-savings models such as these developed by PNNL for DOE," including "unaccounted physical costs, risks, or opportunity costs," "engineering estimates of energy savings [that] can overstate true field returns, sometimes by a large amount," and "engineering simulation models [that] have still not been fully calibrated to approximate actual returns." *Id.* But they sidestepped those concerns: "HUD and USDA nevertheless believe[d] that the PNNL-DOE model used to estimate the savings shown … represents the current state-of-the-art for such modelling, is the product of significant public comment and input, and is now the standard for all of DOE's energy code simulations and models." *Id.* HUD and USDA then published a final determination that adoption of the 2009 IECC for single family homes and ASHRAE 90.1-2007 for multifamily buildings would not negatively affect the affordability and

availability of housing covered by Section 109. *Final Affordability Determination-Energy Efficiency Standards*, 80 Fed. Reg. 25,901 (May 6, 2015) ("2015 Final Determination") (Exh. 51).

THE 2024 FINAL DETERMINATION

New editions of the IECC were thereafter published in 2015 and 2018, and new editions of ASHRAE 90.1 were published in 2016 and 2019. *See* 88 Fed. Reg. at 31,779, 31,793. HUD and USDA did not make any determination pursuant to Section 109 with respect to any of those new editions. Then, on May 18, 2023, HUD and USDA published a preliminary determination "that the 2021 IECC and ASRAE 90.1-2019 will not negatively affect the affordability and availability of housing covered by" Section 109. *Adoption of Energy Efficiency Standards for New Construction of HUD-and USDA-Financed Housing: Preliminary Determination and Solicitation of Comment,* 88 Fed. Reg. 31,773 (May 18, 2023) (Exh. 52). The "core analysis" underlying the preliminary determination was a Pacific Northwest National Laboratory ("PNNL") study that was prepared for DOE. *Id.* at 31,784 & n.38; Exh. 53.

Numerous commenters raised concerns with the data and modelling used by HUD and USDA, as well as the consequences of an incorrect analysis. Leading Builders of America, D.R. Horton, the Mortgage Bankers Association, and NAHB, for example, submitted detailed comments highlighting ways in which the agencies were significantly underestimating the cost of adopting the 2021 IECC and the resulting impact to affordability and availability of low income housing. Exhs. 54-57.

NAHB emphasized that the cost of compliance was substantially higher than estimated by HUD, USDA, and DOE, with an analysis by NAHB-affiliated Home Innovation Research Labs ("HIRL") showing cost increases of $8,859 to $22,572 per home, depending on climate zone. Exh. 57 at 4. NAHB also provided real-world data supplied by its members, with data from Kansas City (in climate zone 4) showing an increased cost to the consumer of $31,853 over the 2012 IECC; data from New Jersey (in climate zones 4 and 5) showing an increased cost to consumers of more than $10,000 over the 2015 IECC; and data from Texas showing an increased cost to consumers of $12,000 (in

climate zone 2) and $13,750 (in climate zone 3). Exh. 57 at 6. The comments by LBA, D.R. Horton, and MBA were to similar effect, with LBA noting the industry estimates were "substantially higher than the [agencies'] preliminary determination estimates of $2,813.49 to $6,796.21." Exh. 54. The State of Montana was more direct. It explained the new standards "could limit or obliterate the supply of HUD or USDA-approved housing." Exh. 58. HUD and USDA nevertheless published a final determination that "the 2021 IECC and ASHRAE 90.1– 2019 will not negatively affect the affordability and availability of housing covered by" Section 109. 89 Fed. Reg. 33,112.

In the 2024 Final Determination, HUD and USDA substantially altered their analysis to reflect, among other things, a 37% increase in construction costs and higher mortgage rates more in line with real-world economic conditions. HUD and USDA also revised the down payment contribution for home purchases to 5% "to better reflect the typical HUD and USDA borrower." 89 Fed. Reg. at 33,121. That's because "[t]he down payment requirement for FHA borrowers is a minimum of 3.5 percent, distinct from a typical 20 percent down payment requirement for conventional mortgage financing … or the 12 per cent down payment rate used by DOE-PNNL and utilized by HUD and USDA in the preliminary determination." *Id.* Finally, HUD and USDA stated that "[c]ost and savings factors have been applied to the affordability analysis to better reflect the typical home [sic] FHA or USDA-sized home." *Id.* According to HUD and USDA, "[t]hese factors revise the analysis to better reflect the smaller home size of a typical FHA or USDA property (2,000 square feet (sf)) compared to a conventionally financed house modelled by PNNL (2,376 sf)." *Id.* HUD and USDA did not, however, revise their model to include real world profit and overhead amounts or typical real-world house designs. The agencies conceded that doing so "would lead to cost estimates approximately **2.2 times larger** than the PNNL analysis" relied on in the Final Determination. 89 Fed. Reg. at 33,134.

THIS LITIGATION

Plaintiff States and NAHB filed this litigation on January 2, 2025. ECF 1. Defendants moved to extend their deadline to respond to the complaint until June 6, *i.e.*, six months after they were served. This Court granted that motion in-part and entered a briefing schedule. ECF 30. Plaintiffs thereafter moved to dismiss or, in the alternative, for a stay or an extended briefing schedule. ECF 32. That motion remains pending, and Defendants have not yet produced the administrative record. Pursuant to the Court's briefing schedule, Plaintiffs now move for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE") is a private entity. Exhs. 7, 8.

2.      ASHRAE publishes ASHRAE Standard 90.1. *See* Exh. 9; 89 Fed. Reg. at 33,128.

3.      As relevant here, ASHRAE published new editions of ASHRAE Standard 90.1 in 1989, 1999, 2004, 2007, 2010, 2013, 2016, and 2019. *See* 67 Fed. Reg. 46,464; 88 Fed. Reg. at 31,775.

4.      The International Code Council ("ICC") is a private entity. Exhs. 10, 11.

5.      The ICC publishes the International Energy Conservation Code ("IECC"). Exh. 12.

6.      As relevant here, ICC published new editions of the IECC in 1998, 2001, 2003, 2006, 2009, 2012, 2015, 2018, 2021, and 2024. Exh. 13; 88 Fed. Reg. at 31,779; 89 Fed. Reg. at 33,130.

