**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| STATE OF UTAH, STATE OF TEXAS, STATE OF ALABAMA, STATE OF ARKANSAS, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF SOUTH CAROLINA, STATE OF TENNESSEE, STATE OF WEST VIRGINIA, and NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, | |
| *Plaintiffs*, | Case No. 6:25-cv-00001-JDK |
| v. | |
| SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF AGRICULTURE, | |
| *Defendants*. | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ..........................................................................................................................1

Statement of Undisputed Facts ............................................................................................6

Response to Statement of Issues to be Decided....................................................................6

Legal Standard .....................................................................................................................7

Argument .............................................................................................................................8

    I.     CRANSTON–GONZALEZ SECTION 109 IS CONSTITUTIONAL ......................8
          A.  The Court Lacks Jurisdiction Over Plaintiffs' Challenge to Section 109 Because the Statute of Limitations Has Run................................................................8
          B.  Section 109's in Toto Code-Update Arrangement Is Not Unconstitutional ...........9
          C.  Section 109's Delegation Does Not Violate the Constitution Because There Was No Delegation and, Even If There Was, the Agencies Retain Enough Control ......9
          D.  Section 109's Spending Conditions Are Not Unambiguous .................................15
    II.    THE 2024 FINAL DETERMINATION IS NOT CONTRARY TO LAW................16
          A.  Section 109 Permits Repeated Updates to Home Energy Standards ....................16
          B.  The 2024 Final Determination Complies with Section 109's Requirements Concerning Availability of New Housing ...........................................................22
    III.  THE 2024 FINAL DETERMINATION SATISFIES THE APA 28..........................25
          A.  The 2024 Final Determination Is Reasonable and Reasonably Explained ...........25

Conclusion .........................................................................................................................30

## TABLE OF AUTHORITIES

**Federal Cases**                                                                **Page(s)**

*Am. Soc'y for Testing & Materials ("ASTM") v. Public.Resource.Org, Inc.,*
   896 F.3d 437 (D.C. Cir. 2018) ............................................................................9

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008) ..........................................................................27

*Amin v. Mayorkas,*
   24 F.4th 383 (5th Cir. 2022) ..............................................................................7

*Appalachian Power Co. v. EPA,*
   249 F.3d 1032 (D.C. Cir. 2001) ........................................................................30

*BCCA Appeal Grp. v. EPA,*
   355 F.3d 817 (5th Cir. 2003) ............................................................................25

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys.,*
   419 U.S. 281 (1974) ..........................................................................................25

*Chamber of Commerce v. CFPB,*
   691 F. Supp. 3d 730 (E.D. Tex. 2023) ...............................................................6

*Cherokee Nation v. Dep't of Interior,*
   531 F. Supp. 87 (D.D.C. 2021) .........................................................................27

*City of Portland v. EPA,*
   507 F.3d 706 (D.C. Cir. 2007) ..........................................................................29

*Consumers' Research v. FCC,*
   109 F.4th 743 (5th Cir. 2024) ..............................................................11, 12, 14

*Corner Post, Inc. v. Bd. of Govs. of Fed. Res. Sys.,*
   603 U.S. 799 (2024) ............................................................................................8

*FCC v. Prometheus Radio Proj.,*
   592 U.S. 414 (2021) ..........................................................................................25

*FDA v. Wages & White Lion Invs., L.L.C.,*
   145 S. Ct. 898 (2025) ........................................................................................25

*Garcia for Congress v. FEC,*
   22 F. Supp. 3d 655 (N.D. Tex. 2014) .................................................................7

*Huawei Techs., USA v. FCC,*

2 F.4th 421 (5th Cir. 2021) ............................................................................................29

*Huskey v. Jones,*
  45 F.4th 827 (5th Cir. 2022) ........................................................................................7

*Int'l Dark-Sky Ass'n v. FCC,*
  106 F.4th 1206 (D.C. Cir. 2024) ................................................................................10

*Irwin v. Dept' of Vets. Affairs,*
  498 U.S. 89 (1990) .......................................................................................................9

*ITServe Alliance, Inc. v. DHS,*
  590 F. Supp. 3d 27 (D.D.C. 2022) ..............................................................................7

*K Mart Corp. v. Cartier, Inc.,*
  486 U.S. 281 (1988) ...................................................................................................18

*King v. Burwell,*
  576 U.S. 473 (2015) ...................................................................................................19

*Little Sisters of the Poor Sts. Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ...................................................................................................26

*Lomax v. Ortiz-Marquez,*
  140 S. Ct. 1721 (2021) ...............................................................................................17

*Marsh v. Or. Nat'l Res. Council,*
  490 U.S. 360 (1989) ...................................................................................................29

*Medina Cty. Envmtl. Action Ass'n v. Surface Transp. Bd.,*
  602 F.3d 687 (5th Cir. 2010) ................................................................................25, 29

*Mississippi v. JXN Water,*
  134 F.4th 312 (5th Cir. 2025) ....................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................................................8

*National Horsemen's Benevolent & Protective Association v. Black,*
  53 F.4th 869 (5th Cir. 2022) ..........................................................................12, 13, 14

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021) ...................................................................................................17

*Ohio v. EPA,*
  603 U.S. 279 (2024) ...................................................................................................30

*Pennhurst v. Halderman,*
   451 U.S. 451, 1 (1981)...................................................................................................17

*SAS Inst. v. Iancu,*
   584 U.S. 357 (2018).......................................................................................................18

*Shafer & Freeman Lakes Envmtl. Conservation Corp. v. FERC,*
   992 F.3d 1071 (D.C. Cir. 2021) .....................................................................................30

*Sierra Club v. EPA,*
   939 F.3d 649 (5th Cir. 2019) .........................................................................................26

*Sierra Club v. Lynn,*
   502 F.3d 43 (5th Cir. 1974) ......................................................................................11, 26

*Texas v Yellen,*
   105 F.4th 755 (5th Cir. 2024).........................................................................................15

*Stone v. INS,*
   514 U.S. 386 (1995).......................................................................................................20

*Sunshine Anthracite Coal Co. v. Adkins,*
   310 U.S. 381 (1940).......................................................................................................11

*Texas v. Rettig,*
   987 F.3d 518 (5th Cir. 2021)....................................................................................*passim*

*Texas v. U.S. Dep't of Health & Human Servs.,*
   ____ F. Supp. 3d____, 2025 WL 818155 (E.D. Tex. Mar. 13, 2025)..............................18

*U.S. Chamber of Commerce v. SEC,*
   85 F.4th 760 (5th Cir. 2023)...........................................................................................26

*U.S. Telecom Ass'n v. FCC,*
   359 F.3d 554 (D.C. Cir. 2004) .....................................................................................9, 11

*United States v. Oregon,*
   366 U.S. 643 (1961).......................................................................................................21

*Willingham v. Dep't of Labor,*
   475 F. Supp. 2d 607 (N.D. Tex. 2007) .............................................................................7

**Federal Statutes**

28 U.S.C. § 2401(a) .............................................................................................................8

38 U.S.C. § 3704(f).............................................................................................................21

42 U.S.C. § 12703(1)-(3).....................................................................................................21

42 U.S.C. § 12709..................................................................................................... 1, 8, 19

42 U.S.C. § 12709(a)....................................................................................................*passim*

42 U.S.C. § 12709(a)(2)............................................................................................... 18, 23

42 U.S.C. § 12709(c)...........................................................................................10, 18, 21

42 U.S.C. § 12709(d)....................................................................................................*passim*

42 U.S.C. § 12709(d)(1)............................................................................................*passim*

42 U.S.C. § 12709(d)(2)..........................................................................................................3

42 U.S.C. § 1487(a)..............................................................................................................28

## Other Authorities

*Preliminary Affordability Determination—Energy Efficiency Standards,*
   79 Fed. Reg. 21,259 (Apr. 15, 2014)......................................................................12

*Request for Information: Updating and Improving the DOE Methodology for Assessing the Cost-Effectiveness of Building Energy Codes,*
   80 Fed. Reg. 19,974 (Apr. 14, 2015) .......................................................................4

*Request for Information: Updating and Improving the DOE Methodology for Assessing the Cost-Effectiveness of Building Energy Codes,*
   80 Fed. Reg. 27,680 (May 14, 2015)........................................................................4

*Updating and Improving the DOE Methodology for Assessing the Cost-Effectiveness of Building Energy Codes*
   80 Fed. Reg. 59,757 (Oct. 2, 2025) ...........................................................................5

*Final Affordability Determination—Energy Efficiency Standards,*
   80 Fed. Reg.25,901 (May 6, 2015)..........................................................................12

*Preliminary Analysis Regarding Energy Efficiency Improvements in the 2021 International Energy Conservation Code (IECC),*
   86 Fed. Reg. 26,710 (May 17, 2021).........................................................................3

*Preliminary Analysis Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1-*

*2019,*
86 Fed. Reg. 20,674 (Apr. 21, 2021) ............................................................................3

*Baseline Energy Efficiency Standards Update for New Federal Commercial and Multi-Family High-Rise Residential Buildings,*
87 Fed. Reg. 20,267 (Apr. 7, 2022) (ASHRAE 90.1-2019) ...................................4

*Adoption of Energy Efficiency Standards for New Construction of HUD– and USDA-Finance Housing: Preliminary Determination and Solicitation of Comment,*
88 Fed. Reg. 31,773 (May 18, 2023)........................................................... 5, 12

*Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD– and USDA-Financed Housing,*
89 Fed. Reg. 33,112 (Apr. 26, 2024) ........................................................ 1, 6, 12

## INTRODUCTION

This case concerns HUD and USDA's joint determination that adopting the latest home-energy codes would not negatively affect availability or affordability of newly built HUD– and USDA-supported housing. *Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD– and USDA-Financed Housing*, 89 Fed. Reg. 33,112 (Apr. 26, 2024) ("Final Determination"). The Final Determination is the culmination of a decade's work, involving expert code bodies, the Department of Energy ("DOE"), HUD, and the Department of Agriculture. Throughout the process, there were multiple opportunities for public input, which some Plaintiffs availed themselves of.

