IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

STATE OF UTAH, STATE OF TEXAS, STATE OF ALABAMA, STATE OF ARKANSAS, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF SOUTH CAROLINA, STATE OF TENNESSEE, STATE OF WEST VIRGINIA, and NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES,

*Plaintiffs,*

v.

SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF AGRICULTURE,

*Defendants.*

Case No. 6:25-cv-00001-JDK

**DEFENDANTS' REPLY IN SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

## I. The Challenge to Section 109 is Time Barred

Plaintiffs' Reply In Support of Summary Judgment and Opposition to Defendants Cross-Motion for Summary Judgment ("Plaintiffs' Reply") does not dispute the fact all Plaintiffs were in existence at the time Section 109's text was last updated in 2007. As such, they would have needed to file their Administrative Procedure Act ("APA") challenge to Section 109 no later than 2013. Plaintiffs failed to do so and their challenge in this case is filed more than 10 years too late and is time-barred.

Attempting to cure the issue, Plaintiffs offer the Third Declaration of Jessica Lynch, who is the Vice President of Housing Finance, National Association of Home Builders. ECF No. 43-1. But Ms. Lynch's declaration does not cure the untimely challenge. Ms. Lynch acknowledges that "NAHB does not … maintain records of the number of years its individual members have been in business." *Id.* ¶ 13. Not only does she fail to identify any member who has been in business for less than six years, she does not provide any evidence that the theoretical member who has been in business for less than six years has suffered the sort of harm necessary to establish standing. Simply put, it is Plaintiffs' burden to establish standing and they cannot do so by piling inference upon inference, which only leaves the Court to speculate as to whether there is a proper plaintiff.[1] The APA challenge to Section 109 is time-barred and should be dismissed.

Plaintiffs' reliance on *Webster v. Doe*, 486 U.S. 592, 601–05 (1988), *Porter v. Califano*, 593 F.2d

---

[1] As an alternative, Plaintiffs ask the Court to permit them additional time to obtain additional affidavits and take discovery to identify one or more NAHB members who were first injured by Section 109 in the six years prior to the suit. ECF No. 43, at 5–6 n.1. Plaintiffs' request for additional time is surprising given their complete opposition to any requests for additional time made by Defendants in this case. To the extent the Court allows Plaintiffs additional time to obtain affidavits and evidence, Defendants reserve their rights to ask the Court to hold Plaintiffs' Motion for Summary Judgment in abeyance while Defendants obtain discovery, if necessary, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure.

770, 781 (5th Cir. 1987), and *State v. U.S.D.H.S.*, 123 F.4th 186, 189 (5th Cir. 2024), is not persuasive. In *Webster* the Supreme Court considered whether Section 102(c) of the National Security Act precluded judicial review of the CIA Director's termination decisions under the APA. *Webster*, 486 U.S. at 599. The Court found that Section 102(c) committed individual employee discharges to agency discretion and therefore APA review was not available. *Id.* at 601. However, the Court found that Section 102(c) did not preclude the court from considering constitutional claims. *Id.* at 603–04. The Court's analysis was limited to the jurisdiction stripping nature of Section 102(c) and does not provide Plaintiffs an avenue to avoid the untimeliness of the claims here.

*Porter* is also of little utility. In *Porter*, the Fifth Circuit merely found that the district court should not have deferred to agency findings on whether an action was "contrary to constitutional right" and therefore remanded the case for a hearing on her constitutional claim. *Porter*, 592 F.2d at 781. *Porter* does not address the question here—whether Plaintiff can avoid a time-barred claim merely because in a timely APA claim a plaintiff can seek to have agency action set aside because it is contrary to a constitutional right. Another important distinguishing factor is that Plaintiffs have not brought direct constitutional claims in this case. Each cause of action is pursuant to the APA, which is clearly time-barred.

Finally, *USDHS* is also inapposite. In that case, the Fifth Circuit simply held that the APA waives sovereign immunity for state trespass-to-chattels claims. *USDHS*, 123 F.4th at 199–200. The APA's statute of limitations in relation to constitutional claims was not at issue. In sum, Plaintiffs' APA challenge to Section 109 is a decade too late and the Court should grant summary judgment in favor of Defendants on those claims.

