## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| STATE OF UTAH, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 6:25-cv-1-JDK |
| | § | |
| U.S. DEPARTMENT OF HOUSING | § | |
| AND URBAN DEVELOPMENT, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

In this case, fifteen states and the National Association of Home Builders challenge a 2024 Final Determination promulgated by the U.S. Department of Housing and Urban Development and the U.S. Department of Agriculture. The Final Determination heightens energy efficiency standards for certain new housing construction. Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing, 89 Fed. Reg. 33,112 (Apr. 26, 2024) (hereinafter, "the Final Determination").

The agencies moved to dismiss the case, arguing that it's not ripe because they are reconsidering the Final Determination and have extended the compliance deadlines. As explained herein, however, the states and homebuilders must presently comply with at least some of the Final Determination's requirements when planning new housing projects. The agencies' motion is thus denied.

The parties also cross-moved for summary judgment on the merits.  Plaintiffs argue that the Final Determination is unlawful under the Administrative Procedure Act for a variety of reasons.  The Court agrees in part, as set forth below.

Plaintiffs first contend that the authorizing statute—Section 109 of the Cranston-Gonzalez Affordable Housing Act, codified at 42 U.S.C. § 12709—is unconstitutional because it delegates the power to establish energy efficiency standards to private code bodies.  Plaintiffs also argue that the statute violates the Spending Clause, U.S. Const. art. I, § 8, cl. 1.  Neither argument has merit.  Section 109 does not present a nondelegation problem because the agencies retain their decision-making authority and the private bodies remain subordinate to them.  Nor does Section 109 violate the Spending Clause because the provision includes clear standards by which states may measure their compliance.

Next, Plaintiffs argue that the Final Determination conflicts with Section 109 and is thus unlawful under the APA.  On this point, the Court agrees.  First, the plain text of Section 109 authorizes the agencies to update the energy efficiency standards only once, which already occurred in 2015.  In addition, Section 109 permits the agencies to adopt new energy efficiency standards only if the standards would not negatively affect the availability of new affordable-housing construction, among other requirements.  Here, however, the agencies' own findings demonstrate that the new standards would reduce availability by 1.5 percent.  None of the agencies' arguments to the contrary is persuasive.

Finally, Plaintiffs argue that the Final Determination was the product of arbitrary and capricious rulemaking. In doing so, Plaintiffs focus almost exclusively on the particular model used by the agencies to analyze the new standards. Plaintiffs fail, however, to explain how the agencies' use of that model ignored relevant factors or evinced a clear error of judgment.

In sum, the Court grants in part Plaintiffs' motion for summary judgment and vacates and sets aside the Final Determination under the APA.

## I.

In 2015, acting under statutory authority, the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Agriculture ("USDA") (together, "the agencies") promulgated a rule requiring compliance with certain model energy codes for new housing construction. In 2023, the agencies decided to require compliance with more recent editions of those codes, citing the same statutory authority.

**A.    The Statute.**    In 1990, Congress enacted the Cranston-Gonzalez Affordable Housing Act. Pub. L. No. 101-625, 104 Stat. 4079 (1990) (codified as amended at 42 U.S.C. §§ 12701 *et seq*.). The Act's "objective" was to "reaffirm the long-established national commitment to decent, safe, and sanitary housing for every American," in part by increasing "the Nation's supply of decent housing that is affordable" and providing "a reliable, readily available supply of mortgage finance at the lowest possible interest rates." 42 U.S.C. § 12702. To that end, Section 109 of the Act required the Secretary of HUD to "promulgate energy efficiency standards for

new construction of public and assisted housing and single-family and multifamily residential housing . . . subject to mortgages under the National Housing Act."  104 Stat. at 4093 (as amended, "Section 109").

By 1992, HUD had taken no action on the required standards.  Accordingly, Congress amended Section 109 to extend the deadline for adopting standards and, if the agency still failed to act, to adopt the standards set by certain private organizations.  Energy Policy Act of 1992, Pub. L. 102-486 § 109, 106 Stat. 2776, 2786-87 (1992).  Later, Congress extended the deadline further to September 30, 2006, and modified Section 109, requiring the Secretary of HUD and the Secretary of USDA jointly to establish energy efficiency standards.  42 U.S.C. § 12709(a).  If the agencies failed to act by September 30, 2006, then new housing construction would be required to meet the standards of the 2006 International Energy Conservation Code ("IECC") or, for multifamily high rises, the American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE") Standard 90.1-2004.  *Id*. § 12709(b).

Congress also addressed future revisions to the 2006 IECC or ASHRAE Standard 90.1-2004, as set forth in Section 109(c) and (d) below.  Section 109 now states as follows:

(a) Establishment.

(1) In general.  The Secretary of Housing and Urban Development and the Secretary of Agriculture shall, not later than September 30, 2006, jointly establish, by rule, energy efficiency standards for—

(A) new construction of public and assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act [12 U.S.C. 1701 et seq.];

(B) new construction of single family housing (other than manufactured homes) subject to mortgages insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 [42 U.S.C. 1471 et seq.]; and

(C) rehabilitation and new construction of public and assisted housing funded by HOPE VI revitalization grants under section 1437v of this title.