7.      Plaintiff States participate in the HOME and/or HTF programs; those programs are subject to Section 109 of the Cranston-Gonzalez Act; and housing units built using funds from the HOME and/or HTF programs are impacted by the Final Determination. 88 Fed. Reg. at 31,794-795; 89 Fed. Reg. at 33,149-150; *see also Housing Trust Fund: Fiscal Year 2024 Allocation Notice*, 89 Fed. Reg. at 58,391 (July 18, 2024).

8.      Plaintiff NAHB is a trade organization; the interests it seeks to protect are germane to its purpose; and it has members who would have standing to challenge the 2024 Final Determination in their own right. 2d Lynch Decl.; Exhs. 3 at 2510, 100; Martin Decl. (ECF 1-1).

## STATEMENT OF ISSUES TO BE DECIDED

1.      Is the requirement for updates to energy efficiency standards in Section 109 of the Cranston-Gonzalez Act unconstitutional under the private non-delegation doctrine and/or the Spending Clause?

2.      Does Section 109 of the Cranston-Gonzalez Act permit HUD and USDA to require compliance with multiple revisions to the IECC and ASHRAE Standard 90.1, *i.e.*, revisions beyond the 2009 IECC and ASHRAE Standard 90.1-2007?

3.      Does the 2021 IECC comply with the statutory requirement that a revised energy efficiency code "not negatively affect the availability or affordability of new construction of" housing covered by Section 109 of the Cranton-Gonzales Act? Alternatively, was HUD and USDA's 2024 Final Determination that the 2021 IECC did comply with that statutory requirement arbitrary, capricious, an abuse of discretion, or contrary to law?

4.      Is the 2024 Final Determination arbitrary, capricious, an abuse of discretion, or contrary to law?

## LEGAL STANDARDS

The Administrative Procedure Act directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2). An agency is therefore required to "examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

"Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record." *UnitedHealthcare Bens. of Tex., Inc. v. CMS*, 2024 U.S. Dist. LEXIS 213013, at *7 (E.D. Tex. Nov. 22, 2024) (Kernodle, J.) (quoting *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 741 F. Supp. 3d 568, 596 (N.D. Tex. 2024), itself citing *Amin v. Mayorkas*, 24 F. 4th 383, 391 (5th Cir. 2022)). Where a court concludes an agency action violates the APA, the Fifth Circuit's "default rule is that vacatur is the appropriate remedy." *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 120 F. 4th 163, 177 (5th Cir. 2024).

## STANDING

The 2024 Final Determination is a final agency action that subjects covered programs to the 2021 IECC. *See* 79 Fed. Reg. at 21,260. Each Plaintiff State receives federal funding through the HOME Program and/or Housing Trust Fund that is conditioned on compliance with energy efficiency standards pursuant to Section 109. *See, e.g.*, 88 Fed. Reg. at 31,794-795; 89 Fed. Reg. at 33,149-150; 89 Fed. Reg. at 58,391. Defendants estimate that complying with the 2021 IECC pursuant to the Final Determination will raise the cost of those homes, resulting in a reduced amount of low-income housing being constructed for a given amount of funding. *See* 89 Fed. Reg. at 33,137, 33,158-159, 33,168-169. Pragmatically, the 2024 Final Determination also pressures Plaintiff States to alter their state building codes. *See* Exh. 57 at 11; *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015). Vacating or setting aside the 2024 Final Determination will redress those injuries.

Plaintiff NAHB is a non-profit trade organization with more than 140,000 members, many of whom build homes subject to the Final Determination. 2d Lynch Decl. ¶¶ 3-4, 9. Such an organization "has standing on behalf of its members when: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Tex. Med. Ass'n v. U.S. H.H.S.*, 587 F. Supp. 3d 528, 538 (E.D. Tex. 2022) (Kernodle, J., quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

About one-third of NAHB's members are home builders and remodelers. 2d Lynch Decl. ¶ 4. HUD and USDA anticipate the Final Determination will reduce the profits of builders of covered housing. 89 Fed. Reg. at 33,134 n.53. Those members would accordingly have standing. For example, NAHB member Tilson Homes's customers used $8,000,000 - $10,000,000 in FHA financing last year to purchase new homes from Tilson. Martin Decl. (ECF 1-1) ¶ 18. Tilson has concluded that requiring compliance with the 2021 IECC will raise the cost of covered homes, reduce the number of affordable homes built by Tilson, and reduce Tilson's profits. *Id.* ¶¶ 19-23. Protecting the profits of its members and the availability of affordable homes is germane to NAHB's purpose, and neither NAHB's claims nor the requested relief requires the participation of NAHB's individual members in this suit. *See* 2d Lynch Decl. ¶¶ 6-7 & Exh. 100; Exh. 3 at 2510-2511. Finally, compliance with the Final Determination will also materially impair the ability of low- and moderate-income home buyers—including customers of NAHB members like Tilson—to acquire new homes. Martin Decl. ¶¶ 19-27; *see Craig v. Boren*, 429 U.S. 190, 196-197 (1976).

## ARGUMENT

I.    **Section 109's delegation of spending conditions to private entities is unconstitutional.**

A.    **USDA and HUD construe Section 109 as incorporating ever-changing efficiency standards set by private code bodies, and the agencies concede they cannot alter those standards.**

Start with why we're here and how the statute works. The Executive Branch repeatedly failed to adopt energy efficiency standards as Congress directed. Congress responded to that failure by amending Section 109 to include backstop efficiency standards developed by private bodies. When the Executive Branch *still* failed to adopt efficiency standards, those backstop standards sprung into force.

Covered housing was thereafter subject to the 2006 IECC and ASHRAE Standard 90.1-2004. *See* 79 Fed. Reg. at 21,261.