But that wasn't enough. Dissatisfied with the result, Plaintiffs filed this suit seeking another bite at the apple. In doing so, however, they have levelled meritless claims, some even barred by the statute of limitations. The statute underlying HUD and USDA's process—42 U.S.C. § 12709—is constitutional. The Final Determination represents the best interpretation of that statute. And the decisions reflected in Final Determination are not arbitrary and capricious. They represent HUD and USDA using the best of their expertise and the public's to conduct a highly technical, scientific analysis and reach a reasoned conclusion. Plaintiffs' motion for summary judgment should be denied and the Court should grant summary judgment in favor of Defendants.[1]

## BACKGROUND

The Final Determination is underpinned by the work of multiple groups. First, two code bodies update their respective home-energy codes. The International Code Council ("ICC") issues the International Energy Conservation Code ("IECC"). It applies to single-family homes and multifamily homes up to three stories. Final Determination at 33,133. The other code, the ASHRAE 90.1 Standard, is formulated by the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE"). It applies to multifamily buildings above three stories. *Id.* The ICC and ASHRAE ("Code Bodies") are nonprofit industry bodies. ECF 35-9 at 2, 15, 17. They accept public

---

[1] Defendants have also filed a Motion to Dismiss, or in the Alternative for a Stay of Proceedings, or in the Alternative for Modification of the Briefing Schedule. ECF 32. Defendants maintain all arguments and their request for relief made therein.

proposals to modify their codes, hold public hearings, accept written comments, and issue final updates to their codes. This process resulted in the 2021 IECC and ASHRAE Standard 90.1-2019.

DOE decides whether the codes are sufficiently energy-efficient for adoption by the Government. It does so via notice-and-comment rulemaking. DOE undertook this process and determined that these codes met the requisite energy-efficiency standards.

Finally, HUD and USDA determine whether to apply the updated codes to HUD– and USDA-supported housing. They may do so only if adopting the codes would "not negatively affect the availability or affordability of new construction of . . . housing . . .subject to mortgages insured under the National Housing Act or insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949, respectively." 42 U.S.C. § 12709(d)(1). HUD and USDA did so with the Final Determination.

**The Energy Codes**

The creation of the codes is the first step toward the Final Determination. The Code Bodies develop their codes along similar paths. *See How Are Building Energy Codes Developed?*, U.S. DEP'T OF ENERGY (Aug. 8, 2016), https://www.energy.gov/eere/ buildings/articles/how-are-building-energy-codes-developed. The IECC undergoes revisions every three years through a five-step process:

1. Public Submission. Participants can include trade associations and government agencies.

2. First Public Hearing. The ICC compiles the proposed changes and publishes them. The ICC then holds a hearing, where stakeholders can debate the proposals' merit before an expert committee. The committee then votes to approve a proposal, modify and approve it, or disapprove it.

3. Public Comment. The public then submits comments on the committee's recommendations as captured by their votes. If there are no comments on an approved or modified proposal, then it is placed on the consent agenda for the second public hearing. If a disapproved proposal has no comments, then it is dropped.

4. Second Public Hearing. Stakeholders present their arguments to ICC Governmental Member Representatives, who then cast the final votes. These representatives come from city and county building departments, state governments, and federal agencies.

5. Finalize New Edition. All changes approved at the second public hearing are published in the new edition of the IECC.

*Id.* Plaintiffs—a trade association and various states—thus had three opportunities for public input when the ICC was updating its code.

ASHRAE follows a similar process to update its code every three years:

1. Public Submission. Anyone can submit proposed revisions at any time.

2. ASHRAE Consideration. The Standards Project Liaison Subcommittee and its co-sponsor, the Illuminating Engineering Society, consider proposals on a continual basis. They then approve or disapprove proposals to continue through the process.

3. Public Hearing. ASHRAE assembles Standing Standards Project Committees to handle the remaining revision process.. These stakeholder committees include members from major interest groups. The committees consider proposals and vote on which to approve. The committee meetings are open to the public, and public participation is encouraged.

4. Public Comment. ASHARE makes proposed changes available for public comment. The comment period typically lasts 30–45 days. Anyone can submit comments. The committee then considers all comments, sometimes resulting in modification and additional rounds of public review.

5. Resolve Comments and Additional Public Comment. If all commenters have deemed their comments resolved, the proposal is accepted. If there are unresolved comments, the committee votes whether to accept the proposal anyway.

6. Finalize New Edition. After an opportunity for appeals, ASHRAE publishes the approved addenda. After three years, all published addenda are complied to create the new edition.

*Id.* ASHRAE thus provides more public input than the ICC: public hearing, public comment, a chance for public pushback against comment resolution, and appeals. Plaintiffs could have participated in any step of the process during the formation of the 2021 ICC and 2019 ASHRAE codes.

**DOE's Determination of Energy Efficiency**

Next in the code-adoption process, DOE determined whether the updated codes improve energy efficiency through notice-and-comment rulemaking. 42 U.S.C. § 12709(d)(2). First, DOE issued separate requests for information on the 2021 ICC and 2019 ASHRAE codes. *See Preliminary Analysis Regarding Energy Efficiency Improvements in the 2021 International Energy Conservation Code (IECC)*, 86 Fed. Reg. 26,710 (May 17, 2021); *Preliminary Analysis Regarding Energy Efficiency Improvements in*

3

*ANSI/ASHRAE/IES Standard 90.1-2019*, 86 Fed. Reg. 20,674 (Apr. 21, 2021).

Next, DOE provided a public-comment period. No plaintiff took the opportunity to offer input. *See* Public Comments, Docket No. EERE-2021-BT-DET-0010 (IECC); Public Comments, Docket No. EERE-2020-BT-DET-0017-0001 (ASHRAE).

Finally, DOE incorporated public comments and issued a final determination on each code's energy efficiency. *See Final Determination Regarding Energy Efficiency Improvements in ANSI/ASHRAE/IES Standard 90.1-2019*, 86 Fed. Reg. 40,543 (July 28, 2021); *Analysis Regarding Energy Efficiency Improvements in the 2021 International Energy Conservation Code (IECC)*, 86 Fed. Reg. 40.529 (July 28, 2021).[2] DOE determined that the 2021 ICC and 2019 ASHRAE codes would improve energy efficiency. 86 Fed. Reg. at 40,543–44; 86 Fed. Reg. at 40,530.

**DOE's PNNL Model for Cost-Effectiveness**

HUD and USDA then examined whether the updated codes would negatively affect the availability or affordability of new housing eligible for HUD or USDA support, 42 U.S.C. § 12709(d)(1), using DOE's Pacific Northwest National Laboratory ("PNNL Model"), *see* Final Determination at 33,133. The PNNL Model is *itself* updated through notice-and-comment rulemaking. First, DOE issued a request for information. *Request for Information: Updating and Improving the DOE Methodology for Assessing the Cost-Effectiveness of Building Energy Codes*, 80 Fed. Reg. 19,974 (Apr. 14, 2015). A public comment period followed, where NAHB commented twice. First, they requested an extension to the comment period. *Comment Letter from NAHB* (Apr. 17, 2015) (Docket No. EERE-2015-BT-BC-0001-0006). DOE granted their request. *See Request for Information: Updating and Improving the DOE Methodology for Assessing the Cost-Effectiveness of Building Energy Codes*, 80 Fed. Reg. 27,680 (May 14, 2015). NAHB then commented on the proposal's substance. *Comment Letter from NAHB* (June 3,

---

[2] DOE also undertakes the same process to determine whether the updated codes are cost-effective. *See Baseline Energy Efficiency Standards Update for New Federal Commercial and Multi-Family High-Rise Residential Buildings*, 87 Fed. Reg. 20,267 (Apr. 7, 2022) (ASHRAE 90.1-2019); *Energy Efficiency Standards for the Design and Construction of New Federal Low-Rise Residential Buildings Baseline Standards Update*, 87 Fed. Reg. 19,595 (Apr. 5, 2022) (2021 IECC). But this analysis is not part of Cranston-Gonzalez's process and thus is not part of HUD and USDA's.