II. **The Non-delegation and Spending Clause Challenges Fail**

Contrary to Plaintiffs' argument, HUD and USDA are not at the mercy of the "whim[s]" of private entities. As explained in HUD's and UDSA's response to Plaintiffs' Motion for Summary

2

Judgment, not only are they not beholden to private entities, but the agencies also have discretion to ignore the private entities' code updates altogether. *See* 42 U.S.C. § 12709(d). This section merely describes the process that the agencies must apply *after* deciding to begin the incorporation process. Even then, the agencies can determine that the new changes should not become the law. And the history surrounding the code updates undercuts Plaintiffs' argument that the agencies are beholden to the private entities' updates. For instance, as Plaintiffs note, the agencies did *not* incorporate IECC updates in 2012, 2015, or 2018, nor ASRHAE updates in 2010, 2013, or 2016. Compl. ¶¶ 96–97.

Turning to the Spending Clause challenge, Plaintiffs misinterpret *Texas v. Yellen*, 15 F.4th 755 (5th Cir. 2024). The issue in *Yellen* was not, as Plaintiffs argue, that the conditions must have been imposed by the statute alone. Rather, the issue in *Yellen* was that the conditions were so inherently vague and ambiguous as to violate the Spending Clause. *Id.* at 771–75.

### III. The Final Determination is not contrary to law.

#### a. Section 109 permits more than one update.

In the Response, Plaintiffs compare the current version of Section 109 to prior versions of the statute to support their argument that the current version of subsection (d) only permits one revision. Not true. The flaw in Plaintiffs' argument is that the Energy Independence and Security Act of 2007 (EISA), Pub. L. 110-140, § 481(4), 121 Stat. 1492, 1648 (2007), was a complete overhaul of the prior legislation, and Section 109(d)'s language shows evidence of being an afterthought. Interpretive presumptions can readily yield to context, particularly when the law "is far from a *chef d'oeuvre* of legislative draftsmanship." *Util. Air Regulatory Grp. v. U.S. Environmental Protection Agency,* 573 U.S. 302, 320 (2014).

#### b. Section 109 provides two parallel paths for energy standards.

Plaintiffs also argue that Section 109(a), not 109(d), allows HUD and USDA to update their home-energy standards whenever the ICC and ASHRAE update their codes. This interpretation

3

misreads Section 109(d) and its relation to the rest of the statute. As noted in HUD and USDA's cross-motion, Section 109 provides the agencies two paths to update energy-efficiency standards. ECF 39 at 18. First is the agency-creation process via Section 109(a) and (c). The agencies issue their own standards that meet or exceed the 2006 IECC and the 2004 ASHRAE standard. Then, if the ICC and ASHRAE update their standards, HUD and USDA must update theirs accordingly unless doing so would not be cost-effective. Second is the agency-incorporation process under Section 109(b) and (d). HUD and USDA allow the private standards to take effect by not adopting their own standards. Then, if the ICC and ASHRAE update their standards, HUD and USDA have the option to incorporate the updates unless doing so would not be cost-effective and thus affect availability and affordability of new housing.

Crucially, both paths require consultation. Under the agency-only process, HUD and USDA must "consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies, building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated" by HUD and USDA. 42 U.S.C. § 12709(a)(2).

Similarly, and as Plaintiffs omit, consultation also occurs under the agency-incorporation process, just more upstream in the process. In updating their respective codes, the ICC and ASHRAE offer multiple opportunities for stakeholders to provide feedback to proposed changes. And critically, the Department of Energy is "statutorily required" to consult the ICC and ASHRAE during their update process after consulting with HUD and "other appropriate Federal agencies." *How Are Building Energy Codes Developed?*, U.S. DEP'T OF ENERGY (Aug. 8, 2016), https://www.energy.gov/eere/buildings/articles/how-are-building-energy-codes-developed; 42 U.S.C. § 6836. The Department of Energy then goes through notice-and-comment rulemaking to determine whether those updates are energy efficient. Finally, HUD and USDA undertake notice-and-

4

comment rulemaking to determine whether to incorporate the updates. *See* ECF 39 at 2–6. HUD and other agencies thus have an opportunity to indirectly consult the ICC and ASHRAE on their updates, and then HUD and USDA in turn seek consultation from others via notice and comment. Section 109 provides two paths for HUD and USDA to implement energy-efficiency standards, but both involve consultation, consider cost-effectiveness, and permit repeated updates. Plaintiffs' attempt to distinguish the two paths is unavailing.