(2) Contents.  Such standards shall meet or exceed the requirements of the 2006 International Energy Conservation Code (hereafter in this section referred to as "the 2006 IECC"), or, in the case of multifamily high rises, the requirements of the American Society of Heating, Refrigerating, and Air-Conditioning Engineers Standard 90.1-2004 (hereafter in this section referred to as "ASHRAE Standard 90.1-2004"), and shall be cost-effective with respect to construction and operating costs on a life-cycle cost basis. In developing such standards, the Secretaries shall consult with an advisory task force composed of homebuilders, national, State, and local housing agencies (including public housing agencies), energy agencies, building code organizations and agencies, energy efficiency organizations, utility organizations, low-income housing organizations, and other parties designated by the Secretaries.

(b) International Energy Conservation Code.  If the Secretaries have not, by September 30, 2006, established energy efficiency standards under subsection (a), all new construction and rehabilitation of housing specified in such subsection shall meet the requirements of the 2006 IECC, or, in the case of multifamily high rises, the requirements of ASHRAE Standard 90.1-2004.

(c) Revisions of the International Energy Conservation Code.  If the requirements of the 2006 IECC, or, in the case of multifamily high rises, ASHRAE Standard 90.1-2004, are revised at any time, the Secretaries shall, not later than 1 year after such revision, amend the standards established under subsection (a) to meet or exceed the requirements of such revised code or standard unless the Secretaries determine that compliance with such revised code or standard would not result in a significant increase in energy efficiency or would not be technologically feasible or economically justified.

(d) Failure to amend the standards.  If the Secretary of Housing and Urban Development and the Secretary of Agriculture have not, within 1 year after the requirements of the 2006 IECC or the ASHRAE Standard 90.1-2004 are revised, amended the standards or made a determination under subsection (c), all new construction and rehabilitation of housing

5

specified in subsection (a) shall meet the requirements of the revised code or standard if—

(1) the Secretary of Housing and Urban Development or the Secretary of Agriculture make a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing (other than manufactured homes) subject to mortgages insured under the National Housing Act (12 U.S.C. 1701 et seq.) or insured, guaranteed, or made by the Secretary of Agriculture under title V of the Housing Act of 1949 (42 U.S.C. 1471 et seq.), respectively; and

(2) the Secretary of Energy has made a determination under section 6833 of this title that the revised code or standard would improve energy efficiency.

42 U.S.C. § 12709(a)–(d).

**B.    The 2015 Final Determination.**  The September 30, 2006 deadline came and went without HUD and USDA establishing any standards.  Meanwhile, the 2006 IECC and ASHRAE Standard 90.1-2004 were revised multiple times.  *See* 75 Fed. Reg. 54,131 (Sept. 3, 2010) (Department of Energy ("DOE") notice discussing 2009 edition of the IECC); 75 Fed. Reg. 54,117 (Sept. 3 , 2010) (DOE notice discussing the 2007 edition of the ASHRAE standards); 77 Fed. Reg. 29,322 (May 17, 2012) (DOE notice discussing 2012 edition of the IECC); 77 Fed. Reg. 28,928 (May 16, 2012) (DOE final rule discussing 2010 edition of the ASHRAE standards); 79 Fed. Reg. 57,900 (Sept. 26, 2014) (DOE notice discussing 2013 edition of the ASHRAE standards).

In 2014, acting pursuant to Section 109(d), HUD and USDA published a preliminary determination that the 2009 IECC and ASHRAE Standard 90.1-2007— revisions to the 2006 IECC and ASHRAE Standard 90.1-2004—would not negatively affect the affordability and availability of covered housing.  Preliminary Affordability Determination—Energy Efficiency Standards, 79 Fed. Reg. 21,259 (Apr. 15, 2014).  A

6

year later, the agencies issued a final determination that the adoption of the 2009 IECC for single family homes and ASHRAE Standard 90.1-2007 for multifamily buildings would not negatively affect the availability or affordability of new construction covered by Section 109 and that the updated codes should therefore take effect. *See* Final Affordability Determination—Energy Efficiency Standards, 80 Fed. Reg. 25,901 (May 6, 2015). This agency action is referred to herein as the "2015 Final Determination."

New editions of the IECC were thereafter published in 2015, 2018, and 2021, and new editions of ASHRAE Standard 90.1 were published in 2016 and 2019. *See, e.g.*, Determination Regarding Energy Efficiency Improvements in the 2015 International Energy Conservation Code (IECC), 80 Fed. Reg. 33,250 (June 11, 2015); Final Determination Regarding Energy Efficiency Improvements in the 2018 International Energy Conservation Code (IECC), 84 Fed. Reg. 67,435 (Dec. 10, 2019). The agencies, however, took no action on these updates until 2023.