So far, so good. Congress specified particular, previously developed, backstop energy efficiency standards if HUD and USDA failed to act, such that States and citizens had fair notice of those standards. But Section 109—as construed by HUD and USDA—actually creates a moving target. According to the agencies, the efficiency standards change whenever the private bodies revise their standards so long as HUD and USDA "make a determination that the revised codes do not negatively affect the availability or affordability of new construction of [covered housing]" and "the Secretary of Energy has made a determination … that the revised code or standard would improve energy efficiency." 89 Fed. Reg. at 33,113 (quoting 42 U.S.C. § 12709(d)).

Worse, HUD and USDA construe Section 109 as mandating they adopt the new standards in their entirety if the standards *as a whole* meet the statutory affordability and availability criteria, regardless of whether individual provisions adversely impact the availability, affordability, or energy efficiency of covered housing; are cost effective; are safe; benefit a specific manufacturer; or are related to legitimate federal interests. Indeed, in response to comments that the insulation provisions in the 2021 IECC are not cost effective, the agencies expressly disclaimed "the ability to pick and choose between specific amendments to the code." 89 Fed. Reg. at 33,130. The implication? If a subsequent version of the IECC required every home to be painted purple, that would be the requirement for covered housing—despite the absence of any tie to the statutory requirements or any legitimate federal purpose—so long as the new standards as a whole met the statutory affordability, availability, and

energy efficiency requirements.[1, 2]

**B.    Section 109 violates the private non-delegation doctrine.**

The private nondelegation doctrine—rooted in the Constitution's Vesting Clauses and the Fifth Amendment's Due Process provision—prevents Congress from giving such unchecked power to private entities like the ICC and ASHRAE. The doctrine was first set forth in *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), where the Supreme Court held that a statute allowing a private entity to set minimum wages and determine maximum labor hours without  government oversight was an unconstitutional delegation of government power. *Id.* at 310-311. The Court then set an outer boundary for nondelegation in *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), explaining that Congress may give a role to private parties in proposing regulations if  the private parties are limited to serving as an "aid" to a government agency that has the authority to "approve[], disapprove[], or modif[y]" the proposed regulations. *Id.* at 388.

The leading Fifth Circuit case on nondelegation is *National Horsemen's Benevolent and Protective Association v. Black*, 53 F.4th 869 (5th Cir. 2022) ("*Horsemen's I*"). The statute in that case gave a private entity "sweeping" authority to "propose rules" that "the FTC *must* approve" if the rules were "consistent" with broad statutory principles. *Id.* at 872. Applying the contrast between *Carter Coal* and

---

[1] The concern is not theoretical. In the 2021 IECC, it was only at the appellate stage that "electric ready" provisions mandating expensive high-current electric circuits near each fossil-fueled appliance were removed from the draft text as beyond the scope of the IECC. Exh. 14 at 3.0. Similar provisions went even further in the 2024 IECC, with the ICC's Board of Directors deciding in a post-appellate proceeding to remove "provisions that the Board viewed as concerning greenhouse gas reduction and not building energy conservation…." Exh. 15. The board was criticized for violating the ICC's own rules in doing so. Exhs. 16-17. In short, the IECC process has been increasingly co-opted to pursue decarbonization instead of  energy efficiency.

[2] To the extent Section 109 does permit the agencies to approve, disapprove, or modify individual provisions of the IECC or ASHRAE, then the agencies applied an incorrect legal standard and the 2024 Final Determination is *per se* arbitrary, capricious, an abuse of  discretion, or otherwise not in accordance with law. *See Gen. Land Office of  Tex. v. U.S.D.O.I.*, 947 F.3d 309, 320 (5th Cir. 2020).

*Adkins*, the Fifth Circuit held the statute was unconstitutional.

The court began with the "cardinal constitutional principle … that federal power can be wielded only by the federal government." 53 F. 4th at 872. "[A] private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Id.* at 881 & n.21 (citing multiple cases and quoting *Adkins*, 310 U.S. at 399). The court then concluded "[t]he FTC's limited review of proposed rules [for consistency with statutory principles] falls short of the 'pervasive surveillance and authority' an agency must exercise over a private entity" required by the non-delegation doctrine. *Id.* at 885 (quoting *Adkins*, 310 U.S. at 388).[3]

Like the FTC in *Horsemen's I*, HUD and USDA concede they can't review the ICC and ASHRAE's policy choices. Section 109 "does not allow for selecting [specific] measures" for covered housing. 89 Fed. Reg. at 33,130. Rather, Section 109 "requires [them] to make a determination on the latest ASHRAE 90.1 or IECC code editions as published." *Id.* That limited all-or-none review of proposed rules for consistency with a handful of statutory criteria falls short of the "pervasive surveillance and authority" required to avoid unconstitutionality.

That Section 109 acts through a condition on spending doesn't save it. "[I]t is an elementary proposition of constitutional law that conditions attached to Spending Clause legislation are valid only if they are not in violation of an independent constitutional provision." *Abbott v. Biden*, 70 F. 4th 817, 845 (5th Cir. 2023). The private non-delegation doctrine is just such an independent "cardinal constitutional principle." *Horsemen's I*, 53 F. 4th at 872.

---

[3] Congress subsequently amended the statute at issue in *Horsemen's I* to permit the agency to "abrogate, add to, and modify" rules proposed by the private entity. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F. 4th 415 (5th Cir. 2024) ("*Horsemen's II*") (quoting statute). The Fifth Circuit then held the amendment cured the constitutional defect, which it reiterated "lay in the agency's being at the mercy of the [private entity's] policy choices." *Id.* at 424. "[T]he problem was that the agency lacked power to second-guess them once they were proposed. Now the FTC has been given that power: it can 'abrogate' or 'modify' [the private entity's] rules it disagrees with." *Id.* at 425.