2015) (Docket No. EERE-2015-BT-BC-0001-0018). Their critiques echo claims they level in this case, including criticizing PNNL Model's prototypical building and the 30-year cost lifecycle. *Id.* at 2–3.

DOE then issued its final notice updating the PNNL Model. *Updating and Improving the DOE Methodology for Assessing the Cost-Effectiveness of Building Energy Codes*, 80 Fed. Reg. 59,757 (Oct. 2, 2015). And in a separate document, the agency responded to comments, including some from NAHB. *See Supporting Materials: Summary DOE Cost Summary of Changes Responding to RFI Comments* (Sept. 3, 2015) (Docket No. EERE-2015-BT-BC-0001-0021). DOE also shared a redline identifying updates to the PNNL Model. *See Supporting Materials: Report: Methodology for Evaluating Cost-Effectiveness of Residential Energy Code Changes (REDLINE Version)* (Aug. 2015) (Docket No. EERE-2015-BT-BC-0001-0022). DOE thus reexamined its model and updated it to conform to current realities and best practices.

**HUD and USDA's Determination**

Finally, HUD and USDA applied the updated PNNL Model to determine whether the 2021 ICC and 2019 ASHRAE codes would negatively impact the availability and affordability of new HUD– and USDA-supported housing. It followed the same practice as the ICC, ASHRAE, and DOE: notice, public comment, and publication of final product.

First, HUD and USDA posted the preliminary determination that the updated codes would not negatively affect availability and affordability; they also requested public comment. *Adoption of Energy Efficiency Standards for New Construction of HUD– and USDA-Finance Housing: Preliminary Determination and Solicitation of Comment*, 88 Fed. Reg. 31,773 (May 18, 2023). And for good measure, HUD and USDA posted their draft Regulatory Impact Analysis ("RIA"), laying out their reasoning in full detail. *RIA: Energy Efficiency Standards* (May 29, 2023) (Docket No. HUD-2023-0034-0005). The agencies provided 60 days for comment. 88 Fed. Reg. at 31,773.

NAHB commented twice. NAHB's substantive comments mirror the claims here, critiquing the PNNL Model and underlying financial assumptions *Comment Letter from NAHB* (Aug. 7, 2023) (Docket No. HUD-2023-0034-0124).[3]

_____

[3] Plaintiff State of Montana also submitted comments. Comment Letter by Attorney General Austin

Finally, HUD and USDA incorporated public feedback and issued the Final Determination. 89 Fed. Reg. 33,112. They contemporaneously issued the final RIA showing their work. Regulatory Impact Analysis: Energy Efficiency Standards (Apr. 25, 2024) (Docket No. HUD-2023-0034-0129). The Final Determination spent nearly a third of its contents responding to public comment, including from NAHB. *See* Final Determination at 33,121–44. Ultimately, HUD and USDA determined that, per 42 U.S.C. § 12709(d)(1), adopting the 2021 ICC and 2019 ASHRAE codes would not negatively affect the availability or affordability of newly built HUD– and USDA-supported housing.

## STATEMENT OF UNDISPUTED FACTS

This case is based on judicial review of an administrative record and therefore Defendants contend a statement of material undisputed facts is not necessary. *See e.g. Chamber of Commerce v. CFPB*, 691 F. Supp. 3d 730, 735 (E.D. Tex. 2023) (excusing parties from the requirement that motions for summary judgment list undisputed facts). Defendants also do not oppose the Court considering Plaintiffs' proposed undisputed facts 1–7, ECF 35, at 9–10, ¶¶ 1-8, in addition to the certified administrative record. Defendants dispute Statement of Undisputed Material Fact 8 because standing is a legal question and thus not appropriate for a statement of facts.

## RESPONSE TO STATEMENT OF ISSUES TO BE DECIDED

1.      Plaintiffs inexplicably waited almost eighteen years to challenge Section 109's constitutionality despite the statute of limitations expiring six years the enactment of the modern text. Should the Court grant summary judgment in favor of Defendants on their time-barred claims?

2.      Section 109 affords private Code Bodies the opportunity to aid HUD and USDA in establishing home energy standards, over which HUD and USDA always maintain full control and final authority. Should the Court deny Plaintiffs' motion for summary judgment on the private non-

---

Knudsen, State of Montana (Aug. 7, 2023) (Docket No. HUD-2023-0034-0111). It argued that HUD and USDA must extend the comment period. Otherwise, they would be using incomplete or incorrect data, thus acting arbitrarily and capriciously. *Id.* As shown below, agencies never rely on data that is complete or completely correct—they typically must make policy based on the best information available at the time.

delegation doctrine?

3.      Section 109's dynamic text is not ambiguous at any moment in time. Should the Court find Section 109 is not unconstitutionally ambiguous under the Spending Clause?

4.      Congress did not explicitly limit HUD and USDA to merely one revision of the IECC and ASHRAE standards. Such interpretation is inconsistent with Section 109(d)'s text, Section 109's text structure, other statutes, and statutory policy. Should the Court find HUD and USDA may update home-energy standards for their programs whenever the ICC and ASHRAE update their codes?

5.      Is HUD's and USDA's finding that, on average, updating the nationwide energy standards for HUD and USDA homes would not negatively impact the availability of new housing arbitrary and capricious?

6.      Is the 2024 Final Determination arbitrary, capricious, an abuse of discretion, or otherwise contrary to law?

## LEGAL STANDARD

When reviewing agency action under the APA, "the district court acts not as a fact finder, but reviews the record compiled before the administrative agency to determine whether the agency's action was arbitrary or capricious." *Garcia for Congress v. FEC*, 22 F. Supp. 3d 655, 658 (N.D. Tex. 2014) (internal quotation marks omitted). Because factual issues have been resolved, the normal summary judgment standard does not apply. *Willingham v. Dep't of Labor*, 475 F. Supp. 2d 607, 611 (N.D. Tex. 2007). Instead, whether the agency acted arbitrarily and capriciously "is a legal question that the court can usually resolve on the agency record."[4] *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). The court must determine whether, based on the record, the agency provided a "rational connection

---

[4] Here, the Court should disregard Plaintiffs' Exhibits 15–17 as extra-record evidence that is not judicially noticeable. In APA cases, "the Court may consider documents in the public record of which the court may take judicial notice." *ITServe Alliance, Inc. v. DHS*, 590 F. Supp. 3d 27, 41 (D.D.C. 2022) (internal quotation marks omitted). That includes official government documents. *See Huskey v. Jones*, 45 F.4th 827, 831 n.3 (5th Cir. 2022). Plaintiffs' motion is supported by material that is neither in the administrative record nor judicially noticeable. *E.g.*, ECF 35 Exs. 15–17. The Court should disregard those materials.

7

between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.    CRANSTON–GONZALEZ SECTION 109 IS CONSTITUTIONAL

Plaintiffs first argue that the Final Determination is invalid because its underlying statute, Section 109 of the Cranston–Gonzalez National Affordable Housing Act of 1990, 42 U.S.C. § 12709, is unconstitutional. But the statute of limitations has expired on Plaintiffs' APA claim of unconstitutionality. Even if not time-barred, Plaintiffs" arguments fail because Section 109 does not violate the private nondelegation doctrine and is not so ambiguous as to violate the Spending Clause.

### A.  The Court Lacks Jurisdiction Over Plaintiffs' Challenge to Section 109 Because the Statute of Limitations Has Run

Plaintiffs bring their claims under the Administrative Procedure Act against the United States. Compl. ¶¶ 74–121. Plaintiffs thus had six years "after the right of action first accrues" to sue. 28 U.S.C. § 2401(a). Read generously, Plaintiffs' constitutional causes of action accrued when they were injured by the modern text of Section 109. *Corner Post, Inc. v. Bd. of Govs. of Fed. Res. Sys.*, 603 U.S. 799, 809 (2024). But they did not bring their claims within six years of the text's enactment.

Plaintiffs long precede Section 109: 15 of the 16 plaintiffs are sovereign states, while the NAHB was founded in 1942. Compl. ¶¶ 6–21. And as Plaintiffs explain at length, Section 109's text was last updated with the Energy Independence and Security Act of 2007, Pub. L. 110-140, 121 Stat. 1492, 1648. ECF 35 at 9–10; *id.* Ex. 6. Their six-year statute of limitations thus expired in 2013. Section 2401(a) "imposes an outer time limit on claims brought against the United States." *Corner Post*, 603 U.S. at 848. Failure to bring a claim within this outer limit deprives courts of jurisdiction. *Texas v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021), *cert. denied sub nom Texas v. Comm'r*, 142 S. Ct. 1308 (mem). Plaintiffs' constitutional claims should thus be dismissed for lack of jurisdiction.

Even if equitable tolling is available under Section 2401(a), it is not available to Plaintiffs, who have offered no explanation for their 18-year delay in challenging Section 109's constitutionality. *See*

*Irwin v. Dept' of Vets. Affairs*, 498 U.S. 89, 96 (1990) (equitable tolling does not extend to excusable neglect).