### c. There is not a negative impact on availability

The fact that Plaintiffs label all aspects of HUD and USDA's research-based analysis "speculative" does not make them so. In this regard, Plaintiffs' rehashing of the same arguments set forth in their Motion for Summary Judgment does not move the needle. As explained in HUD and USDA's response to the Motion, the modeling analysis Plaintiffs critique is merely one part of the availability determination. The holistic analysis took into consideration other facts including builder impacts, evidence from prior code adoption, and jurisdictional energy-code variability, Final Determination at 33,175–33,180, and after considering the totality of factors concluded that the updates would not result in a noticeable impact on housing. *Id.* at 33,176; Final Determination Regulatory Impact Analysis at 78–96.

### IV. Plaintiffs fail to carry their burden of establishing the Final Determination is arbitrary and capricious.

At this point in the proceedings, it is apparent that Plaintiffs disagree with the Final Determination. But mere disagreement with Final Determination is not sufficient to show that it should be set aside as arbitrary and capricious. "The APA's 'arbitrary and capricious standard' is 'deferential,' requiring only 'that agency action be reasonable and reasonably explained.'" *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-CV-450-JDK, 2023 WL 5489028, at *5 (E.D. Tex. Aug. 24, 2023) (quoting *FCC v. Prometheus Radio Project*, 529 U.S. 414, 423 (2021)). The

standard is also "demanding." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018). "The district court is not permitted to conduct a *de novo* review . . . and ultimately substitute its own determination for that of [the] agency's." *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at *4 (5th Cir. Oct. 12, 2023) (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983)). Additionally, despite Plaintiffs' attempt to flip the burden, because an agency's decision is presumptively valid, it is Plaintiffs' burden to establish the decision should be set aside as arbitrary and capricious. *Texas Tech Physicians Associates v. United States Department of Health and Human Services*, 917 F.3d 837, 844 (5th Cir. 2019); *see also Woods v. Federal Home Loan Bank Bd.*, 826 F.2d 1400, 1408–09 (5th Cir. 1987) ("… plaintiffs have the burden to show that the Bank Board's decision to appoint a receiver was arbitrary and capricious."). Here, Plaintiffs' second guessing of the agencies' process, assumptions, and ultimate conclusion does not render them arbitrary and capricious. The APA does not allow for that sort of Monday-morning quarterbacking.

Plaintiffs' first argument challenges the use of the PNNL model. They criticize the model based on being now a decade-old model and because the agencies adjusted its inputs in making the 2024 Final Determination. But Plaintiffs fail to show how these issues make the model so unreliable as to render its use arbitrary or capricious. Primarily, Plaintiffs fail to show that the PNNL's model being roughly 10 years old affects its reliability. It does not. Plaintiffs' second argument—that the agencies "cannot have it both ways," in claiming that the PNNL model "represents the current state-of-the-art for modeling," and also adjust the inputs to the model—merely shows Plaintiffs' failure to appreciate the difference between a model and its inputs. ECF No. 43, at 11. The PNNL model is, at its core, a mathematical software program. The information fed into the model—its inputs—can be adjusted without changing the model itself. Thus, there is nothing inconsistent with maintaining that PNNL is a state-of-the-art model while simultaneously adjusting the inputs fed into the model to

6

accurately reflect real-world conditions.[2] The fact that the agencies revised the inputs to reflect current market conditions is a strength rather than a weakness and demonstrates that the process was neither arbitrary nor capricious.