**C.    The 2024 Final Determination.**    In 2023, again citing Section 109(d), HUD and USDA published a preliminary determination that "the 2021 IECC [update] and [2019] AS[H]RAE [update] will not negatively affect the affordability and availability of housing covered by" Section 109. Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing: Preliminary Determination and Solicitation of Comment, 88 Fed. Reg. 31,773 (May 18, 2023). During the notice-and-comment period, several industry organizations criticized the agencies' analysis and explained that the cost of adopting these standards would

7

severely limit affordable low-income housing.  Docket No. 35, Ex. 57 (Comment Letter from NAHB) ("[R]equiring the 2021 IECC and ASHRAE 90.1-2019 codes on virtually all new construction supported by HUD and USDA undoubtedly will have adverse consequences on the affordability and availability of new construction of single and multifamily housing."); *Id.*, Ex. 56 (Comment Letter from Mortgage Bankers Association) ("[T]his proposal could be devastating for millions of Americans looking to buy or rent safe, decent, affordable housing."); *Id.*, Ex. 55 (Comment Letter from national homebuilder) ("We have found the impact to affordability and increase in cost of 2021 IECC compliance to be considerably more than the estimates . . . in your preliminary determination.").

Nevertheless, in 2024, HUD and USDA promulgated the regulation at issue here—the 2024 Final Determination.  89 Fed. Reg. 33,112.  Although the agencies revised some of their cost estimates to account for the commenters, HUD and USDA determined that the 2021 IECC and ASHRAE Standard 90.1-2019 will not negatively affect the affordability and availability of housing covered by the statute.  The effective date of the Final Determination was May 28, 2024.  *Id.*  The initial deadline for complying with the 2021 IECC and ASHRAE Standard 90.1-2019 was set between November 2024 and November 2025 for most programs.  *Id.* at Table 32.

**D.    This Lawsuit.**  Plaintiffs, a coalition of fifteen States and the National Association of Home Builders, filed this action against HUD and USDA on January 2, 2025.  Docket No. 1.  Plaintiffs allege that the 2024 Final Determination violates the APA, 5 U.S.C. §§ 701 *et seq*., and should therefore be set aside.

Defendants filed a motion to dismiss on jurisdictional grounds, Docket No. 32, which was shortly followed by a motion for summary judgment by the Plaintiffs. Docket No. 35. Defendants filed a response and cross-motion for summary judgment. Docket No 39.

Since the filing of this lawsuit, the agencies have extended the compliance deadline in the Final Determination to December 31, 2026. *See* Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing; Extension of HUD Compliance Dates, 90 Fed. Reg. 11,622 (Mar. 10, 2025); Final Determination: Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing; Additional Extension of HUD Compliance Dates, 91 Fed. Reg. 4,933 (Feb. 3, 2026). HUD has explained that these extensions are necessary in part to "provide additional time for the administration to review questions of fact, law and policy supporting the Final Determination." 90 Fed. Reg. 11,622.

On July 7, 2025, HUD and USDA published a joint notice stating that they are "considering reexamining the analysis in the Final Determination." Docket No. 51-1; Adoption of Energy Efficiency Standards for New Construction of HUD- and USDA-Financed Housing; Notice for Comment, 90 Fed. Reg. 29,882, 29,885. Nonetheless, according to a status report filed by Plaintiffs in January 2026, there is no indication that the agencies are doing anything more than "considering reexamining" the Final Determination. Docket No. 67.

## II.

The Court first addresses Defendants' motion to dismiss, which argues that the case is not ripe and should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  Docket No. 32.  As explained below, the Court denies the motion.

## A.

Rule 12(b)(1) requires dismissal of a complaint where "the court lacks the statutory or constitutional power to adjudicate the case."  *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 307 (5th Cir. 2021) (citation omitted).  "Article III of the United States Constitution provides that federal courts have the power to decide only actual cases or controversies."  *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714–15 & n.20 (5th Cir. 2012) (citing U.S. Const. art. III, § 2).  "The justiciability doctrines of standing, mootness, political question, and ripeness all originate in Article III's 'case' or 'controversy' language."  *Id.* at 715 (citation omitted).

The basic rationale for the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 267 (5th Cir. 2017) (quoting *Abbott Labs.  v. Gardner*, 387 U.S. 136, 148 (1967)).

10

## B.

Defendants argue that Plaintiffs' claims are not ripe because the agencies have extended the compliance deadlines while they "consider reexamining" the 2024 Final Determination. Docket No. 32 at 5–9; Docket No. 51-1.

To determine whether a case is ripe for adjudication, courts evaluate (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Walmart*, 21 F.4th at 311 (quoting *Abbott Labs.*, 387 U.S. at 149). Both prongs must be established for the action to be ripe. *See Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 435 n.30 (5th Cir. 2021). On the "fit for decision" prong, "[a] challenge to administrative regulations is fit for review if (1) the questions presented are purely legal ones, (2) the challenged regulations constitute final agency action, and (3) further factual development would not significantly advance the court's ability to deal with the legal issues presented." *Texas v. United States*, 497 F.3d 491, 498 (5th. Cir. 2007) (internal quotations and alterations omitted).

Plaintiffs have established all prongs here. Plaintiffs' claims are fit for decision because the claims raise purely legal issues and the Final Determination is "final agency action"—points that Defendants do not dispute. Docket No. 32 at 7. Nor would further factual development significantly advance the issues before the Court. Defendants argue that "the agencies are still evaluating whether to revise or revoke the [F]inal [D]etermination." *Id.* But an agency may always revise or revoke final agency action; that possibility does not make an APA challenge unripe. The agencies

11

here, moreover, state that they are "considering reexamining" the Final Determination, which is even less definitive than actually reexamining the rule. Finally, the cases cited by Defendants are inapposite as they did not involve agency action, much less final agency action like the Final Determination here. *See, e.g.*, *Walmart*, 21 F.4th at 308 (holding that positions taken by the government in settlement negotiations were not "rules" for APA purposes); *Trump v. New York*, 592 U.S. 125, 131 (2020) (reasoning that a presidential statement of intent to exclude unlawful aliens from Census apportionment was not an "implement[ed]" action that could give rise to justiciable claims).