**C.    Section 109 violates the requirement that statutory spending conditions be unambiguous.**

Section 109 also directly violates the Spending Clause. At least with respect to States, "[i]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously" to ensure that "the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Not merely the existence of a condition, but also the requisite clarity for the condition itself must appear on the face of the statute. It can't be provided by subsequent regulations. That's because "[r]egulations that interpret statutes are valid only if they either match Congress's unambiguous command or are clarifying a statutory ambiguity." *Texas v. Yellen*, 105 F.4th 755, 773 (5th Cir. 2024) (quoting *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F. 3d 350, 361 (5th Cir. 2021)). "Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of [*South Dakota v. Dole*, 483 U.S. 203 (1987)]." *Id.*

The Fifth Circuit explained:

> Take a hypothetical statute passed by Congress that provides modest funding to the states to invest in their healthcare infrastructure. But as a condition of receiving those funds, the states must agree that "no portion of these funds shall be used to advance injustice," subject to a recoupment provision. "Injustice" in such a context has no discernable content. It is hopelessly ambiguous, far more so than the putative command at issue in *Pennhurst* to provide "appropriate treatment" to the intellectually disabled in the "least restrictive" setting. * * * * Any future administration could fill in its expansive contours with whatever requirements that the administration sees fit, and which the states could have never anticipated.

105 F.4th at 770. But that's precisely what Section 109 does. However—unlike the Fifth Circuit's rejected hypothetical—Section 109 doesn't have a "future administration" filling in the details. The details are instead filled in by private code-setting bodies. Section 109 is unconstitutional.

## II.    The Final Determination Is Contrary to Law

The Court need not reach the constitutional questions to hold that HUD and USDA's 2024 Final Determination to require compliance with the 2021 IECC is unlawful. That's because Congress

contemplated only a single update to the backstop energy efficiency standards. And even if Congress did make an expansive delegation to the whims of the ICC and ASHRAE, the 2021 IECC concededly violates the statutory bar on a revision that "negatively affect[s] the availability or affordability of new construction of" covered housing.

### A. Section 109 only permitted a single update to the 2006 IECC and ASHRAE Standard 90.1-2004

"As usual, we start with the statutory text." *Rest. Law Ctr.*, 120 F. 4th at 171. Section 109 directs that "if the requirements of the <u>2006</u> IECC or the ASHRAE Standard 90.1-<u>2004</u> are revised," covered housing "shall meet the requirements of <u>the</u> revised code or standard if … the Secretary of Housing and Urban Development or the Secretary of Agriculture make a determination that the revised codes do not negatively affect the availability or affordability of new construction…." Congress's reference to specific editions of the IECC and ASHRAE Standard 90.1—the 2006 and 2004 editions, respectively—must be given meaning. *See United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019). Likewise Congress's use of the definite article to refer to those specific editions. *See Cochise Consultancy, Inc. v. United States ex rel Hunt*, 587 U.S. 262, 272 (2019). The statutory history and Congress's use of differing language confirm that only an update to those specific editions, *i.e.*, a single revision to the 2009 IECC and ASHRAE Standard 90.1-2007, was permitted.

**1.** Recognizing that building standards are regularly updated, Section 109 originally required HUD to adopt standards based on "the most recent edition of the Model Energy Code of the Council of American Building Officials." 104 Stat. at 4093. But when Congress amended Section 109 to add the subsection (b) backstop provision and the subsection (c) revision provision for the agencies' own standards, Congress also amended Section 109 to reference specific code editions: "CABO Model Energy Code, 1992" and "ASHRAE Standard 90.1-1989." 106 Stat. at 2786-87. The plain reading is that Congress wanted covered housing to comply with the specified editions of those efficiency standards.

17

Moreover, the new subparagraph (b) backstop made no reference to revisions, but the subparagraph (c) revision for the agency's own standards required action "[i]f the requirements of CABO Model Energy Code, 1992, or … ASHRAE Standard 90.1-1989, are revised at any time." *Id.* In contrast, a different provision of the same statute—the Energy Policy Act of 1992—required action "[w]henever CABO Model Energy Code, 1992, (*or any successor of such code*) is revised." 106 Stat. at 2783 (emphasis added; codified as amended at 42 U.S.C. § 6833). A similar provision required action "[w]henever the provisions of ASHRAE Standard 90.1 1989 (*or any successor standard*) … are revised." *Id.* The reference to "any successor standard" has been construed to reference the comprehensive revisions that are published periodically as a new edition. *Building Energy Standards Program: Determination Regarding Energy Efficiency Improvements*, 67 Fed. Reg. 46,464, 46,466 (July 15, 2002). Where, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). The distinct references to "or any successor code" and "any successor standard" in the Energy Policy Act of 1992 must be given meaning distinguishable from the contemporaneous Section 109 provisions that lack those references.

**2.** Related statutes make clear that Congress knows how to provide for on-going updates untied to any particular edition of the IECC or ASHRAE Standard 90.1. For example, in 2005, Congress tied federal building performance standards to the 2004 IECC and ASHRAE Standard 90.1–2004. Energy Policy Act of 2005, Pub. L. 109-58 § 109, 119 Stat. 594, 614-615 (amending 42 U.S.C. § 6834). Congress required updating action "[n]ot later than 1 year after the date of approval of each subsequent revision of the ASHRAE Standard or the International Energy Conservation Code, as appropriate." *Id.* The reference to "each subsequent revision" and the identification of "the ASHRAE Standard" and the "International Energy Conservation Code" without reference to specific editions makes clear the updating obligation in 42 U.S.C. § 6834 is ongoing.

**3.** In contrast, the 2007 amendment to Section 109 makes clear Congress understood the meaning of a *particular code edition* being "revised" did *not* provide for ongoing updates.

*First*, in the new subsection (d) backstop revision provision at issue here, Congress tracked the language used in the subsection (c) revision provision, but omitted the phrase "at any time." Congress instead required action "within 1 year after the requirements of the 2006 IECC or the ASHRAE Standard 90.1-2004 are revised." In addition to the use of the definite article to refer to specific editions, *supra*, and the textual implication from updating the specific ASHRAE edition, *infra*, "Congress's choice to depart from the [ongoing updates] model of [the] closely related [Energy Policy Act of 2005 and Energy Policy Act of 1992] is a choice neither [courts] nor the agenc[ies] may disregard." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018).