### B.  Section 109's in Toto Code-Update Arrangement Is Not Unconstitutional

Plaintiffs argue that Cranston–Gonzalez Section 109 is unconstitutional because it incorporates changing energy standards that HUD and USDA cannot alter. However, Plaintiffs' argument is devoid of any case law for the idea that such a "moving target" is unconstitutional. To the contrary, such an arrangement is "a common and accepted practice by federal agencies." *Rettig*, 987 F.3d at 531–32 (recognizing that federal agencies have incorporated by reference "over 1,200 standards established by private organizations") (citing *Am. Soc'y for Testing & Materials ("ASTM") v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018)). Federal law even encourages it: the Office of Management and Budget has proclaimed a federal policy of "furthering the reliance upon private sector expertise to supply the Federal government with cost-efficient goods and services." OMB Circular A-119 (2016); *see also ASTM*, 896 F.3d at 442. Many of these standards are regularly updated, yet courts have not questioned them. There is no reason for the Court to do so here.

### C.  Section 109's Delegation Does Not Violate the Constitution Because There Was No Delegation and, Even If There Was, the Agencies Retain Enough Control

Section 109 does not delegate any congressional or executive role to the Code Bodies. Instead, it merely provides them an opportunity for input. And even if there were a delegation, it would be constitutional because HUD and USDA have final reviewing authority over the updated codes' incorporation into regulation. Section 109 thus does not violate the nondelegation doctrine.

#### a.  Section 109 Provides No Delegation in a Constitutional Sense

Plaintiffs contend that Section 109 is unconstitutional because it violates the private nondelegation doctrine. Yet there has been no delegation here. Private entities may participate in the agency decisionmaking process without presenting a nondelegation issue when they (1) establish a "reasonable condition" for agency approval; (2) gather facts; or (3) give advice. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004), *cert. denied*, 543 U.S. 925 (2004). No matter which option

characterizes the Code Bodies' role in Section 109 home energy standards, there is no delegation here.

Some HUD and USDA program participants must meet the updated energy codes before HUD or USDA approve their participation. This is a reasonable condition for agency approval. The Code Bodies undertake a rigorous process to determine which home energy technologies should be included in their respective codes. *See supra* Background, Energy Codes, at 5–6. They thus have the "institutional expertise" to shape best practices in home energy. *Rettig*, 987 F.3d at 531. HUD and USDA simply "incorporated" the standards into the Final Determination, a common practice. *See supra* Section I.B. Section 109 thus embodies a reasonable connection between the Code Bodies' codes and HUD and USDA's home energy determination. It does not amount to a delegation.

The same conclusion holds if the Court characterizes the code bodies' role as fact gathering. When fact gathering, agencies "may permit outside parties to perform nondiscretionary activities such as compiling, hearing, and transmitting technical information." *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1216 (D.C. Cir. 2024). Here, the Code Bodies compile information on new home-energy technologies, take public comments, and publish the final code updates. HUD and USDA thus permit the code bodies to perform simple fact gathering. This arrangement presents no nondelegation issue.

Finally, if the Code Bodies' role is best defined as "giving advice," there is still no constitutional delegation. A federal agency "may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself." *U.S. Telecom*, 359 F.3d at 568. Section 109's text provides precisely that arrangement: HUD and USDA do not have to incorporate code updates.[5] Their discretion is bounded only in that—once they decide to incorporate the code updates into their standards—they must determine whether the updates satisfy the availability and affordability criteria. *See* 42 U.S.C. § 12709(d). But that determination is wholly within the agencies' control. *See id.* § 12709(d)(1). And even then, HUD and USDA can refuse to turn to an outside entity for advice and craft their own codes. *Id.* § 12709(a). Whether the agencies ignore, accept, or reject code updates,

---

[5] Section 12709(c) speaks in mandatory terms, but that is only if HUD and USDA issue their own standards under Section 12709(a). The agencies have not done so.

HUD and USDA make the final decision. The Code Bodies merely give advice, so there is no delegation of constitutional authority.

To be sure, when a private entity gives advice to a federal agency, the agency must do more than "rubber-stamp" its decisions. *U.S. Telecom*, 359 F.3d 554. "The agency must independently perform its reviewing, analytical and judgmental functions and participate actively and significantly in the preparation in drafting process." *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). And that is what HUD and USDA do. The Code Bodies issue updated codes and publish them. Everything beyond that is up to the agencies. They decide whether to explore incorporating the updates into their programs at all. If so, they issue a preliminary determination; they accept and respond to public comment; and they issue a final determination. HUD and USDA undertake full notice-and-comment procedures to adopt code updates—a process that involves the agencies' full function and participation. The Code Bodies exercise no delegated authority.

### b. Even If Section 109 Delegates Authority to the Code Bodies, the Agencies Retain Sufficient Control Over Their Work

But even if Section 109 embodied a delegation to private entities, the law is constitutional. Private delegations are constitutional if they meet three conditions: (1) the government has "final decision-making authority," (2) the agencies actually exercise their authority rather than rubber-stamp others' work, and (3) the private actors remain "subject to the 'pervasive surveillance and authority'" of the government. *Consumers' Research v. FCC*, 109 F.4th 743, 770 (5th Cir. 2024) (en banc), *cert. granted*, 145 S. Ct. 587 (2024) (mem) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)).

Section 109 meets all three. First, HUD and USDA maintain final decision-making authority. The Code Bodies update their codes. That's it. There is no effect on what home energy standards apply to HUD and USDA programs. The agencies have discretion to outright ignore code updates. *See* 42 U.S.C. § 12709(d). And when the agencies choose to act on the codes, they undertake their own independent process to determine whether to incorporate the updates into their regulations. *See* 42 U.S.C. § 12709(d)(1). Finally, the agencies make a final decision whether to incorporate the updates,

all while retaining the authority to decide to issue their own home energy standards. *Id.* § 12709(a).

Next and relatedly, HUD and USDA exercise their authority rather than rubber-stamp the code updates. Unlike in *Consumers' Research*, code updates cannot be incorporated into HUD and USDA programs via acquiescence. 109 F.4th at 771. Rather, the agencies undertake full notice-and-comment rulemaking under the APA. *See, e.g.*, Final Determination at 89 Fed. Reg. 33,112; *Adoption of Energy Efficiency Standards for New Construction of HUD– and USDA-Financed Housing: Preliminary Determination and Solicitation of Comment*, 88 Fed. Reg. 31,773 (May 18, 2023); *Final Affordability Determination—Energy Efficiency Standards*, 80 Fed. Reg. 25,901 (May 6, 2015); *Preliminary Affordability Determination—Energy Efficiency Standards*, 79 Fed. Reg. 21,259 (Apr. 15, 2014). It is impossible for HUD or USDA to rubber-stamp code updates into their respective programs.

Last, the updated codes remain subject to HUD and USDA's pervasive surveillance and authority. The Fifth Circuit has interpreted this requirement as whether the private entity's decisions are subject to independent oversight. *National Horsemen's Benevolent & Protective Association v. Black*, 53 F.4th 869, 885 (5th Cir. 2022) (*Horsemen's I*). Such is the case here. The Code Bodies undertake their process to draft updates, but it is ultimately within HUD and USDA's purview to determine whether the resulting updates are worth incorporating into their programs. Under *Consumers' Research*, Section 109 provides HUD and USDA enough control under the private-delegation doctrine.

*Rettig* is instructive. In that case, the U.S. Department of Health and Human Services ("HHS") issued a rule requiring HHS to certify state–insurer Medicaid contracts as actuarially sound before states could receive reimbursement for their payments to insurers. 987 F.3d at 524–25. But "actuarially sound" was defined via standards issued by the private Actuarial Standards Board. *Id.* at 525–26. States could thus receive Medicaid reimbursement from HHS only if they satisfied a private standard. Multiple states sued, challenging the regulation under the private nondelegation doctrine. *Id.* at 526. The district court held in part that the rule violated the nondelegation doctrine and set it aside. *Id.*

The Fifth Circuit reversed on this point and rendered judgment for the Government. *Id.* at 536. After reiterating the "reasonable connection" standard, *see supra*, the court held that there was no

delegation. *Id.* at 531–32. It reasoned that certification "by a qualified actuary who applies the Board's standards is reasonably connected to ensuring actuarially sound rates because the Board and a qualified actuary have institutional expertise in actuarial principles and practices." *Id.* at 531. In other words, HHS "could achieve *exactly the same result* by promulgating regulations that adopted" the Board's standards. *Id.* at 532. HHS thus did not delegate its duties to a private entity.

But the court continued. Even if HHS had delegated its duties, such a delegation was not unlawful because it did not divest HHS of its "final reviewing authority." *Id.* at 533. HHS reviewed and accepted the Board's standards, had ultimate authority to approve a state's Medicaid contract, and certification was only a small part of the approval process. *Id.* In the end, HHS maintained full control over the reimbursement process. *Id.* Any delegation to the Board was not unlawful.