Plaintiffs criticize the use of a 15% profit margin and the HUD's reliance on the BC-3 dataset. Again, the agencies' use of this profit margin reasonable. As HUD and USDA previously noted, Department of Energy data comes from the BC3 database supplemented by recent studies, consultation with research groups, and RSMeans Residential Cost Data. ECF 39 at 27. And the profit figure comes from PNNL using data from RSMeans. *See* M. Tyler et al., *National Cost-Effectiveness of ANSI/ASHRAE/IES Standard 90.1-2019*, at 4.1-4.3, U.S. DEP'T ENER. (July 2021) (AR-11590) [hereinafter *National Cost-Effectiveness*]; *see also Understanding RSMEans Data's Construction Costs and Using Them to Estimate*, RSMEANS DATA, https://www.rsmeans.com/resources/what-is-construction-estimating (last visited June 23, 2025) [hereinafter *Understanding RSMeans*]. RSMeans "invests over 30,000 hours in cost research annually," and they "continuously monitor developments in the construction industry to ensure reliable, thorough and up-to-date cost information." *Understanding RSMeans*. PNNL took the RSMeans data, cross-referenced it with the previously listed sources as needed, and conducted a technical review. *National Cost-Effectiveness*, at 4.1. The 15% figure thus comes from a comprehensive, up-to-date database, validated by information from other sources and examined by experts within the Department of Energy. The figure is well-founded and well-reasoned.

The choice of home modeling is similarly not arbitrary or capricious. Plaintiffs argue that

---

[2] *Chamber of Commerce of the U.S. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023), is readily distinguishable. Plaintiffs quote this case to say that agencies "cannot have it both ways" in rulemaking. ECF No. 43, at 11. But the difference is that in *Chamber of Commerce*, the court expressed concern that the SEC was attempting to have it "both ways" because it was simultaneously accepting and rejecting the reasoning underlying the price discovery benefit as part of its analysis. *Id.* at 778. Unlike *Chamber of Commerce*, HUD and USDA are not attempting to maintain contrary positions on the same factor at the same time.

7

Defendants failed to "provide a complete analytic defense" of the mode. ECF No. 43, at 12 (quoting *Texas v. United States Environmental Protection Agency,* 137 F.4th 353, 369 (5th Cir. 2025)). In that case, the Fifth Circuit provided:

> While courts routinely defer to agency modeling for complex phenomena, model assumptions must have a 'rational relationship' to the real world. An agency "'must explain[] the assumptions and methodology used in preparing the model'; and 'provide' a complete analytic defense' should the model be challenged. A "failure to address or reconcile" conflicting data can "create an 'unexplained inconsistency in the rulemaking record."

*USEPA*, 137 F.4th at 369 (citation modified). Against this background, the Fifth Circuit found that the EPA's failure to reconcile conflicting results for $SO_2$ concentrations near the Longview airport created an unexplained inconsistency in its analysis. *Id.* Ultimately, the Fifth Circuit remanded the matter for EPA to conduct more reasoned decision-making.

But the concerns expressed in *USEPA* are not implicated by HUD's choice of home model. Unlike the conflicting $SO_2$ readings in *USEPA*, which required further analysis and reconciliation, the different home models are not inherently at odds in a way that would require further studies to reconciliation. And the agencies' modeling assumption is explained and does "have a rational relationship to the real world." Specifically, the Final Determination explains "[t]he set of prototypes PNNL uses in its analysis are designed to represent the majority of the new residential building construction stock in the United States using a combination of U.S. Census, RECS, and Home innovation Data." Final Determination at 33,134. Surely selecting a prototype house that "represent[s] the majority of new residential building construction" constitutes a rational relationship to the real world and the reason for this selection is clearly identified. This is especially true because the requirement of a rational relationship is an extremely low bar. Again, Plaintiffs' disagreement with the conclusion or the suggestion that there are other options does not render the Final Determination's selection arbitrary or capricious.