Plaintiffs also satisfy the hardship prong. The Final Determination imposes different and more stringent building requirements on new housing. Although the agencies have extended some compliance deadlines until December 2026, buildings are not constructed overnight and often have long lead times. Docket No. 33, Ex. 4 (Declaration of Jessica Lynch, Vice President, NAHB) ¶¶ 6–9. The average completion time for a single-family house in 2023 was approximately 10.1 months; for multi-family buildings, it was 19.9 months. *Id.* ¶ 7. Thus, any construction project covered by HUD or USDA programs that starts today must plan to comply with the standards adopted by the Final Determination. *See id.* ¶ 9. Further, Defendants did not extend the compliance deadlines for certain state programs, and thus the Plaintiff States are presently required to comply with the 2021 IECC. *See* 90 Fed. Reg. 11,622 (HUD Notice of deadline extension) (noting that compliance deadlines for States' HOME and HTF programs remained set at November 28, 2024). In sum, the Final

Determination has been formalized, and its effects have been felt in a concrete way by the challenging parties. *See Contender Farms, L.L.P.*, 779 F.3d at 267.

Accordingly, Defendants' motion to dismiss on jurisdictional grounds is **DENIED**.

## III.

The parties cross-move for summary judgment on Plaintiffs' four claims, each of which seeks to set aside the Final Determination as unlawful under the APA. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

The Court addresses Plaintiffs' four counts in turn.

## A.

Plaintiffs first assert that Section 109 is unconstitutional and thus the Final Determination is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). Docket No. 1, Count One. Plaintiffs primarily argue that Section 109 violates "the private non-delegation doctrine" because it delegates to private code bodies—the IECC and ASHRAE—the power to establish energy efficiency standards. Docket No. 35 at 14–15. Plaintiffs also contend that Section

109 violates the Spending Clause because the statutory spending conditions are ambiguous. *Id.* at 16. Neither argument has merit.

1.    The Constitution vests federal power in only three branches of government—not in private entities unaccountable to the people. *See, e.g., A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 310–11 (1936); *National Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 872–73 (5th Cir. 2022) ("*Horsemen's I*"). Indeed, "[a] cardinal constitutional principle is that federal power can be wielded only by the federal government." *Horsemen's I*, 53 F.4th at 872. "Private entities may do so only if they are subordinate to an agency." *Id.* Thus, a statute may not give a private entity the power to "formulate detailed rules on an array of topics" and then constrain an agency's power to reject or modify those rules. *See id.* at 872. "An agency does not have meaningful oversight if it does not write the rules, cannot change them, and cannot second-guess their substance." *Id.* Such an arrangement violates "the settled constitutional principle that forbids private entities from exercising unchecked government power." *Id.* at 873.[1]

---

[1]  *Horsemen's I* addressed a statute requiring the Federal Trade Commission to adopt certain rules proposed by the Horseracing Authority. *Horsemen's I*, 53 F.4th at 872. After the Fifth Circuit issued its decision in *Horsemen's I*, Congress amended the statute to give the FTC the power to abrogate, add to, or modify the Authority's rules. *Horsemen's Benevolent & Protective Ass'n v. Black,* 107 F.4th 415, 420 (5th Cir. 2024) ("*Horsemen's II*"). In *Horsemen's II*, the Fifth Circuit held that the amended statute largely cured the nondelegation problem—except for a different provision that gave the Horseracing Authority enforcement powers under the statute. *Id.* at 421. In June 2025, the Supreme Court vacated the Fifth Circuit's judgment in *Horsemen's II* and remanded the case "for further consideration in light of" *Consumer's Research. Horseracing Integrity & Safety Auth., Inc. v. Nat'l Horsemen's Benevolent & Protective Ass'n*, 145 S. Ct. 2837 (2025). The case remains pending at the Fifth Circuit.

On the other hand, delegating power to a private entity may be permissible if the entity is "broadly subordinate" to a federal agency. *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 660 (2025); *see also, e.g., Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940) (statute permitting boards of coal companies to propose minimum coal prices to the National Bituminous Coal Commission for "approv[al], disapprov[al], or modifi[cation]" was "unquestionably valid" because the private boards "function[ed] subordinately to" the agency and were subject to its "authority and surveillance.").

In *Consumers' Research*, the Supreme Court approved the appointment of a private entity to administer a fund for the Federal Communications Commission because the entity did not "make policy" and was required to "carry out all its tasks 'consistent with' the FCC's rules, 'orders, written directives, and other instructions.'" 606 U.S. at 693 (quoting 47 C.F.R. § 54.702(c)). In fact, the private entity in that case "play[ed] an advisory role," while the "Commission alone ha[d] decision-making authority." *Id.* Specifically, the private entity gathered data and estimated costs of the fund and then shared those projections with the FCC. *Id.* That, according to the Court, was the end of the entity's role: the FCC had all subsequent and final authority to review, revise, and approve the rules for contributing to the fund. *Id.* at 693–94. "The [FCC] is, throughout, the final authority . . . ." *Id.* In rejecting the plaintiff's nondelegation argument, the Court reasoned that "the Administrator's projections can have only the legal (or, indeed, practical) effect the Commission

15

decides they should." *Id*. at 694. "Not the Administrator, but the Commission, endorses final projections . . . and formally promulgates them." *Id*.