*Second*, Congress struck "CABO Model Energy Code, 1992" each place it appeared and inserted "the 2006 IECC" in its place. 121 Stat. at 1648-1649. With respect to ASHRAE Standard 90.1, Congress similarly struck "1989" each place it appeared and inserted "2004." *Id.* Among the provisions changed were those requiring action if the specific code or standard was "revised at any time." The change to the edition of ASHRAE Standard 90.1 is telling. New editions of ASHRAE Standard 90.1 were issued in 1999, 2001, and 2004. If ASHRAE Standard 90.1-2004 was simply a revision of ASHRAE Standard 90.1-1989, that statutory change would have been meaningless; the revision already would have been authorized by the text. But "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). The better reading is that because the statute references particular editions being revised, only a single update to the 2006 IECC and ASHRAE Standard 90.1-2004 was contemplated, *i.e.*, an update to the next edition.

The best reading is that Congress contemplated only a single update—to the 2009 IECC and ASHRAE Standard 90.1-2007. That update was accomplished by the 2015 Final Determination, 89 Fed. Reg. 25,901, such that the second update in the 2024 Final Determination is contrary to law.

**B.**  **HUD and USDA concede the 2021 IECC does not comply with the statutory bar against negative affects to availability of covered housing.**

Regardless of whether Section 109 theoretically permits more than one revision, the 2021 IECC does not comply with the statutory criteria for doing so. That's because Section 109 provides that covered housing will only be subject to a revised efficiency standard if "the Secretary of Housing and Urban Development or the Secretary of Agriculture make a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing … subject to mortgages insured under the National Housing Act [*i.e.*, FHA-insured mortgages[4]] … or insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 …." 42 U.S.C. § 12709(d)(1). The agencies concede, however, that adopting the 2021 IECC would reduce the availability of covered housing.

In their Regulatory Impact Analysis, HUD and USDA used an estimate of the price elasticity of demand applicable "for low-income households" and "estimate[d] … that the quantity in an affected submarket will decline by 1.5 percent of the pre notice market activity" as a result of applying the 2021 IECC. Exh. 59 at 80. In the 2024 Final Determination, the agencies try to minimize that calculation as their "most cautious estimate," 89 Fed. Reg. at 33,177, but it is the only estimate in the RIA. The agencies then concede adopting the 2021 IECC "would reduce the production of homes for FHA-insured borrowers by 1.5 percent, which represents a 0.2 percent reduction of all homes available to FHA-insured homebuyers." *Id.*

---

[4] Pursuant to the National Housing Act, 12 U.S.C. §§ 1707 *et seq.*, the FHA, an entity within HUD, administers a program to insure private lenders against loss on single-family home mortgage loans. *See, e.g.*, *S. Tex. Mortg. Corp. v. HUD*, 163 F. App'x 321, 322 (5th Cir. 2006) (per curiam).

That should have been the end of the analysis. Section 109 requires that "the revised codes do not negatively affect the availability or affordability of new construction of" covered housing. The explanation for that prohibition is that the Cranston-Gonzalez Act is a *housing* statute. Congress accordingly focused on "free lunch" efficiency that unquestionably benefits low-income homebuyers. Indeed, Rep. Oakar—one of the authors of Section 109—explained that "adoption of the [1992] CABO-MEC [would reduce] total energy consumption for heating and cooling by an average of 25 percent," such that "[a] homeowner on average would pay less than $8 more in mortgage payments and save $15 per month in energy bills." Exh. 4 at 4568. *Id.* Hence the absolute bar on negative affects to affordability and availability.

Rather than accept the result of their analysis, the agencies tried to sidestep the statutory bar with speculation. The RIA claims that "[i]ncluding the benefits imparted by the Notice will diminish, and *maybe* even reverse, the contraction of new construction from higher minimum energy standards." Exh. 59 at 80 (emphasis added). Similarly, in the 2024 Final Determination, HUD and USDA claim that "[a]ny adverse impacts on availability would be diminished where there is a perceptible demand for energy-efficient homes," 89 Fed. Reg. at 33,177, but they offer no evidence that contingent condition would be satisfied in the relevant market, i.e., low-income and "especially price sensitive" first-time buyers, as distinguished from other market segments. 88 Fed. Reg. at 31,790.

Their models having shown a negative impact to affordability and availability, HUD and USDA cannot simply speculate that negative impact away. *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("[S]peculation is an inadequate replacement for the agency's duty to undertake an examination of the relevant data and reasoned analysis."); *see also Louisiana v. U.S.D.O.E.*, 90 F. 4th 461, 473, 475 (5th Cir. 2024) ("[T]he 2022 DOE recognized the facts that undermined its Repeal Rule, cited other facts to suggest the Repeal Rule would conserve water and energy, and then implicitly credited the latter without explaining why. That is the touchstone of arbitrary and capricious agency

action."); *Business Roundtable v. SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011) (action was arbitrary and capricious where agency "failed … to quantify the certain costs or to explain why those costs could not be quantified; neglected to support its predictive judgments; contradicted itself; and failed to respond to substantial problems raised by commenters"). HUD and USDA's speculation rendered the 2024 Final Determination arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

III.    **The analysis in the Final Determination is unreasoned, arbitrary, and capricious.**

The problems with HUD and USDA's analysis don't stop with speculation about offsets to the conceded negative impact to availability. That's because the details of that analysis indicate the negative impact is actually larger than the agencies report.

Under the APA, HUD and USDA were required to "examine the relevant data and articulate a satisfactory explanation for [the 2024 Final Determination] including a rational connection between the facts found and the choice made." *Louisiana*, 90 F. 4th at 469 (quoting *State Farm*, 463 U.S. at 43); *see also Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (describing an agency's "affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule"). If HUD and USDA's stated reasoning "fails to account for relevant factors," fails to grapple with contrary evidence in the record, or "evinces a clear error of judgment," it is arbitrary and capricious and violates the APA. *Louisiana*, 90 F. 4th at 469, 473. "Bare acknowledgments" and "conclusory statements" are not enough. *Id.* at 473; *see also Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) ("Stating that a factor was considered, however, is not a substitute for considering it."). The 2024 Final Determination fails at every turn.

A.    **HUD and USDA have long-acknowledged discrepancies between energy savings models and actual returns.**

Since the 2014 Preliminary Determination, HUD and USDA have acknowledged "studies that discuss limitations associated with cost-savings models such as those developed by PNNL." 79 Fed.