So too here. Requiring some developers to build to standards formed by home-energy experts is reasonably connected to ensuring that HUD– and USDA–insured homes are as energy efficient as practicable. In fact, HUD and USDA could achieve the same result by promulgating regulations that adopt the Code Bodies' standards. *See* 42 U.S.C. § 12709(a). The Final Determination is thus not a delegation to the Code Bodies. And even if it were, HUD and USDA independently reviewed and accepted the codes and have ultimate authority to ensure that developers build to those standards. HUD and USDA maintain full control over the home-energy-standards process.

Plaintiffs rely heavily on *Horsemen's I*, but that case is distinguishable. In *Horsemen's I*, private entity at issue—the Horseracing Integrity and Safety Authority ("HISA")—had far more independence to regulate horseracing than ASHRAE and the ICC have to regulate home energy. First, HISA formulated proposed rules. *Horsemen's I*, 53 F.4th at 874. The approved rules covered "numerous topics" and were "minutely detailed," covering horse necropsies, continuing-education requirements for horseracing participants, veterinary regulations, regulations governing horseshoes and riding crops, rules concerning jockeys' health and safety, and sanctions. *Id.* at 875. HISA's rulemaking power was "sweeping." *Id.* at 882. The FTC, by contrast, could promulgate only "temporary rules on a break-glass-in-case-of-an-emergency basis." *Id.* at 883. Here, the Code Bodies'

13

energy codes are important and comprehensive—but they cover only one aspect of homebuilding. They are far from sweeping. They are not even mandatory: regulated parties can choose an alternative compliance pathway that meets or exceeds the codes' standards. *See* Final Determination at 33,141. Finally, sole rulemaking power lies with the agencies. 42 U.S.C. § 12709(a). The Code Bodies play a much smaller role in the rulemaking process than HISA did in *Horsemen's I*.

Second, the FTC lacked authority to review HISA's policy choices. *Id.* at 884. True, HISA had to submit its rules to the FTC for review and approval. *Id.* But the FTC *had to* publish the proposed rules in the Federal Register for public comment. *Id.* It then *had to* determine within 60 days whether the rule was consistent with relevant law. *Id.* Finally, if the rule was consistent, then the FTC *had to* approve the proposed rule. *Id.* But HUD and USDA are under no such obligations and remain free to reject the code updates if they do not meet the availability or affordability requirement. 42 U.S.C. § 12709(d)(1). HUD and USDA retain full power over whether to accept the updated codes.[6]

*Consumers' Research* is also distinguishable. There, the en banc Fifth Circuit struck down the Universal Service Fund contribution mechanism because it amounted to a "double-layered delegation" that was "unprecedented" in U.S. history. 109 F.4th at 779. While the court was "highly skeptical" that the mechanism complied with the public and private nondelegation doctrines, it expressly noted that it "need not resolve either question." *Id.* at 778. What mattered, instead, was that "*the combination* of Congress's sweeping delegation to FCC and FCC's unauthorized subdelegation" to a private entity violated the Constitution. *Id.* But within the private-nondelegation analysis, the court highlighted the fact that the contribution mechanism could take effect without any agency input. *Id.* at 750.

No such double delegation exists here. Instead, Section 109 contains a straightforward express delegation of nongovernmental power to a private entity. Even if Section 109 delegates authority to a private entity, it is a straightforward delegation from Congress to the Code Bodies. And while in

---

[6] *Horsemen's I* is distinguishable for other reasons. For instance, HISA had power to investigate, issue sanctions and bring suit. *Id.* at 874. The Code Bodies do not. Additionally, HISA was funded primarily through fees collected from regulated entities, *id.* at 875, whereas ICC and ASHRAE are non-profits which do not receive funding from mandatory fees on regulated entities, ECF 35-9 at 2, 15, 17

*Consumers' Research* the agency's failure to act deemed private action approved, here the opposite is true: code updates do not take effect until HUD and USDA undertake notice-and-comment rulemaking to incorporate them. *See* 42 U.S.C. § 12709. *Consumers' Research* is not binding here.

Cranston–Gonzalez Section 109 mentions the Code Bodies' home energy standards, but it does not delegate any power to them. Instead, the Code Bodies are merely an aid to HUD and USDA's work in decreasing home power bills. And even if Section 109 delegates authority to the Code Bodies, that delegation is constitutional because HUD and USDA retain full control and final authority. Section 109 does not violate the private-nondelegation doctrine.

### D.  Section 109's Spending Conditions Are Not Unambiguous

Plaintiffs next contend that Cranston–Gonzalez Section 109 is unconstitutional as to the State Plaintiffs because it violates the Spending Clause. Specifically, they seem to claim that Section 109 is unconstitutionally ambiguous because its reference to the private codes includes updates to those codes. But, under the Spending Clause, a statutory term must be inherently ambiguous to be unconstitutional. Section 109, by contrast, refers to highly detailed energy codes.

Plaintiffs' argument turns on *Texas v. Yellen*. Section 109, however, is a far cry from the provision in *Yellen*. There, the Fifth Circuit found a provision of the American Rescue Plan Act ("ARPA") that barred recipient states from using ARPA funds to "directly or indirectly offset" reductions in state tax revenue via "a change in law, regulation, or administrative interpretation" was ambiguous and violated the Spending Clause 105 F.4th 755, 761 (5th Cir. 2024) (quoting 42 U.S.C. § 802(c)(2)(A)). Its decision turned on two key aspects of this statute. First, the ambiguity "primarily stem[med] from the capacious meaning of the term 'indirectly.'" *Id.* at 771. The Fifth Circuit determined that "indirectly" was too ambiguous because it was not clear how broadly the federal government would consider changes to a state's finances when determining whether it had violated this provision. This ambiguity was aggravated by the "fungibility of money": a change in law unrelated to ARPA might have a knock-on effect of reducing revenue, but it was not clear if that would violate the law. *Id.* at 772. And second, ARPA did not identify the baseline that any revenue reductions would

be reduced. *Id.* It thus set no standard by which states could measure whether they were in compliance. *Id.* Both considerations led the Fifth Circuit to affirm the lower court's permanent injunction. *Id.* at 775. Here, Section 109's text is clear. It specifically references the IECC and ASHRAE Standard 90.1 codes. If a State is not sure what that entails, it can go to www.energycodes.gov for details.

Even *Yellen*'s hypothetical that Plaintiffs quote is different from this case. The Fifth Circuit used the example of a federal statute that says states "must agree that 'no portion of these funds shall be used to advance injustice.'" *Id.* at 770. "'Injustice' in such a context has no discernible content. It is hopelessly ambiguous . . . ." *Id.* Not so here. The IECC and ASHRAE Standard 90.1 are highly detailed, comprehensive codes. They are not ambiguous, much less hopelessly so.

At bottom, Plaintiffs' argument confuses *ambiguous* text with *dynamic* text. A statute might incorporate changeable content. But just because the content is subject to change does not mean that it is ambiguous at any given moment. And this distinction makes good sense. Without it, challengers could invalidate any Spending Clause legislation whenever Congress amends the law. This is absurd, but it is the logical conclusion of Plaintiffs' argument. The Court must examine the law as it exists at the time it is challenged. And Section 109 is not inherently ambiguous. Section 109 is constitutional.

## II.    THE 2024 FINAL DETERMINATION IS NOT CONTRARY TO LAW.

Plaintiffs argue that the 2024 Final Determination is invalid because Section 109(d) permits only a one-time update to HUD's and USDA's standards, which was done with the 2015 Final Determination. But this reading of Section 109(d) is misplaced. Section 109's text, structure, and history, other statutes, and statutory policy all confirm that the best reading of Section 109(d) permits repeated standards updates. The 2024 Final Determination is well-based in Section 109(d).

### A.  Section 109 Permits Repeated Updates to Home Energy Standards

Plaintiffs contend that Section 109 permitted only a single update to HUD's and USDA's energy standards: The 2015 Final Determination, which codified the immediate updates to the 2006 ICC and 2004 ASHRAE codes. *See* 42 U.S.C. § 12709(d). "In expounding a statute," however, courts "must not be guided by a single sentence or member of a sentence, but look to the provisions of the

16

whole law, and to its object and policy." *Pennhurst v. Halderm*, 451 U.S. 1, 18 (1981) (internal quotation marks omitted). Plaintiffs' reading bucks this principle. It ignores context, makes comparisons to irrelevant laws, and misreads the statutory history.

Importantly, Plaintiff's reading of Section 109 turns the statute on its head. They read Section 109(d) as imposing a ceiling: one final determination after the 2006 ICC and 2004 ASHRAE codes are updated, and nothing more. In fact, Section 109(d) sets the floor. To ensure energy efficiency and homeowner savings, HUD and USDA had to apply the more modern standards. As part of that effort, they have the power to issue final determinations as the codes are updated, however often that is.

"When called on to resolve a dispute over a statute's meaning, [a court] normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). Courts "exhaust all the textual and structural clues bearing on that meaning." *Id.* (internal quotation marks omitted). They also look to "the overall policies and objectives of the statute." *Mississippi v. JXN Water*, 134 F.4th 312, 320 (5th Cir. 2025) (internal quotation marks omitted). Section 109's text, structure, history, and goals confirm that it permits repeated updates.