8

Plaintiffs identify *Shafer & Freeman Lakes Environmental Corp. v. FERC*, 992 F.3d 1071 (D.C. Cir. 2021), as "exemplify[ing] what agencies should do when their model was challenged." Here, the agencies did examine the relevant data, explain the basis for their decision, and identify evidence buttressing their judgment, in addition to responding to commenters' concerns. *See* Final Determination at 33,121–33,144. As such, this case is consistent with the type of analysis that Plaintiffs' claim exemplifies what agencies should do. Also important is a portion of *Shafer* that Plaintiffs omit. The *Shafer* court also makes clear "[t]he point of administrative review is not to settle the scientific debate., but to ensure that the Service 'explain[ed] the assumptions and methodology used in preparing the model[.]" *Shafer*, 992 F.3d at 1093 (quoting *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.—MDL No. 1993,* 709 F.3d 1, 13 (D.C. Cir. 2013)). That is exactly the point. This Court's job is not to settle the debate regarding which prototypical home design is the most appropriate in the real world. Rather, the Court need only confirm that the Defendants explained why they selected the model they did. The record shows that Defendants did so and therefore the Final Determination should not be set aside as arbitrary or capricious.

Finally, *Louisiana v. US Department of Energy*, 90 F.4th 461 (5th Cir. 2024), does not apply here. In *Louisiana*, the Fifth Circuit vacated a DOE rule repealing a prior loosening of standards for dishwashers and laundry machines. *Id.* at 465. In doing so, the court found that DOE acted arbitrarily and capriciously for several reasons. Relevant here, the administrative record included evidence that the repeal would make dishwashers and laundry machines less energy and water efficient. *Id.* at 472. Yet DOE did not grapple with this contrary evidence. Instead, it "acknowledged the concern and moved on." *Id.* at 473. In other words, it recognized unfavorable facts, cited favorable facts, and gave more weight to the latter without explanation. *Id.*

DOE's analysis of the facts, however, was much less rigorous than HUD and USDA's here. In response to commentators' detailed objections, DOE summarily rejected their concerns based on

a "policy judgment" that the underlying statute would be thwarted by allowing the prior rule-loosening to remain in effect. U.S. Dep't of Energy, *Energy Conservation Program: Product Classes for Residential Dishwashers, Residential Clothes Washers, and Consumer Clothes Dryers*, 87 Fed. Reg. 2673, at 2684 (Jan. 19, 2022). DOE also dismissed the comments by stating, "Considerations regarding energy and water use, as well as [the statute's] other requirements, should have been addressed during the rulemaking process for [the prior rule loosening]." *Id.* at 2684–85. In other words, because the prior rule did not conduct a proper analysis of the facts, DOE deemed this enough to summarily repeal that rule without a proper analysis of the facts. *See id.* at 2678.

HUD and USDA's analysis was far from that rejected in *Louisiana*. The agencies undertook a rigorous analysis detailed in two regulatory impact analyses, a preliminary determination, and a final determination, all of which have been included in the Administrative Record. The agencies conducted more than sufficient analysis to rationally explain why they weighed some evidence greater than others. HUD and USDA were not arbitrary and capricious in issuing the Final Determination.

## CONCLUSION

For the reasons above, along with those set forth in Defendants' Response in Opposition to Plaintiffs' Moton for Summary Judgment and Cross-Motion for Summary Judgment, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiffs' Motion for Summary Judgment.

Dated: June 26, 2025                                Respectfully submitted,


                                                    YAAKOV M. ROTH
                                                    Acting Assistant Attorney General
                                                    Civil Division

                                                    LESLEY FARBY
                                                    Deputy Branch Director

                                                    JAY R. COMBS
                                                    ACTING UNITED STATES ATTORNEY

                                                    /s/ James Gillingham
                                                    JAMES GARLAND GILLINGHAM
                                                    Texas State Bar No. 24065295
                                                    james.gillingham@usdoj.gov
                                                    110 N. College, Suite 700
                                                    Tyler, TX  75702
                                                    (903) 590-1400
                                                    Fax: (903) 590-1436

                                                    *Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2025, I electronically filed the foregoing document with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of this filing.

*/s/ James Gillingham*
JAMES GILLINGHAM
Assistant United States Attorney