Applying that precedent here, the Court concludes that Section 109 does not violate the nondelegation doctrine. Plaintiffs focus their argument on Section 109(d), which requires that new construction comply with any revised IECC or ASHRAE codes under certain circumstances. 42 U.S.C. § 12709(d). Plaintiffs contend that Section 109(d) "incorporat[es] ever-changing efficiency standards set by private code bodies" and violates "the private non-delegation doctrine." Docket No. 35 at 12–16. But Plaintiffs misread the statute. First, Section 109(d) does not automatically "incorporate" new IECC and ASHRAE efficiency standards. Rather, the new standards govern only if (1) HUD or USDA "mak[es] a determination that the revised codes do not negatively affect the availability or affordability of [new housing]," and (2) the Secretary of Energy "makes a determination . . . that the revised code or standard would improve energy efficiency." 42 U.S.C. § 12709(d). Thus, if the agencies refuse to make these findings—as they did for many years—then the new codes have no force or effect. *Cf. Horsemen's I*, 53 F.4th at 882–84 (noting that the private entity had "sweeping rulemaking power," with the ability to establish, enforce, and punish all entities involved in the horseracing industry and that the FTC lacked the final say on what rules the entity promulgated); *Carter Coal Co.*, 298 U.S. at 310–11 (striking down a statute that allowed private entities to set wages and hours for the rest of the industry). In this way, Section 109(d) is more like the statute in *Consumers' Research*, which provided that the private administrator's "projections

can have only the legal (or, indeed, practical) effect the Commission decides they should." 606 U.S. at 694. "Not the Administrator, but the [agency] endorses [the proposal] . . . and formally promulgates [the rules]." *Id.*; *see also id.* at 695 ("It is *sufficient* . . . that the private party's recommendations . . . *cannot go into effect without an agency's say-so* . . . ." (citing *Sunshine Anthracite Coal Co.*, 310 U.S. at 399 (emphases added)).

Second, nothing in Section 109(d) prohibits the agencies from adopting their own efficiency standards—or modifying or revising the new codes or standards issued by the IECC or ASHRAE. In fact, Section 109(a) *requires* the agencies to establish their own energy efficiency standards that "meet or exceed" the 2006 IECC or the ASHRAE Standard 90.1-2004. 42 U.S.C. § 12709(a). If the IECC or ASHRAE later revises its code, then the agencies "shall . . . amend" their own standards "to meet or exceed" the new codes. *Id.* § 12709(c). Naturally, improving on a given code update before promulgating a new rule is a "modifi[cation]," *Sunshine Anthracite Coal Co.*, 310 U.S. at 388, or "revis[ion]," *Consumers' Research*, 606 U.S. at 694. Thus, again, Section 109 is similar to the statute upheld in *Consumer's Research*, where the agency retained the power to review, direct, and revise the private administrator's fund recommendations. 606 U.S. at 692–94; *see also Sunshine Anthracite Coal Co.*, 310 U.S. at 388; *cf. Horsemen's I*, 53 F.4th at 872 (holding that delegation was unconstitutional where the agencies "[could] not write the rules, [could not] change them, and [could not] second-guess their substance").

Accordingly, the Court concludes that Section 109 does not present a nondelegation problem.

**2.**    Plaintiffs also argue that Section 109 violates the Spending Clause. Docket No. 35 at 16.  The Court disagrees.

The Spending Clause grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  "Incident to this power, Congress may attach conditions on the receipt of federal funds[.]"  *Texas v. Yellen*, 105 F.4th 755, 767 (5th Cir. 2024) (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)).  "If Congress intends to impose a condition on the grant of federal moneys [to the States], it must do so unambiguously" to ensure that "the State voluntarily and knowingly accepts the terms of the 'contract.'"  *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  "Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of [*Dole*, 483 U.S. 203]."  *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021).

Plaintiffs' argument on this point is brief and unclear.  Plaintiffs recite a hypothetical statute discussed in *Texas v. Yellen,* 105 F.4th at 771, and then assert "that's precisely what Section 109 does."  Docket No. 35 at 16.  But the hypothetical statute in *Yellen* prohibited states from using federal funding "to advance injustice," which the court explained was "hopelessly ambiguous."  105 F.4th at 770.  No such

ambiguity exists here.  Section 109 requires that new housing construction comply with specific energy efficiency standards—either the standards established by the agencies or the IECC and ASHRAE standards after the agencies make certain findings.  That is not "hopelessly ambiguous."

Nor does the real statute addressed in *Yellen* support Plaintiffs.  *Yellen* involved a provision in the American Rescue Plan Act that broadly prohibited states from using allotted funds to take any action "directly or indirectly" that would reduce their net tax revenue.  The Fifth Circuit found that this condition was invalid under the Spending Clause primarily because states would be unable to know whether a reduction was "indirect[]."  105 F.4th at 774.  The court also reasoned that the relevant provision violated the Spending Clause because it failed to set a standard by which states could determine that they were in compliance with the "indirect[] offset" requirement.  *Id.* at 772.