Reg. at 21,266. Indeed, the agencies noted a study finding "that nearly half of the investments that engineering assessments showed in energy audits … would have short payback periods were not adopted due to unaccounted physical costs, risks, or opportunity costs," and that "engineering estimates of energy savings can overstate true field returns, sometimes by a large amount, and that some engineering simulation models have still not been fully calibrated to approximate actual returns." *Id.* In the 2015 Final Determination, HUD and USDA nevertheless proceeded with the "PNNL-DOE model used to estimate the savings shown" because it supposedly "represent[ed] the current state-of-the-art for such modeling, is the product of significant public comment and input, and is now the standard for all of DOE's energy code simulations and models." 80 Fed. Reg. at 25,914.

HUD and USDA relied on a similar methodology to analyze the 2021 IECC. But the agencies simply regurgitated verbatim the same statements about studies showing model limitations, unaccounted for costs, and overstated returns. For example, the agencies again noted "studies that discuss limitations associated with cost-savings models such as those developed by PNNL," including one suggesting "it is difficult to take at face value the quantitative conclusions…." 88 Fed. Reg. at 31,784. And they—again—recited that the now-decade-old PNNL model "represents the current state-of-the-art for such modelling," 88 Fed. Reg. at 31,784-85, apparently without considering whether that statement remained true. The agencies' conclusory drive-by on such a critical aspect of the problem indicates a lack of reasoning so serious as to violate the APA.

**B.    The agencies rejected newer models and ignored real world data indicating that compliance with the 2021 IECC costs substantially more than HUD and USDA estimated**

HUD and USDA's failure to grapple with whether to revisit their model is surprising. Multiple commenters raised concerns with both the inputs and the output of the agencies' analysis. NAHB, for example, commented that a Home Innovation Research Labs ("HIRL") analysis showed costs to comply with the 2021 IECC were two to three times higher than the PNNL model used by the

agencies. 89 Fed. Reg. at 33,134. The agencies' ground for rejecting the HIRL analysis was that "[t]he analysis produced by PNNL was developed with a methodology that underwent a rigorous public comment and peer review process, [and] has been used for cost-benefit analysis of the revised editions of the IECC and ASHRAE since the 2006 IECC," whereas the HIRL analysis and another commenter's report "are independent, third-party studies that include additional data and analysis but are not peer reviewed nor do they follow a federally approved methodology." *Id.* Assuming arguendo that taking public comment on a prior model constitutes peer review, *see* 88 Fed. Reg. at 31,784—it doesn't—that a model was peer-reviewed a decade-or-more before utterly fails to establish that it remains the "current state-of-the-art" or that it accurately models reality. The agencies offered nothing more than *ipse dixit* for their contrary conclusion.[5]

Worse, HUD and USDA ignored the real-world data showing their models significantly underestimated the real-world cost of implementing the 2021 IECC, and that generally aligned with the HIRL analysis. Exh. 57 at 6. The Fifth Circuit has found arbitrary and capricious action where an agency "recognized the facts that undermined its [rule], cited other facts … and then implicitly credited the latter without explaining why." *Louisiana*, 90 F. 4th at 473. Here, however, the agencies didn't even acknowledge the contrary real-world data. That failure to "reflect upon the information

---

[5] The agencies response was also both a reversal in position and reflective of a schizophrenic approach to data and analyses supplied by HIRL. For example, in the 2015 Final Determination, the agencies favorably cited HIRL's analysis that calculated payback periods similar to DOE's, 80 Fed. Reg. at 25,906. The agencies then noted that PNNL's methodology incorporates data from HIRL. *Id.* Similarly, in the 2024 Final Determination, the agencies found it "important to note" that HIRL's energy savings analysis "show[s] consensus with the PNNL energy savings estimates used by HUD and USDA in their determination," and again noted that PNNL's methodology incorporates data from HIRL. *Id.* The inference is that the agencies were cherry-picking data and results that agreed with the PNNL model to support their desired outcome, while disregarding data and results from those same sources that undermined that outcome. Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Commerce v. U.S.D.O.L.*, 885 F. 3d 360, 382 (5th Cir. 2018).

contained in the record and grapple with contrary evidence" reflected arbitrary, capricious, and unreasoned decision-making. *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017); *see also New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("[A]n agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary agency action, and the findings based on [such a] study are unsupported by substantial evidence.").

### C. HUD and USDA ignored serious defects in their analysis.

#### 1. HUD and USDA acknowledged they originally used outdated economic factors, but did not adjust their analysis to consider real-world business arrangements and real-world home designs.

The agencies ultimately conceded their model wasn't aligned with reality. Indeed, they admitted the economic factors used in their "peer reviewed" and "federally approved methodology" were wrong. HUD and USDA couldn't blind themselves to the judicially-noticeable mortgage rates and CPI inflation published in the *Wall Street Journal*. So they "revised their analysis to include updated economic factors that better reflect current market conditions," as well as the lower down payment and smaller home sizes typical of FHA borrowers. 89 Fed. Reg. at 33,133, 33,136-37.

HUD and USDA did not, however, adjust their models to accurately reflect real-world business arrangements and home design. The agencies then attributed the differences between the PNNL and HIRL estimates to the profit margin used and "differences between the configuration of the model homes used by PNNL and [HIRL] respectively." 89 Fed. Reg. at 33,134. The result is that HIRL's cost estimates are approximately 2.2 times larger than the PNNL analysis. *Id.* If HIRL's estimate is correct—or the real answer is merely closer to HIRL's estimate than the agencies' estimate—the higher cost would severely undermine the agencies' Final Determination given that the agencies' lower cost estimates concededly decrease availability of covered housing.

2. **The agencies failed to account for real-world contractor and subcontractor business arrangements and the associated overhead and profit, such that the Final Determination underestimates the real-world cost to homebuyers.**

There is agreement that the proper cost analysis should reflect the change in cost to the home buyer, *i.e.*, so-called "first cost." "The PNNL methodology [used by HUD and USDA] for evaluating the impacts of building energy codes defines first cost as the marginal retail cost of implementing a code change," "including materials, labor, equipment, overhead, and profit." 89 Fed. Reg. at 33,134. In the PNNL analysis, "[a] factor of 15 percent is included for overhead and profit." *Id.* at 33,135.