Start with the text:

> If the Secretary of Housing and Urban Development and the Secretary of Agriculture have not, within 1 year after the requirements of the 2006 IECC or the ASHRAE Standard 90.1-2004 are revised, amended the standards or made a determination under subsection (c), all new construction and rehabilitation of housing specified in subsection (a) shall meet the requirements of the revised code or standard if [they satisfy availability and affordability].

42 U.S.C. § 12709(d). Plaintiffs latch onto the references to the "the 2006" ICC standard and the "the 2004" ASHRAE standard and argue only their immediately following updates can be incorporated into HUD and USDA's standards. Any additional code updates after those fall outside Section 109.

This reading is too cabined and ignores text and context. Reading Section 109 as a whole confirms that it allows HUD and USDA to update their standards any time after the Code Bodies update their codes. First is Section 109(d)'s text. Courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2021). And

Section 109(d) contains no one-time limitation. It says how HUD and USDA evaluate new standards after they "are revised." Not after they are revised "the first time," or revised "once." Plaintiffs' interpretation would have the Court insert omitted terms into Section 109(d).

Section 109 as a whole buttresses this reading. When interpreting laws, courts "must examine 'the language and design of the statute as a whole.'" *Texas v. U.S. Dep't of Health & Human Servs.*, __ F. Supp. 3d __, 2025 WL 818155, at *6 (E.D. Tex. Mar. 13, 2025) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). Section 109 sets out two alternative paths for incorporating new home energy standards. First is the agency-only process: HUD and USDA establish their own energy standards. 42 U.S.C. § 12709(a). These standards must "meet or exceed" the requirements of the 2006 IECC and ASHRAE Standard 90.1-2004. *Id.* § 12709(a)(2). But if these standards "are revised at any time," HUD and USDA must amend their standards to meet or exceed the new standards, unless doing so would not "result in a significant increase in energy efficiency or would not be technologically feasible or economically justified." *Id.* § 12709(c). "In this context, as in so many others, 'any' means 'every.'" *SAS Inst. v. Iancu*, 584 U.S. 357, 359 (2018). So every time the Code Bodies' standards are updated, HUD and USDA must update their standards, too. Not only when the standards are revised "the first time" or revised "any one time." Revised "at any time"—that is, every time they are revised.

Second is the current process: HUD and USDA incorporate the Code Bodies' standards. Since the agencies did not issue their own standards in time, the 2006 IECC and ASHRAE Standard 90.1-2004 took effect. *Id.* § 12709(b). But when these standards are revised, HUD and USDA must incorporate those standards, unless doing so would negatively affect the availability or affordability of new-build housing. *Id.* § 12709(d). Section 109 thus establishes two options. HUD and USDA can create their own standards that are pegged to the Code Bodies', and update their standards whenever the Code Bodies do. Or HUD and USDA can incorporate the Code Bodies' standards directly, and incorporate updated standards whenever the Code Bodies issue them.

Plaintiffs emphasize the fact that "at any time" is in subsection (c) but not subsection (d). Thus, they claim, Section 109(c) allows repeated updates, but Section 109(d) only a one-time update.

18

Yet there is no apparent reason why "at any time" is in subsection (c) but missing from subsection (d). First, subsection (d) was inserted after subsection (c). *Compare* 42 U.S.C. § 12709 (1992), *with* 42 U.S.C. § 12709 (2007). And there is no indication that Congress made a deliberate choice in omitting "at any time" from subsection (d). This provision appeared whole cloth in a predecessor to the bill that would become EISA. *See* S. 1115, 110th Cong. § 507(4) (introduced Apr. 16, 2007). The same language survived unchanged through two more iterations before making it into EISA. *See* S. 1321, 110th Cong. § 267(5) (2007); S. 1419, 110th Cong., § 267(5) (2007). Section 109(d) eventually became law as EISA § 481(4). Pub. L. 110-140, § 481(4), 121 Stat. 1492, 1648 (2007). But there is nothing even hinting at why "at any time" is in subsection (c) and not subsection (d).

In fact, the only remark at all about now-Section 109(d) supports repeated updates. The Senate Energy and Natural Resources Committee's report to one of EISA's predecessor bills notes that § 109(d) "applies updated energy conservation codes to public and assisted housing administered by the Department of Housing and Urban Development." S. Rep. No. 110-65, at 16 (2007). The most important Senate committee during EISA's drafting process did not think that Section 109(d) applies only "the next" updated energy conversation codes.

EISA's history also implies that there was no intent behind omitting "at any time" from subsection (d). As discussed above, "at any time" was never in the legislative text. *See* S. 1115, 110th Cong. § 507(4) (2007). It was introduced without that language and stayed so. It was one of EISA's "key parts" written "behind closed doors, rather than through the traditional legislative process." *King v. Burwell*, 576 U.S. 473, 491 (2015) (internal quotation marks omitted). And in EISA—a 300-plus page overhaul of America's energy landscape—this one small part "does not reflect the type of care and deliberation that one might expect of such significant legislation." *Id.* at 492. The Court should not infer from the absence of "at any time" that Section 109(d) is limited to one update.

Statutory history likewise supports this reading. Plaintiffs claim that, because Section 109 has been periodically revised to reference the most recent codes, Congress meant to limit Section 109(d) to one update after that code. Because Section 109(d)'s latest update references the 2004 ICC and

19

2006 ASHRAE codes, HUD and USDA could update their standards to conform to only the update immediately after these codes. In other words, the 2004 and 2006 references set a ceiling. In fact, they set a floor.

As Plaintiffs note, EISA made two key changes: (1) "CABO Model Energy Code, 1992" was replaced with "the 2006 IECC"; and (2) "1989" ASHRAE Standard 90.1 was replaced with "2004." Pub. L. 110-140, § 481(5)-(6), 121 Stat. 1648–49. That included the reference in Section 109(c), requiring HUD and USDA to update their own standards "at any time" that the private codes are updated. The ASHRAE 1989 standard was updated in 1999, 2001, and 2004. Under Plaintiffs' reading, then, HUD and USDA already had a duty to update their own standards to match these. Thus, with EISA, if HUD and USDA had created their own standards, then they would have already had a duty to update them to the 2004 ASHRAE code. So if Congress meant to allow repeated updates, the reference to the 2004 ASHRAE code would be redundant.

There are several issues with this reasoning. First, this cuts against Plaintiffs' argument that Section 109(c) allows repeated updates via "at any time," while Section 109(d) lacks that language and so allows only one update. The "at any time" language was in the previous version of Section 109 and in the current version. So, per Plaintiffs' argument, HUD and USDA would have always been under a duty to update their standards whenever ASHARE is updated. "When Congress acts to amend a statute, [courts] presume it intends its amendments to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). Yet any reference to a specific ASHRAE code year would have no effect: whether 1989 or 2004, the agencies would have to update their codes. EISA replacing "1989" with "2004" would be a redundant change.

Second, this argument fails to parse EISA. Congress made these replacements without reference to any specific provision, but instead by mechanically replacing the older reference with the newer. *See id.* And because Section 109(d) was introduced with EISA and already included the 2006 and 2004 references, that language is separate from the changes made to the other code references.

Instead, Congress updated the code references to set a floor. If EISA had kept the reference

to the 1989 ASHRAE standard, then HUD and USDA could "meet or exceed" its requirements by updating to the 1999 version. *See* 42 U.S.C. § 12709(c) (requiring that agencies' standards "meet or exceed the requirements of such revised code or standard"). But, by EISA's passage, that code would already be years out of date. Instead, Congress updated Section 109 to refer to the most recent codes to set a floor. HUD– and USDA-supported homes have to meet or exceed best practices in home energy, as determined by the Code Bodies.

Other statutes also support this reading. In particular, the Department of Veterans Affairs will provide a loan to buy or build a home only if the property complies with "the energy efficiency standards under section 109 of the Cranston–Gonzalez National Affordable Housing Act, as amended by section 101(c) of the Energy Policy Act of 1992." 38 U.S.C. § 3704(f) (citation omitted). Section 101(c) of the Energy Policy Act provided HUD and USDA with the option to incorporate the Code Bodies' standards instead of making their own. Pub. L. 102-486, § 101(c), 106 Stat. 2776, 2787. But since there was no subsection (d), there was no way for HUD and USDA to incorporate updated standards. Under Plaintiffs' reading, then, standards for VA housing would thus be frozen with the CABO Model Energy Code of 1992 and ASHRAE Standard 90.1-1989, while those for HUD and USDA housing would be held to at least the 2006 and 2004 standards. Surely, with § 3704(f), Congress did not mean for veterans' housing to be held to a lesser standard than a typical FHA-insured single-family home. After all, the "solicitude of Congress for veterans is of long standing." *United States v. Oregon*, 366 U.S. 643, 647 (1961). Yet that is a logical conclusion of Plaintiffs' argument.