Neither of those defects is present here.  Section 109 specifically requires that new housing comply with the energy efficiency standards adopted by the agencies or, if the agencies fail to adopt such standards, by the 2006 IECC or ASHRAE Standard 90.1-2004.  States may also be required to comply with updated codes if the agencies make the proper findings.  In all of these scenarios, the standards are clear and specific—a far cry from the standards discussed in *Yellen*.

*    *    *

Finding no constitutional problem with Section 109, the Court **DENIES** Plaintiffs' motion for summary judgment on Count I and **GRANTS** Defendants' cross-motion.[2]

## B.

Counts II and IV allege that the Final Determination is inconsistent with Section 109 and should therefore be set aside under the APA.

The APA states that courts should "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law, [or] in excess of statutory jurisdiction, authority, or limitations . . . ." 5 U.S.C. §§ 706(2)(a), (c).  An agency rule that is inconsistent with the governing statute and that "rewrites clear statutory terms" must be held "'unlawful and set aside' on this basis alone." *Tex. Med. Ass'n. v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 543 (E.D. Tex. 2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)).  It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328.

In analyzing Section 109, the Court applies the "fundamental canon of statutory construction" that words "should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586

---

[2]  Defendants also argue that Count I is barred by the six-year statute of limitations in 28 U.S.C. § 2401(a).  *See* Docket No. 39 at 8.  Because the Court finds that Count I fails as a matter of law, it need not address this argument.  *See, e.g.*, *Thomas v. First Fitness Int'l, Inc.*, No. 309-CV-324-L, 2010 WL 2671330, at *5 (N.D. Tex. June 30, 2010) ("[Because] these [alternative] arguments constitute independent and adequate grounds warranting Defendant's entitlement to judgment as a matter of law, . . . the court therefore need not address Defendant's statute of limitations argument.").

U.S. 105, 113 (2019) (citation modified); *Van Loon v. Dep't of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024) ("Where a statute leaves terms undefined, we accord those terms their 'ordinary, contemporary, common meaning.'" (citation omitted)); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (explaining that "the whole point of having written statutes" is that "every statute's meaning is fixed at the time of enactment" (citation omitted)); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."). The Court, moreover, must examine "the language and design of the statute as a whole." *E.g., K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

The Court considers each Count in turn.

## 1.

Count II alleges that Section 109(d) permits the agencies to adopt only one update to the codes, which the agencies accomplished in the 2015 Final Determination. Thus, according to Plaintiffs, the 2024 Final Determination is contrary to the statute. The Court agrees.

Section 109(d) states in pertinent part:

> If the Secretary of Housing and Urban Development and the Secretary of Agriculture have not, within 1 year after the requirements of the 2006 IECC or the ASHRAE Standard 90.1-2004 are revised, amended the standards or made a determination under subsection (c), *all new construction and rehabilitation of housing* specified in subsection (a) *shall meet the requirements of the revised code or standard* if [the agencies determine that the revised codes do not negatively affect the availability or affordability of new construction and would improve energy efficiency].

42 U.S.C. § 12709(d) (emphases added).  The first part of Section 109(d) contemplates that the 2006 IECC and ASHRAE Standard 90.1-2004 may be revised or amended. And then the second part plainly states that new construction and rehabilitation shall satisfy "the revised code or standard," which is singular, not plural.  Thus, a natural reading of Section 109(d) is that only the first revision to the 2006 IECC and ASHRAE Standard 90.1-2004 would govern.  Indeed, this is the interpretation followed by the agencies in 2014 when they adopted the first such revision—the 2009 IECC and ASHRAE Standard 90.1-2007.  *See* 80 Fed. Reg. 25,901 (determining that the first revision to the 2006 IECC and ASHRAE Standard 90.1-2004 would not negatively affect the affordability and availability of covered housing).

Other textual clues confirm this interpretation.  For example, Section 109 originally authorized HUD to adopt standards based on "the most recent edition" of the model energy codes.  *See* Cranston-Gonzalez Act of 1990, 104 Stat. 4079, 4093 ("Such standards shall meet or exceed the provisions of the most recent edition of the Model Energy Code of the Council of American Building Officials . . . .").  The current version of Section 109, however, references specific code editions—the 2006 IECC and the ASHRAE Standard 90.1-2004.  Subsection (d) then states that the first revision to these specific editions shall govern if the agencies have failed to follow the procedures under subsections (b) or (c).  If Congress had wanted the agencies to adopt code updates on an ongoing basis, then it would have no reason to reference a particular edition in the statute.  *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to

presume that [the] legislature says in a statute what it means and means in a statute what it says there." (quotation omitted)).

Another clue is found in Section 109(c).  That provision requires the agencies to amend their own standards established under subsection (a) if "the requirements of the 2006 IECC or . . . ASHRAE Standard 90.1-2004 are revised *at any time*."  42 U.S.C. § 12709(c) (emphasis added).  The use of the phrase "at any time" plainly includes all future editions of the codes.  But subsection (d)—which governs here because the agencies never established their own standards under (a)—lacks this language.  In its place is a clear textual limit to "the revised code or standard" following the 2006 IECC or ASHRAE Standard 90.1-2004—that is, the 2009 IECC and ASHRAE Standard 90.1-2007.