But the PNNL analysis critically omits the profit and overhead of general contractors. In contrast, the HIRL analysis supplied by NAHB recognizes that real-world home construction typically involves both a general contractor and trade-specific subcontractors like plumbing companies, electric companies, and insulation companies. And in the real-world, both the general contractor and the subcontractors charge for overhead and profit. The HIRL analysis accordingly explained "[t]he total cost to [the] builder includes overhead and profit … applied to individual component costs (materials and labor) to represent the cost charged by the sub-contractor," and "[t]he total cost to consumer is based on applying a builder's gross profit margin of 19.0% to the builder's total cost." Exh. 60 at 1 (citing NAHB's Builder's Cost of Doing Business Study, 2019 Edition). But rather than acknowledge the real-world business arrangement, HUD and USDA faulted the HIRL analysis for its purported "assumption of a high profit margin." 89 Fed. Reg. at 33,134.

The failure of the agencies to account for the business arrangement commonly used in real-world home construction was arbitrary and capricious. *See Louisiana*, 90 F. 4th at 472-473 (ignoring effect of real-world substitution of handwashing on dishwasher energy efficiency was arbitrary and capricious). Further, the agencies provide no support for their assumption of a single, 15.0% profit margin, an omission that is particularly significant in the face of contrary data showing an industry average of a 19.0% margin for general contractors, alone. That, too was arbitrary and capricious. *See*

*Columbia Falls*, 139 F.3d at 923 (explaining that an agency "retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule").

### 3. The agencies inexplicably relied on a simple, non-representative box-style home for modelling insulation costs.

HUD and USDA correctly explained that "[t]he design of the home plays a role by determining the quantity of insulation." 89 Fed. Reg. at 33,134. That's because a home with a larger exterior surface area requires more insulation. The agencies also correctly identified the difference in the design of the PNNL and HIRL model homes, as well as the resulting impact on insulation quantity, and, in turn, cost:

> The model single family homes of PNNL are similar in terms of living space (floor area). The Home Innovation model is less dense, however, and has more of its floor area in the first floor than the second floor. A low-density design leads to larger areas exposed to the exterior and in need of insulation. For example, although the floor area of the Home Innovation home is only 5 percent greater, the ceiling area requiring insulation is 56 percent greater.

89 Fed. Reg. at 33,134.

The PNNL single-family model home is a simple box, *i.e.*, a shape that minimizes surface area:



Exh. 64 at 2.3 - 2.4; Exh. 53 at B.2. In contrast, "[t]he building geometry … used in [HIRL's] analysis

… was originally developed using Home Innovation's 2009 Annual Builder Practices Survey (ABPS)

for a representative single-family detached home." Exh. 60 at 2. Known as the "Standard Reference

House," "[t]he parameters [including first floor area, first floor wall area, second floor area, and second

floor wall area] represent the average values from the ABPS for building areas and features not dictated

by the IECC," with "[t]he geometry … updated based on Home Innovation's 2019 ABPS." *Id.*



Exh. 60 at 2-3. HIRL's underlying methodology document elaborates:

> The Standard Reference House … is not intended to represent a house that has been
> or would be built; however, it does represent the relative averages for the components
> that affect energy consumption. This is appropriate for a methodology such as this
> with a goal to predict representative energy usage.
> \* \* \* \* \*
> Most houses are irregular in shape (i.e., not rectangles). Consequently, houses have a
> higher ratio of wall to floor area as compared to a simple rectangle. The Standard
> Reference House shape incorporates average wall areas and floor areas along with
> assigning equal wall exposure in all cardinal directions into its design.

Exh. 61 at 2-4. [6]

---

[6] The common practice in both industry and government is to develop a model and publish the
detailed description of that model when first used or in a separate "methodology" paper or "technical
support document," with subsequent uses of the model simply cross-referencing the original detailed

In the 2024 Final Determination, HUD and USDA discuss the HIRL and PNNL analyses, and they correctly note "[t]he representativeness of the [HIRL] and PNNL data are not equivalent." 89 Fed. Reg. at 33,134. The agencies elaborate that "[t]he set of prototypes PNNL uses in its analysis are designed to represent the majority of the new residential building construction stock," then recite the irrelevant point that the PNNL methodology "uses a suite of representative residential prototype buildings, including a single family and a low-rise multi-family residential building, each with four different foundation types … and four heating system types." *Id.* That's little more than a crude attempt to imply by association that the geometry of the PNNL prototype is representative. It's not, and neither the PNNL analysis nor the PNNL methodology documents claim otherwise. The agencies then concede that "[t]he Standard Reference House by [HIRL] is primarily based on the results of the 2008-2009 Annual Builder Practice Survey," which "represents a comprehensive source of general housing characteristics in the United States and contains information on building square footage, wall square footage, … and other residential construction characteristics." *Id.* But the agencies then reject the higher insulation cost estimate generated by the data-backed HIRL model.

HUD and USDA never explained why they selected the unrepresentative box geometry put forth by PNNL over the HIRL geometry. *But see New Orleans*, 969 F.2d at 1167. Given the large cost impact, geometry is certainly an important aspect of the problem. And the significantly higher cost when geometry is "primarily based on" "a comprehensive source of general housing characteristics" that includes building square footage and wall square footage seriously undermines the 2024 Final Determination. But there's only a bare acknowledgment that the HIRL geometry yields higher cost.

---

description. *See* Exhs. 53 at 2-3; 60 at 1 & n.1. The detailed description was identified in the HIRL analysis cited by HUD and USDA. Given the agencies' discussion of the HIRL model in the 2024 Final Determination, 89 Fed. Reg. at 33,134, the detailed description of the HIRL model, Exh. 61, was presumably considered by the agencies. But if the detailed description of the HIRL model wasn't considered, the agencies' dismissal of that model was arbitrary and capricious.