Finally, statutory policy supports a repeated-update interpretation. First, EISA's purposes included increased energy independence, security, and building efficiency. Pub. L. 110-140 Preamble, 121 Stat. at 1492. Next, among Cranston–Gonzalez's goals are to help families save for home down payments; retain housing as affordable; and extend public–private partnerships to produce and operate affordable housing. 42 U.S.C. § 12703(1)-(3). Finally, Congress has declared that the objectives of national housing policy should include increasing the nation's supply of affordable housing; expanding opportunities for homeownership; and providing every American with mortgages at the lowest

possible interest rates. *Id.* § 12702(2), (5)-(6). Periodically updating home-energy standards to the newest technologies and newest standards—thus lowering housing costs in the long run—better serves the purposes of EISA, Cranston–Gonzalez, and Congress's declared national housing policy.

In fact, freezing energy standards in 2006 or 2004 would make energy costs and financing more expensive for American families. If HUD and USDA updated their standards soon after the Code Bodies updated their codes, then the standards would be frozen there. Over time, then, HUD– and USDA-supported housing would fall behind the market in energy efficiency. Such housing would have higher energy bills, leading to less affordability and, through increased cost risk, higher mortgage rates. Alternatively, HUD and USDA would wait for years, through multiple code updates to ensure maximum benefit from new energy technologies. If the change is too great, then the new codes might negatively impact availability and affordability and thus could not be adopted. HUD and USDA would then be stuck with the 2004 or 2006 codes. But even if HUD and USDA could adopt the future codes, they would still be encouraged to wait years before doing so. In the meantime, HUD– and USDA-supported housing would continue to be more expensive through energy bills and mortgage rates. No matter the scenario, the logical conclusion of Plaintiffs' argument would undercut Congress's expressly stated purposes in EISA and Cranston–Gonzalez. Only with repeated updates can HUD and USDA advance these goals.

Plaintiffs contend that Section 109(d) allowed HUD and USDA to incorporate new home-energy standards only once, for the 2006 ICC and 2004 ASHRAE codes. They argue that, because HUD and USDA did so in the 2015 Final Determination, the 2024 Final Determination is based on an incorrect reading of § 109(d). But the best reading allows HUD and USDA to update home-energy standards for their programs whenever the ICC and ASHRAE update their codes. This is confirmed by Section 109(d)'s text, Section 109's text structure, other statutes, and statutory policy.

## B. The 2024 Final Determination Complies with Section 109's Requirements Concerning Availability of New Housing

Plaintiffs assert that the agencies concede that the 2021 IECC does not meet the availability

requirement of Section 109(d)(1). According to them, the RIA admits that applying the 2021 IECC would reduce low-income housing by 1.5%, and the Final Determination admits that applying it would reduce FHA home production by the same rate. HUD and USDA then allegedly tried to sidestep these figures by speculating them away.

This argument ignores clear statements to the contrary and cherry-picks unfavorable-sounding statements. First, it fails to mention the Final Determination's definition *availability*: "a measure of builder supply," that is, "whether builders will make such housing available to consumers at the higher code level." The measure for this is "whether the higher cost per unit will impact whether that unit is likely to be built or not." Final Determination at 33,122. This definition is statutorily mandated. Cranston–Gonzalez requires that agency-created home energy standards "be cost-effective with respect to construction and operating costs on a life-cycle basis." 42 U.S.C. § 12709(a)(2). And while the agencies have not crated their own standards, that mandate still informs their statutory mandate to adopt the Code Bodies' standards only after determining that they would not effect "availability or affordability," both of which are affected by cost. *Id.* § 12709(d).

Plaintiffs' argument takes quotations out of context. First, the Impact Analysis does say that the "first estimate from this analysis is that the quantity in affected submarket will decline by 1.5 percent of the pre-notice market activity." RIA at 80. But that estimate was just one piece of evidence among many. The Impact Analysis reached that determination through research-based economic modelling—separate from the PNNL Model—to estimate external per unit cost on market equilibrium in a vacuum. *See id.* at 79–90, 130 (App'x E). But that was only one piece of evidence. HUD also considered the existing housing supply, existing code standards across states, regional market variations, capitalization of energy-efficiency standards, and more. *See id.* 78–96. And after considering all this evidence together, the Impact Analysis's conclusion was clear: "Our fundamental finding is that under certain conditions, minimum energy standards could deter the construction of affordable housing, but on average we do not expect a reduction of new construction to be an outcome." *Id.* at 7. On average, across the nation, HUD's analysis determined that updating the

nationwide energy standards for HUD and USDA homes would not negatively impact the availability of new housing.

The Final Determination reflects this conclusion. Plaintiffs quoted it as conceding that the 2021 IECC "would reduce the production of homes for FHA-insured borrowers by 1.5 percent, which represents a 0.2 percent reduction of all homes available to FHA-insured homebuyers." Final Determination at 33,177. But again, this quote comes from the Final Determination's economic modelling in a vacuum. HUD and USDA did acknowledge that this was their "most cautious estimate," but they do not concede anything from it. In the *very next sentence*, they explain that this estimate "is considered a 'worst-case' scenario because it does not account for any of the positive effects of energy-efficiency." *Id.* at 33,177. If availability is measured by net cost, then it must count both costs and benefits. HUD and USDA should not be punished for using the most unfavorable assumptions in their economic modelling out of maximum caution.

More important, this modelling again was just one piece of HUD and USDA's availability determination. They also considered builder impacts, evidence from prior code adoption, jurisdictional energy-code variability, and more. *Id.* at 33,175–33,180. And again, they concluded that "there would be no noticeable impact on the supply of housing covered by this notice." *Id.* at 33,176. Plaintiffs' argument evinces a failure to carefully parse the Impact Analysis and Final Determination. They each explain how those negative figures are part of a larger consideration that, on balance, the updated standards will not negatively impact availability or affordability under Section 109(d)(1).

The Impact Analysis and Final Determination are candid about operating assumptions, model limitations, and unknown variables. Plaintiffs grab onto these concessions to argue that HUD and USDA have admitted they're wrong. But, in reality, Plaintiffs' quotations cherry-pick unfavorable-sounding language, ignore that those quotes were just a part of the analysis, and ignores the bigger picture and clear conclusions to the contrary. The Final Determination did not violate Section 109(d)(1)'s availability requirement.

### III.    THE 2024 FINAL DETERMINATION SATISFIES THE APA.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). The scope of this review is "narrow," and courts "must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025). When an agency's "particular technical expertise is involved," courts are at their "most deferential in reviewing the agency's findings." *Medina Cty. Envmtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010).

In issuing the 2024 Final Determination, HUD exercised its particular technical expertise to make a reasonable and reasonably explained decision that the 2021 ICC and 2019 ASHRAE standards would not negatively affect new housing availability or affordability. Plaintiffs contend that the 2024 Final Determination fails to account for relevant factors, fails to grapple with contrary evidence in the record, or evinces a clear error of judgment. But, under the most deference to HUD and USDA's decision, it was not arbitrary and capricious.

### A.  The 2024 Final Determination Is Reasonable and Reasonably Explained

Plaintiffs elaborate on a host of purported issues that they see with the Final Determination's analysis. But the faults they cite are not so under the APA. Some agency decisions are not the most well-explained. But courts "will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). And HUD and USDA's logic in the 2024 Final Determination may reasonably be discerned.

### a.  The Final Determination Properly Relied on the PNNL Model

First is its choice to rely on the Department of Energy's PNNL Model. There "is a presumption of regularity to the [agency's] choice of analytical methodology, so the challenging parties must overcome a considerable burden." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 832 (5th Cir. 2003) (internal quotation marks omitted). This presumption recognizes that "a model is meant to simplify

reality in order to make it tractable, and need not fit every application perfectly." *Sierra Club v. EPA*, 939 F.3d 649, 687 (5th Cir. 2019) (internal quotation marks omitted). And it exists because it "is within the agency's discretion to determine the mode of analysis that most allows it to determine as best it can the economic implications of the rule it has proposed." *U.S. Chamber of Commerce v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (internal quotation marks omitted).

Plaintiffs cannot overcome their considerable burden because HUD and USDA explained why they relied on the PNNL Model over others. Final Determination at 33,133–34. Above all, unlike other models, the PNNL Model undergoes a "rigorous public comment and peer review process." *Id.* at 33,134. In 2015, DOE undertook a comprehensive notice-and-comment update to the PNNL Model. *Supra* Background at 6. This update incorporated feedback from stakeholders. As for peer review, the PNNL Model puts its data through the EnergyPlus software program. PNNL Methodology at 2.1 & n.3. EnergyPlus relies on regular testing to ensure that it incorporates the latest software and remains bug-free. *Testing and Validation*, EnergyPlus, https://energyplus.net/testing (last visited May 15, 2025). The PNNL Model's public-comment period also garnered comments from experts in the field, including Plaintiff NAHB. *Comment from NAHB*, Docket No. EERE-2015-BT-BC-0001-0001 (June 3, 2015). The 2024 Final Determination thus accurately explained why this model was better than others. Final Determination at 33,133–33,137.

Specifically, Plaintiffs take issue with HUD and USDA's refusal to adopt the model developed for Plaintiff NAHB by Home Innovation Research Labs ("HIRL"). They note that the HIRL model estimates that the Final Determination's code updates will result in cost increases 2.2 times higher than the PNNL Model's estimates. Plaintiffs conclude from this that the Final Determination's methodology was flawed.