Defendants' arguments to the contrary are unpersuasive.  They start by arguing that "Section 109 as a whole confirms that it allows HUD and USDA to update their standards any time after the Code Bodies update their codes."  Docket No. 39 at 17.  That's certainly true for Section 109(c), which includes the "at any time" language.  But everyone agrees that Section 109(d), not 109(c), applies here.  And Defendants provide no textual reason why Section 109(d) also allows for multiple updates.  Defendants argue that "there is no apparent reason why 'at any time' is in subsection (c) but missing from subsection (d)."  Docket No. 39 at 19.  Courts, however, should give effect to every word and every provision in a statute.  *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–79 (2012) ("[E]very word and every provision is to be given effect . . . ."); *see also, e.g.*,

*Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presumes that Congress intended a difference in meaning." (citation modified)).  And doing so here means that Section 109 allows for multiple code updates only if the agencies establish their own standards under Section 109(a) and act promptly by following the procedures set forth in Section 109(c).

Defendants also claim that Congress meant "to set a floor," not a "ceiling," by including the 2006 IECC and ASHRAE Standard 90.1-2004 in the statute.  Docket No. 39 at 20.  But the best reading of Section 109(d) is that the first revision to the 2006 IECC and ASHRAE Standard 90.1-2004 is both the floor and the ceiling when the agencies fail to act under the statute's other provisions.  That's not contrary to the "statutory policy" of Section 109, as the agencies claim.  *Id.* at 21.  It's the most natural reading of the statutory text.  This interpretation also prevents the agencies from circumventing Section 109's other provisions by using the more abbreviated procedure in Section 109(d).

In sum, Section 109(d) permitted the agencies to adopt only the first revision to the 2006 IECC and the ASHRAE Standard 90.1-2004, which occurred in the 2015 Final Determination, *see* 80 Fed. Reg. 25,901.  Because the agencies lacked the statutory authority to promulgate the 2024 Final Determination, the Court **GRANTS** Plaintiffs' motion for summary judgment on Count II and sets aside the Final

Determination under 5 U.S.C. § 706(2)(C) on this basis.  Defendants' cross-motion for summary judgment on Count II is **DENIED**.

### 2.

Count IV alleges that the Final Determination is contrary to law for an additional reason—it would reduce the availability of covered housing in violation of Section 109.  Docket No. 1 at 28–29; Docket No. 35 at 20–22.  Again, the Court agrees.

Section 109(d) states that covered housing will be subject to the revised code or standard only if HUD and USDA "make a determination that the revised codes do not negatively affect the availability or affordability of new construction of assisted housing and single family and multifamily residential housing . . . subject to mortgages insured under the National Housing Act . . . ."  42 U.S.C. § 12709(d).  The agencies have interpreted "availability" to mean "whether builders will make such housing available to consumers at the higher code level; *i.e.*, whether the higher cost per unit as a result of complying with the revised code will impact whether that unit is likely to be built or not."  89 Fed. Reg. 33,175–76.

Before issuing the Final Determination here, the agencies conducted a Regulatory Impact Analysis ("RIA") to examine the new codes' impact on the availability of affordable housing.   Docket No. 35, Ex. 59; Docket No. 38 (Administrative Record), AR-0072; 89 Fed. Reg. 33,114.  The RIA determined that the 2021 IECC would reduce the availability of new affordable-housing construction by 1.5 percent.  AR-0140.  The RIA explained:

> The current proposed update of IECC . . . requirements constitutes a more expansive impact [than the 2009 update].  The per-unit cost is

greater [under the 2021 IECC] than for the previous update [under the 2009 IECC]. For example, [the Pacific Northwest National Laboratory's ("PNNL")] estimate of the upfront incremental cost of building to the IECC 2021 from the IECC 2009 is approximately $5,500, ranging from a low upfront incremental cost of $2,800 in Climate Zone 1 to a high of $6,800 in Climate Zone 8 . . . . The geographic scope of the impact of the . . . update is also more extensive. In 2015, construction in only 16 states was affected. For [this] update, 43 states and the District of Columbia are below the 2021 IECC.[3]

AR-0138; *see also* 89 Fed. Reg. 33,176. Due in part to this increase in incremental cost, the RIA concluded that "the quantity [of new construction] would decline by 1.5 percent of the [pre-Final Determination] market activity." AR-0140.

The agencies acknowledge this conclusion, as they must. But they repeatedly claim it was "just one piece of evidence" they considered. Docket No. 39 at 23–24. The agencies contend that they "also considered builder impacts, evidence from prior code adoption, jurisdictional energy-code variability, and more." *Id.* at 24. Their argument is vague, conclusory, and difficult to follow. The Final Determination is not much better. Although the Final Determination states that "there would be no noticeable impact on the supply of housing covered by this notice," 89 Fed. Reg. 33,176, it also concludes that "the approximately 2 percent increase in construction cost would reduce the production of homes for FHA-insured borrowers by 1.5 percent," *id.* at 33,177. The rest of the analysis appears to be wishful thinking that the "demand for energy-efficient homes" will surpass the higher cost and thereby "counteract any adverse impacts on availability." 89 Fed. Reg. 33,177.