HUD and USDA's analysis is thus analogous to the analysis the Fifth Circuit held arbitrary and capricious in *Louisiana v. U.S. Department of Energy*, 90 F. 4th 461. There, the Fifth Circuit held the result "appear[ed] to rest on [the agency's] unexplained balancing of evidence" because the agency "recognized the facts that undermined its [rule], cited other facts to suggest [support for its rule], then implicitly credited the latter without explaining why." *Id.* at 473. The analysis in the Final Determination is even more arbitrary and capricious because the "other facts" the agencies rely on consist of a plainly inferior, non-representative geometry that merely minimizes insulation cost.

## **CONCLUSION**

Whether viewed as unconstitutional, contrary to statute, or arbitrary and capricious, the 2024 Final Determination is unlawful. The Court should grant summary judgment in favor of Plaintiffs, and the Court should vacate and set aside the 2024 Final Determination. *See Rest. Law Ctr.*, 120 F. 4th at 177.

Dated: April 28, 2025

Respectfully submitted:

**DEREK BROWN**
  **ATTORNEY GENERAL OF UTAH**

*/s/ Stanford E. Purser*
STANFORD E. PURSER (USB 13440)
  *Solicitor General*
OFFICE OF THE UTAH
  ATTORNEY GENERAL
160 E. 300 S., 5th floor
Salt Lake City, Utah 84111
Tel. (801) 366-0100
spurser@agutah.gov

*Counsel for State of Utah*


*/s/ Joseph S. St. John*
JOSEPH S. ST. JOHN (LSB 36682)
ST. JOHN LLC
1701 Jefferson Avenue
New Orleans, LA 70115
Tel. (410) 212-3475
scott@stjohnlaw.com

*Counsel for National Association of Home Builders
of the United States*



**STEVE MARSHALL**
  **ATTORNEY GENERAL OF ALABAMA**

*Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GEN.
501 Washington Ave.
Montgomery, AL 36130
Tel. (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

**KEN PAXTON**
  **ATTORNEY GENERAL OF TEXAS**

BRENT WEBSTER
*First Assistant Attorney General*

*/s/ Ryan G. Kercher*
RYAN G. KERCHER (TSB 24060998)
*Deputy Division Chief*
  *Special Litigation Division*
ZACHARY BERG (TSB 24107706)
*Special Counsel*
OFFICE OF THE ATTORNEY GENERAL
  OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Tel. (512) 463-2100
Ryan.Kercher@oag.texas.gov
Zachary.Berg@oag.texas.gov

*Counsel for State of Texas*



**RAUL R. LABRADOR**
  **ATTORNEY GENERAL OF IDAHO**

*/s/ Sean "Jack" Corkery*
SEAN "JACK" CORKERY
  *Assistant Solicitor General*
OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W Jefferson St #210
Boise, ID 83720
Tel. (208) 332-3548
jack.corkery@ag.idaho.gov

*Counsel for State of Idaho*

**TIM GRIFFIN**
  **ATTORNEY GENERAL OF ARKANSAS**

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON (TSB 24092947)
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL TIM GRIFFIN
323 Center Street, Suite 200
Little Rock, AR 72201
Tel. (501) 682-2007
autumn.patterson@arkansasag.gov

*Counsel for State of Arkansas*


**THEODORE E. ROKITA**
  **ATTORNEY GENERAL OF INDIANA**

*/s/ James A. Barta*
JAMES A. BARTA*
  *Solicitor General*
INDIANA ATTORNEY GENERAL'S OFFICE
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Tel. (317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*


**KRIS W. KOBACH**
  **ATTORNEY GENERAL OF KANSAS**

*/s/ James Rodriguez*
JAMES RODRIGUEZ
  *Assistant Attorney General*
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel. (785) 296-7109
jay.rodriguez@ag.ks.gov

*Counsel for State of Kansas*


**BRENNA BIRD**
  **ATTORNEY GENERAL OF IOWA**

*/s/ Eric H. Wessan*
ERIC H. WESSAN
  *Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel. (515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*


**LIZ MURRILL**
  **ATTORNEY GENERAL OF LOUISIANA**

*/s/ Kelsey L. Smith*
KELSEY L. SMITH (TSB 24117070)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel. (225) 428-7432
SmithKel@ag.louisiana.gov

*Counsel for State of Louisiana*


**AUSTIN KNUDSEN**
  **ATTORNEY GENERAL OF MONTANA**

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.*
  *Deputy Solicitor General*
MONTANA DEPT. OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
peter.torstensen@mt.gov

*Counsel for State of Montana*

**ANDREW BAILEY**
**ATTORNEY GENERAL OF MISSOURI**

*/s/ Dominic X. Barceleau*
DOMINIC X. BARCELEAU*
  *Assistant Attorney General*
OFFICE OF THE MISSOURI
  ATTORNEY GENERAL
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel: (314) 340-7366
dominic.barceleau@ago.mo.gov

*Counsel for State of Missouri*


**MICHAEL T. HILGERS**
**ATTORNEY GENERAL OF NEBRASKA**

*/s/ Grant D. Strobl*
GRANT D. STROBL*
  *Assistant Solicitor General*
OFFICE OF THE NEBRASKA ATTORNEY GEN.
2115 State Capitol
Lincoln, NE 68509
Tel. (402) 471-2683
grant.strobl@nebraska.gov

*Counsel for State of Nebraska*


**JONATHAN SKRMETTI**
**ATTORNEY GENERAL AND REPORTER**
**OF TENNESSEE**

*/s/ Whitney D. Hermandorfer*
WHITNEY D. HERMANDORFER (TNSB 041054)
  *Director of Strategic Litigation*
STATE OF TENNESSEE
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 20207
Nashville, Tennessee 37202
Tel. (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*


**ALAN WILSON**
**ATTORNEY GENERAL OF SOUTH CAROLINA**

*/s/ Thomas Hydrick*
THOMAS HYDRICK*
  *Assistant Deputy Solicitor General*
OFFICE OF THE SOUTH CAROLINA
  ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*


**JOHN B. MCCUSKEY**
**ATTORNEY GENERAL OF WEST VIRGINIA**

*/s/ Michael R. Williams*
MICHAEL R. WILLIAMS (WVB 14148)*
  *Solicitor General*
State Capitol Complex,
Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
Tel. 304-558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

*\* pro hac vice or motion for admission to follow*

33