But that is not the legal standard. HUD and USDA merely had to articulate a "rational connection between the facts found and the choice made." *Little Sisters of the Poor Sts. Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (quoting *State Farm*, 463 U.S. at 43). They did so in the Final Determination and its Regulatory Impact Analysis: the models differed in their starting

assumptions about overhead costs and profit margins and about model-home design. RIA, Final Determination, at 32. And the Final Determination and Impact Analysis explain why HUD rejected the HIRL model based on these differences.

The PNNL and HIRL models differ in their assumptions about costs due to overhead and profit margins. The PNNL Model increases cost estimates 15% to account for these factors. Final Determination, at 33,135. The HIRL model adds 27%. *Id.* at 33,134. The different figures come down to different data sets. For overhead and profit, the PNNL Model relies on aggregate cost data from several sources made available on DOE's Building Component Cost Community ("BC3") database. 2015 PNNL Methodology at 3.7. The current BC3 dataset contains 3,132 inputs with 30 field descriptions, totaling 93,360 unique data points. *See* BC3 Data, https://www.energycodes.gov/energy-and-economic-analysis (last visited May 15, 2025). When BC3 data sources conflict or are unclear, DOE cross-references corroborating estimates from other sources such as major hardware suppliers and recent studies by DOE, buildings-research groups such as ASHRAE, and more. *Id.* BC3 also draws from RS Means Residential Cost Data, a constructions-costs database. *Id.*

HIRL's data set, by contrast, estimates overhead based on a far less comprehensive data set. It also uses RS Means Residential Cost Data for construction costs. **Home Innovation Research Labs,** *2021 IECC Residential Cost Effectiveness Analysis* at 15 (App'x A) (June 2021) ("2021 IECC HIRL Study").[7] For equipment costs, however, it draws only from public figures on distributor website, and testing and documentation costs came from an "internet search" of web sites. *Id.* For profit margins, HIRL draws only from adjusted industry average gross profit margin for 2017, as reported by NAHB's 2019 Builder's Cost of Doing Business Study. Final Determination, at 33,133 n.50; 2021 IECC HIRL Study, at 1 & n.6.[8] This study, meanwhile, gathered data by collecting and

---

[7] HUD and USDA cited this study in the Final Determination and Final RIA. Final Determination at 33,133 n.50; Final RIA at 108, 128 & n.177. It is thus included in the Administrative Record. *See* AR-0003; *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (noting that the administrative record includes "any findings or reports" on which the agency based its decision).

[8] Administrative records include "materials directly *or indirectly* relied on to make all decisions." *Cherokee Nation v. Dep't of Interior*, 531 F. Supp. 87, 94 (D.D.C. 2021) (emphasis added). The Final Determination

analyzing 2017 financial statements from builders across the country. Overview, NAHB, The Cost of Doing Business Study (2019 ed.), https://perma.cc/YRT9-FSGD. HIRL's data set, then, is ad hoc, primarily relies on publicly available data, and contains few to no cross-references or quality checks.

As HUD and USDA recognized, "The representativeness of the NAHB and PNNL data are not equivalent." Final Determination at 33,134; RIA at 128 (App'x D). The PNNL Model's input data was far more comprehensive than the HIRL model's. That constitutes more than good reason for the agencies to choose the model they did.

Next, the PNNL Model designed its prototypical home "to represent the majority of the new residential building construction stock in the United States using a combination of U.S. Census, [Renewable Energy Certificates], and [Plaintiff] NAHB data." *Id.* at 128 (App'x D); *see also* Final Determination at 33,134.[9] The HIRL model, by contrast, was "primarily based on the results of the 2008-2009 Annual Builder Practices Survey." *Id.* As a result of the differing data sets, the HIRL model's prototype home is a much different shape than the PNNL Model's. *See* ECF 35 at 33–34. This resulted in different energy-cost estimates. RIA at 129. And because the PNNL Model's prototype was based on a more comprehensive data set than the HIRL model's, HUD and USDA reasonably decided to use the former. *See* Final Determination at 33,134.

In the end, Plaintiffs offer a circular argument. They contend that the HIRL model reflects "real-world business arrangements," "real-world home designs," and "real-world contractor and subcontractor business arrangements and the associated overhead and profit." ECF 35 at 31–32. But their argument assumes that the HIRL model accurately reflects real-world conditions. As HUD and USDA determined in their expertise, the PNNL Model relies on a greater trove of data and is thus

---

and Final RIA cited the 2021 HIRL Study. *Supra* n.7. And the 2021 HIRL Study cited the 2019 Builder's Cost of Doing Business Study. 2021 IECC HIRL Study at 1 & n.6. HUD and USDA thus indirectly relied on the 2019 study to reach the Final Determination, and it and its overview belong in the administrative record. AR-0001.

[9] This comports with USDA's statutory duty to support only rural homes that are "modest in size, design, and cost." 42 U.S.C. § 1487(a).

better represents the real world.

Finally, Plaintiffs' brief and exhibits—chocked with discourse about modeling, insulation ratings, mathematical formulas, and computer renderings—show exactly why courts defer to agencies in technical matters. So does the Final Determination itself: it is the culmination of work by two expert industry bodies, DOE, and finally the HUD and the Department of Agriculture. This case shows exactly why courts are at their most deferential when an agency's particular technical expertise is involved. *Medina Cty. Envmtl. Action*, 602 F.3d at 699.

"When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 378 (1989). Here, HUD and USDA experts had to choose between DOE's PNNL Model or NAHB's NIRL model. HUD and USDA relied on their experts' reasoned decision to stick with the PNNL Model because it was based on better data.[10] That decision was within their discretion. And HUD and USDA articulated the rational connection between the models' differences and their choice of the PNNL model. The agencies' decision to stay with the PNNL Model was not arbitrary and capricious.

### b. The Agencies Properly Accounted for Public Comment

Finally, Plaintiffs contend throughout their brief that HUD and USDA failed to properly address public comments levelled against the PNNL Model. Their argument boils down a claim that HUD and USDA did not use the Final Determination to relitigate considerations already rejected and explained in other parts of the administrative record. This claim, however, ignores law and context.

When responding to comments, agencies only need to have "'clearly thought about the [commenters'] objections' and offered 'reasoned replies—all the APA requires.'" *Huawei Techs., USA v. FCC*, 2 F.4th 421, 450 (5th Cir. 2021) (alteration in original) (quoting *City of Portland v. EPA*, 507

---

[10] To be clear, HUD and USDA do not contend that the PNNL Model is based on *perfect* data. But data need not be perfect. "It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *State Farm*, 463 U.S. at 52. As shown above, HUD and USDA noted the differing data quality and used their judgment to apply the PNNL Model. That is enough.

F.3d 706, 714 (D.C. Cir. 2007)). HUD and USDA did just that. As noted above, the agencies described at length why it chose to apply the PNNL Model over the HIRL one. *Supra* at III.A.a.

Plaintiffs also claim that the agencies dismissed limitations with the model. In fact, the agencies addressed those limitations head-on. *See* Final Determination, at 33,152 ("Limitations of Cost Savings Models"); RIA at 33. "That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it." *Shafer & Freeman Lakes Envmtl. Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021) (quoting *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) (per curiam)). For the reasons already explained, HUD and USDA decided to apply the PNNL Model.

Next, Plaintiffs accuse the agencies of cherry-picking the HIRL model where it agreed with the PNNL Model. In fact, the Final Determination simply acknowledged that the two models reached similar conclusions about energy savings. But the agencies' analysis availability and affordability analysis did not depend on this overlap. HUD and USDA pointed it out simply to show that some other models supported the PNNL Model's conclusions. Their reasoning, however, was entirely independent of these models.

Finally, HUD and USDA did in fact change key PNNL Model inputs in response to public comment—including from Plaintiff NAHB. *See, e.g.*, Final Determination at 33,153–33,154 & Fig. 2. For instance, NAHB pointed out that the Preliminary Determination's assumed interest rate was too low in light of market changes since its publication. NAHB Comment at 7. The agencies agreed and increased the assumed rate to fit current realities. Final Determination at 33,153–33,154 & Fig. 2. HUD and USDA could not "simply ignore 'an important aspect of the problem.'" *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43). Instead, they evaluated all significant comments carefully and, where warranted, updated their modeling. HUD and USDA properly considered and responded to comments.

## CONCLUSION

For the reasons above, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiffs' Motion for Summary Judgment.

Dated: May 27, 2025                           Respectfully submitted,


                                              ABE M. McGLOTHIN, JR.
                                              ACTING UNITED STATES ATTORNEY

                                              /s/ James Gillingham
                                              JAMES GARLAND GILLINGHAM
                                              Texas State Bar No. 24065295
                                              james.gillingham@usdoj.gov
                                              110 N. College, Suite 700
                                              Tyler, TX  75702
                                              (903) 590-1400
                                              Fax: (903) 590-1436

                                              *Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2025, I electronically filed the foregoing document with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of this filing.

/s/ James Gillingham
JAMES GILLINGHAM
Assistant United States Attorney