---

[3] The Final Determination revised these cost estimates to account for inflation. The average incremental cost increase as of 2023 was even higher—$7,229. Docket No. 38 (Administrative Record), AR-6987.

26

The agencies also argue that the 1.5% decrease in availability was a "most cautious estimate." Docket No. 39 at 24. But it was the agencies' *only* estimate. In the Final Determination, the agencies also state that the 1.5% decrease represents a "'worst-case' scenario" because the underlying data "does not account for any of the positive effects of energy-efficiency." 89 Fed. Reg. 33,177. Nowhere, however, do the agencies explain how such effects are supposed to counteract the higher construction costs and decreased availability of affordable housing. As one court explained in addressing similar agency guesswork, "[a]bsent some qualification, presumptions and speculations do little—if anything—to justify agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 777 (N.D. Tex. 2022) ("By using irrelevant data, Defendants again fail to articulate a rational connection between the facts found and the choice made." (internal quotations omitted)).

Because the Final Determination would decrease the availability of affordable housing, it is contrary to Section 109(d). The Court thus **GRANTS** summary judgment for Plaintiffs on Count IV and sets aside the Final Determination on this additional basis. Defendants' cross-motion for summary judgment on Count IV is **DENIED**.

### C.

Plaintiffs allege in Count III that the analysis in the Final Determination was "unreasoned, arbitrary, and capricious." Docket No. 35 at 22. As explained below, the Court finds that Plaintiffs failed to carry their burden on this count.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (alterations in original)).

To decide whether agency action is arbitrary and capricious, courts begin by asking whether "an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (citation omitted). The second question is whether the agency's reasoning "fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Cntr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021); *see also Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) ("[The] court must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." (quotation omitted)). The scope of this review is "narrow," and courts "must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *Wages & White Lion Invs., L.L.C.*, 604 U.S. at 567.

Critically, "an agency cannot simply ignore an important aspect of the problem." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 293 (2024) (internal quotations omitted).

Plaintiffs primarily complain that the agencies used the Pacific Northwest National Laboratory's ("PNNL") model to determine whether the 2021 IECC would negatively affect the availability or affordability of new construction. Docket No. 35 at 22–23. Plaintiffs contend that the agencies should have instead used a model proposed by Plaintiff National Association of Home Builders ("NAHB"). *Id.* But the agencies squarely addressed this issue in the Final Determination. 89 Fed. Reg. 33,133–34. According to the agencies, the PNNL model "was developed with a methodology that underwent a rigorous public comment and peer review process [and] has been used for cost-benefit analysis of the revised editions of the IECC and ASHRAE since the 2006 IECC." 89 Fed. Reg. 33,134. The model proposed by NAHB, in contrast, was based on "independent, third-party studies that include additional data and analysis but is not peer reviewed" and did not "follow a federally approved methodology." *Id.* Other than pointing out that the two models are different, Plaintiffs fail to explain why the agencies' decision to rely on the PNNL model failed to account for relevant factors or evinced a clear error of judgment. *See Texas v. United States*, 40 F.4th at 226.

The remainder of Plaintiffs' argument is less than clear, but it appears to be other ways of arguing that the agencies should have used NAHB's model, not PNNL's. For example, Plaintiffs say that PNNL's model assumed an overhead and profit margin of 15%, but should have instead used a margin of 19%. Docket No. 35 at 26.

29

As evidence, Plaintiffs cite NAHB's model, which in turn cites a study prepared by NAHB in 2019 that is not in the record.  Docket No. 35 at 26.  In any event, the agencies addressed overhead and profit in the Final Determination, 89 Fed. Reg. 33,134–35, and explained in their brief that the PNNL model used 15% for overhead and profit because it relied on a more extensive set of data than NAHB's model, Docket No. 39 at 27–28.  Plaintiffs fail to demonstrate how this decision was clear error.

Finally, Plaintiffs contend that PNNL's model used a "simple, non-representative box-style home" for modeling insulation costs when it should have used the home style from NAHB's model.  Docket No. 35 at 27–29.  The agencies' articulated reason for relying on this shape—that it better represents the majority of new residential building construction stock in the United States (RIA at 128)—is reasonable and reasonably explained, which is all the APA requires.  Docket No. 39 at 28; *see Texas v. United States*, 40 F.4th at 226.

In sum, Plaintiffs fail to show how the agencies' decision to rely on the PNNL model was arbitrary and capricious under the APA.  Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment on Count III and **GRANTS** Defendants' cross-motion.

## IV.

The Court **DENIES** Defendants' motion to dismiss (Docket No. 32).

The Court **GRANTS-in-part** Plaintiffs' motion for summary judgment (Docket No. 35), enters judgment for Plaintiffs on on Counts II and IV, and **SETS ASIDE AND VACATES the 2024 Final Determination**.

The Court **GRANTS-in-part** Defendants' cross-motion for summary judgment (Docket No. 39) and **DISMISSES** Counts I and III.

All other pending motions are **DENIED as moot**.  All other relief not expressly granted herein is hereby **DENIED**.

So **ORDERED** and **SIGNED** this **5th**  day of **March, 2026.**

_____
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE